## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

COMMITTEE ON THE JUDICIARY,
UNITED STATES HOUSE OF
REPRESENTATIVES,

2138 Rayburn House Office Building
Washington, D.C. 20515,

*Plaintiff*,

v.

MERRICK GARLAND, in his official
capacity as Attorney General of the United
States,

950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530,

*Defendant*.

Case No.  1:24-cv-1911

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Committee on the Judiciary of the United States House of Representatives

(Judiciary Committee or Committee) brings this civil action against Defendant Merrick Garland

to enforce a duly authorized, issued, and served Congressional subpoena (Subpoena) to Garland,

which is attached as Exhibit A.  The Judiciary Committee alleges as follows:

### INTRODUCTION

1.       This dispute is principally about a frivolous assertion of executive privilege.  As

part of its oversight investigation into the Department of Justice's (DOJ) commitment to

impartial justice and its impeachment inquiry into President Joseph Biden, the Judiciary

Committee issued a Subpoena to Attorney General Merrick Garland to obtain records related to

Special Counsel Robert Hur's investigation of President Biden's mishandling of classified documents.  Among other things, the Committee sought materials related to the Special Counsel's interviews with President Biden and Mark Zwonitzer, the ghostwriter of President Biden's 2017 memoir.

2.      While DOJ has provided the Committee with transcripts of those interviews, transcripts that the Executive Branch has released publicly, Attorney General Garland has refused to produce the audio recordings of the Special Counsel's interviews with President Biden and Mr. Zwonitzer.  Instead, Attorney General Garland asked that President Biden assert executive privilege over those recordings, and President Biden complied with that request.

3.      Audio recordings are better evidence than transcripts of what happened during the Special Counsel's interviews with President Biden and Mr. Zwonitzer.  For example, they contain verbal and nonverbal context that is missing from a cold transcript.  That verbal and nonverbal context is quite important here because the Special Counsel relied on the way that President Biden presented himself during their interview—"as a sympathetic, well-meaning, elderly man with a poor memory"[1]—when ultimately recommending that President Biden should not be prosecuted for unlawfully retaining and disclosing classified information.  The audio recordings, not the cold transcripts, are the best available evidence of how President Biden presented himself during the interview.  The Committee thus needs those recordings to assess the Special Counsel's characterization of the President, which he and White House lawyers have forcefully disputed, and ultimate recommendation that President Biden should not be prosecuted.

---

[1] Robert K. Hur, *Report on the Investigation Into Unauthorized Removal, Retention, and Disclosure of Classified Documents Discovered at Locations Including the Penn Biden Center and the Delaware Private Residence of President Joseph R. Biden, Jr.* 6 (Feb. 2024) (Report), https://perma.cc/X5MV-RU8J

4.      President Biden's self-serving attempt to shield the audio recording of his interview with the Special Counsel while publicly releasing a transcript of that same interview represents an astonishing effort to expand the scope of executive privilege from a constitutional privilege safeguarding certain substantive communications to an amorphous privilege that can be molded to protect things like voice inflection, tone, and pace of speech. Any privilege that could conceivably apply to President Biden's interview with the Special Counsel was waived when the Executive Branch released a transcript of that interview to the press and produced that transcript to the Committee. And any privilege that could conceivably apply to the Special Counsel's interview with Mr. Zwonitzer was waived when the Executive Branch produced a transcript of that interview to the Committee and released that transcript in response to a Freedom of Information Act (FOIA) request.

5.      Additionally, the heart of the privilege claim—that Executive Branch employees will be less likely to cooperate with DOJ investigations if they know that audio recordings of their interviews may be released to Congress *after DOJ has made transcripts of those same interviews publicly available*—is at odds with common sense. If the potential for disclosure would chill cooperation, it would be the disclosure of a transcript, which DOJ voluntarily disclosed here, not the disclosure of audio recordings after the transcripts are widely available.

6.      For these reasons and the others set forth below, President Biden's invocation of executive privilege lacks any merit. The Committee therefore asks this Court to overrule the assertion of executive privilege and order that Attorney General Garland produce the audio recordings of the Special Counsel's interviews with President Biden and Mr. Zwonitzer to the Committee.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331.  This case arises under

Article I of the Constitution of the United States and implicates Article I, Section 1, which vests

"[a]ll legislative Powers" in the Congress of the United States, and Article 1, Section 2, Clause 5,

which provides the House of Representatives with "the sole Power of Impeachment."

8.      This Court has authority to issue a declaratory judgment and order other just and

proper relief pursuant to 28 U.S.C. §§ 2201(a) and 2202.

9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1), 1391(b)(2), and

1391(e)(1).

## PARTIES

10.      Plaintiff Committee on the Judiciary of the United States House of

Representatives is a standing committee of the House that, among other duties, conducts

oversight of DOJ.

11.      Defendant Merrick Garland serves as the Attorney General of the United States.

## ALLEGATIONS

**I.      The Committee's constitutional authority to conduct investigations, including an
impeachment inquiry, and to issue subpoenas to advance its investigations**

12.      Article I of the Constitution vests Congress with "[a]ll legislative Powers."[2]

Those powers include the authority to investigate matters relating to subjects within its broad

legislative purview; conduct oversight of Executive Branch agencies; examine whether

Executive Branch agencies are faithfully, effectively, and efficiently executing the laws; and

determine whether changes to federal law are necessary and proper.  For nearly a century, the

---

[2] U.S. Const. art. I, § 1, cl. 1.

Supreme Court has recognized that the Constitution vests the House with the "power of inquiry—with process to enforce it"—commensurate with the House's Article I legislative authority to investigate any subject on which "legislation could be had."[3]

13.     The Constitution commits to each chamber of Congress the authority to "determine the Rules of its Proceedings."[4]  Pursuant to this authority, the 118th House of Representatives adopted the Rules of the House of Representatives (House Rules) to govern itself during the current Congress.[5]  The House Rules establish various standing committees, including the Judiciary Committee, and delegate to each committee "jurisdiction and related functions."[6]

14.     The Judiciary Committee's legislative and oversight jurisdiction includes, among other subjects, "judicial proceedings, civil and criminal," as well as "[c]riminal law enforcement and criminalization."[7]  Thus, the Judiciary Committee exercises jurisdiction (among other matters) over legislation relating to criminal proceedings and law enforcement matters. The House Rules further mandate that "[a]ll bills, resolutions, and other matters relating to" subjects within the Judiciary Committee's jurisdiction be referred to the Judiciary Committee for its consideration.[8]

---

[3] *McGrain v. Daugherty*, 273 U.S. 135, 174, 177 (1927).

[4] U.S. Const. art. I, § 5, cl. 2.

[5] *See* H. Res. 5, 118th Cong. § 1 (2023) (adopting House Rules for the 118th Congress), https://perma.cc/28AM-XD4R; *see also* House Rules, 118th Congress (Jan. 10, 2023), https://perma.cc/3UX4-2YG5.

[6] House Rule X.1.

[7] House Rule X.1(*l*)(1), (7).

[8] House Rule X.1.

15.     As a standing committee, the Judiciary Committee also has "general oversight responsibilities," including regarding the "operation of Federal agencies and entities" within its areas of jurisdiction.[9]  As such, the Judiciary Committee exercises oversight of the structure and functions of DOJ.[10]  Among other responsibilities, the Judiciary Committee is charged with reviewing "on a continuing basis … the application, administration, execution, and effectiveness of laws and programs … within its jurisdiction."[11]  The Judiciary Committee must determine whether such laws are being "implemented and carried out in accordance with the intent of Congress" and if there are "any conditions or circumstances that may indicate the necessity or desirability of enacting new or additional legislation."[12]

16.     The House Rules empower all standing committees, including the Judiciary Committee, to "conduct at any time such investigations and studies as it considers necessary or appropriate in the exercise of its responsibilities" over matters within its jurisdiction.[13]  To aid these inquiries, the Judiciary Committee, like all standing committees, is authorized to issue subpoenas for testimony and records.[14]

---

[9] House Rule X.2(a), (b)(1)(B).

[10] *See, e.g.*, *Oversight of DOJ: Hearing Before the H. Comm. on the Judiciary*, 118th Cong. (June 4, 2024) (oversight hearing conducted with Attorney General Merrick Garland appearing as a witness), https://perma.cc/M7WE-2JC3.

[11] House Rule X.2(b)(1)(A).

[12] House Rule X.2(b)(1)(C).

[13] House Rule XI.1(b)(1).

[14] *See* House Rule XI.2(m)(1)(B), (3)(A)(i); *see also* Rule IV(a), Rules of the Committee on the Judiciary of the U.S. House of Representatives, 118th Cong. (2023) (Judiciary Committee Rules) ("A subpoena may be authorized and issued by the Chair, in accordance with clause 2(m) of rule XI of the House of Representatives, in the conduct of any investigation or activity or

17.     Separate from Congress's legislative authority, the power of impeachment is textually committed by the Constitution to the House and the House alone.[15]  This power is far-reaching.  Indeed, in "an impeachment investigation involving the President of the United States[,] [i]t would be difficult to conceive of a more compelling need than that of this country for an unswervingly fair inquiry based on all the pertinent information."[16]  Even prior presidents have admitted that an impeachment inquiry "would penetrate into the most secret recesses of the Executive Departments" and would include the authority to "command the attendance of any and every agent of the Government, and compel them to produce all papers, public or private, official or unofficial, and to testify on oath to all facts within their knowledge."[17]

18.     The Committee's jurisdiction includes impeachment.[18]  Resolutions that call for the impeachment of officials are normally referred by the Speaker of the House to the

---

series of investigations or activities within the jurisdiction of the Committee, following consultation with the Ranking Minority Member."), https://perma.cc/6UUS-LYEH.

[15] U.S. Const. art. I, § 2, cl. 5 ("The House of Representatives … shall have the sole power of impeachment.").

[16] *In re Rep. & Recommendation of June 5, 1972*, 370 F. Supp. 1219, 1230 (D.D.C. 1974).

[17] 4 J. Richardson, *A Compilation of the Messages and Papers of the Presidents*, H. Misc. Doc. 53-210, at 434 (1897) (statement of President James K. Polk), https://perma.cc/82XR-DWJ2.

[18] *Constitution, Jefferson's Manual, and Rules of the House of Representatives of the United States*, H. Doc. 117-161, § 605, at 329 (2023) ("[R]esolutions … that directly call for the impeachment of an officer have been referred to the Committee on the Judiciary …."), https://perma.cc/6JDB-H6C3.  As *Jefferson's Manual* explains, "[i]n the House various events have been credited with setting an impeachment in motion," including "charges made on the floor;" "a resolution introduced by a Member and referred to a committee;" or "facts developed and reported by an investigating committee of the House."  *Id.* § 603, at 327.

Committee[19] and are eligible for consideration pursuant to applicable House and Committee Rules.[20]

19.     On September 12, 2023, Speaker Kevin McCarthy directed the Judiciary Committee, among other committees, to open a formal impeachment inquiry into President Joseph Biden.[21]  The scope of the inquiry includes whether President Biden has abused his office of public trust to enrich himself or his family, including in connection with his family's business dealings with foreign parties.[22]  On December 13, 2023, the House adopted House Resolution 918,[23] which directed three committees, including the Judiciary Committee, "to continue their ongoing investigations as part of the House of Representatives inquiry into whether sufficient grounds exist for the House of Representatives to exercise its Constitutional power to impeach Joseph Biden, President of the United States of America."[24]  The full House has also confirmed

---

[19] *See, e.g.*, 169 Cong. Rec. H2809 (daily ed. June 12, 2023) (referring to the Judiciary Committee House Resolution 493, setting forth articles of impeachment against President Biden), https://perma.cc/CA8S-BXDJ; 169 Cong. Rec. H4181 (daily ed. Aug. 11, 2023) (referring to the Judiciary Committee House Resolution 652, setting forth articles of impeachment against President Biden), https://perma.cc/8GM8-JXBF; 162 Cong. Rec. H4926 (daily ed. July 13, 2016) (referring to the Judiciary Committee House Resolution 828, setting forth articles of impeachment against John Andrew Koskinen, Commissioner of the IRS), https://perma.cc/D22N-YEMN; 133 Cong. Rec. 6522 (1987) (referring to the Judiciary Committee House Resolution 128, setting forth articles of impeachment against Judge Alcee Hastings), https://perma.cc/TV7V-JXVK.

[20] *See* House Rule XI.2(b), (c)(1); *see also* Judiciary Committee Rule II(c)**.**

[21] Memorandum from Rep. James Comer, Chairman, H. Comm. on Oversight & Accountability, et al., to Members of the H. Comm. on Oversight & Accountability, et al., at 2 (Sept. 27, 2023) (Impeachment Memorandum) (attached as Ex. B).

[22] *See id.* at 27-28.

[23] 169 Cong. Rec. H6922-23 (daily ed. Dec. 13, 2023), https://perma.cc/ATQ9-27VV.

[24] H. Res. 918, 118th Cong. (2023), https://perma.cc/69QX-U332.

that the Committee has the "authority to issue subpoenas … [to] further[] the impeachment inquiry."[25]

## II. The Judiciary Committee's ongoing oversight of DOJ's commitment to impartial justice

### A. DOJ's investigation of President Biden's mishandling of classified information

20.     On November 2, 2022, President Biden's personal counsel discovered boxes containing documents with classification markings, dating from when he was Vice President, in an office that he previously used at the Penn Biden Center in Washington, D.C.[26]  The boxes and documents were retrieved by the National Archives, and upon review, archivists found documents that were classified up to the Top Secret level and included codes indicating that some of this material constituted Sensitive Compartmented Information.[27]  The National Archives then informed DOJ and the Office of the Director of National Intelligence about the discovery of these classified records.[28]  On November 14, 2022, Attorney General Garland assigned John Lausch, then the U.S. Attorney for the Northern District of Illinois, to investigate the matter to determine whether a Special Counsel should be appointed to oversee the investigation.[29]

---

[25] *Id.* § 6 (adopting House Resolution 917); H. Res. 917, 118th Cong. § 2 (2023) (confirming subpoena authority), https://perma.cc/B3JT-WEZT.

[26] Report at 19.

[27] *Id.* at 19-20.

[28] *Id.* at 20.

[29] *Id.* at 21.

21.     On December 20, 2022, personal counsel for President Biden discovered additional classified documents, this time in two separate locations in the garage of President Biden's Wilmington, Delaware home.[30]  Lausch was notified of the discovery, and FBI agents retrieved the documents.[31]  On January 11, 2023, personal counsel for President Biden found another document with classification markings, this time in a notebook located in the basement den of the President's Wilmington home.[32]  Lausch was notified the next day, and the FBI eventually collected two classified documents related to Afghanistan and Iraq from that notebook.[33]  Shortly thereafter, an attorney from the White House Counsel's Office provided the FBI with the notebook.[34]

22.     That same day, January 12, Attorney General Garland appointed Robert K. Hur as Special Counsel.[35]  Garland's order authorized Hur to continue Lausch's investigation, "including [into] possible unauthorized removal and retention of classified documents or other records discovered at the Penn Biden Center for Diplomacy and Global Engagement and the Wilmington, Delaware, private residence of President Joseph R. Biden, Jr., as well as any matters that arose from the initial investigation or may arise directly from the Special Counsel's

---

[30] *Id.* at 22-23.

[31] *Id.* at 23.

[32] *Id.* at 24-25.

[33] *Id.* at 25.

[34] *Id.*

[35] Off. Att'y Gen., DOJ, Order No. 5588-2023, *Appointment of Robert K. Hur as Special Counsel* (Jan. 12, 2023) (attached as Ex. C).

investigation or that are within the scope of 28 C.F.R. § 600.4(a)."[36]  Hur was also authorized to prosecute federal crimes arising from his investigation into these matters.[37]

23.     During Special Counsel Hur's investigation, FBI agents found additional classified documents in President's Biden's home and within his Senate papers at the University of Delaware.[38]

24.     The Special Counsel and his team conducted 173 interviews of 147 witnesses.[39] These witnesses included President Biden, as well as Mark Zwonitzer, the ghostwriter for the President's 2017 memoir, *Promise Me, Dad*.[40]

25.     The Special Counsel and his team also listened to audio recordings Zwonitzer made of his interviews with the President as he was ghostwriting the memoir.[41]  Zwonitzer had deleted digital audio recordings of his conversations with President Biden, but because "[t]he recordings had significant evidentiary value," investigators recovered them from Zwonitzer's laptop and external hard drive.[42]  Indeed, the Special Counsel stated that "there is unique evidentiary value in a subject's own voice as captured on an audio recording."[43]

---

[36] *Id.* at 1.

[37] *Id.*

[38] Report at 26-28.

[39] *Id.* at 29.

[40] *Id.* at 29, 98, 336.

[41] *Id.* at 103.

[42] *Id.* at 334.

[43] *Id.* at 343.

26.     During a recorded interview with Zwonitzer in February 2017, the President, who had just left the vice presidency and at that point was renting a home in Virginia, commented that he had "just found all the classified stuff downstairs."[44]  Hur concluded that this statement was likely a reference to the same marked classified documents that FBI investigators had found in his Delaware garage in 2022.[45]  Additionally, during his recorded discussions with Zwonitzer in 2017, the President disclosed classified information to his ghostwriter by reading aloud classified passages from a notebook nearly verbatim on at least three occasions.[46]

27.     The Special Counsel's Report about his investigation was publicly released on February 8, 2024.  He concluded that while the "investigation uncovered evidence that President Biden willfully retained and disclosed classified materials after his vice presidency when he was a private citizen," "no criminal charges [were] warranted."[47]  The Report explained that this latter conclusion was based in part on the belief that "jurors would likely find reasonable doubt" that the President willfully, that is, "with intent to break the law," retained and disclosed classified information because "some jurors [would likely believe] that [the President] made an innocent mistake rather than acting willfully."[48]

28.     The Special Counsel reached this determination in part based on his analysis of how the President appeared and presented.  In fact, the Special Counsel himself stated as much when he testified in front of the Committee, explaining that he "did take into account not just the

---

[44] *Id.* at 3-4, 110-115.

[45] *Id.* at 4, 114.

[46] *Id.* at 9.

[47] *Id.* at 1.

[48] *Id.* at 4-5.

words from the cold record of the transcript, but the entire manner in living color in real time of how the President presented himself."[49]   For example, the Special Counsel's Report explained that the President "would likely present himself to a jury, as he did during [Hur's] interview of him, as a sympathetic, well-meaning, elderly man with a poor memory."[50]   In the President's own recorded interview with the Special Counsel, the Special Counsel noted that the President's memory "appeared hazy."[51]   For example, Hur noted that President Biden "did not remember when he was vice president," forgetting both when his term as vice president began and ended.[52] As a result, the Special Counsel believed that a reasonable juror could believe that the President lacked the required mens rea, willfulness, to support a conviction.

29.     In transmitting the Special Counsel's Report, the Attorney General notified the Committee of the President's decision "not to assert executive privilege over any part of the report or its appendices."[53]   Further, the Report does not include any redactions.

30.     President Biden has disputed the Special Counsel's subjective interpretation of how he presented himself.   Three days before the Report was publicly released, President Biden's attorneys sent a letter to the Special Counsel attacking the "highly prejudicial language"

---

[49] *Hearing on the Report of Special Counsel Robert K. Hur: Before the H. Comm. on the Judiciary*, 118th Cong. 50 (Mar. 12, 2024) (statement of Special Counsel Hur) (Special Counsel Hearing Transcript) (attached as Ex. D).

[50] Report at 6.

[51] *Id.* at 208.

[52] *Id.*

[53] Letter from Merrick Garland, Att'y Gen., DOJ, to Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary, et al. (Feb. 8, 2024) (attached as Ex. E).

the report used to describe the President's memory.[54]  The letter disputes that the President's memory was "hazy," and instead asserts that the President offered "detailed recollections across a wide range of questions."[55]  The day before the Report was released, President Biden's attorneys sent another letter to DOJ, again disputing the Report's "critical comments about the President's memory."[56]  Hours after the Report was released, President Biden told the nation at a press conference: "[M]y memory is fine."[57]  Finally, on February 12, President Biden's attorneys sent yet another letter to DOJ excoriating the Special Counsel's Report for its "repeated unnecessary, inflammatory, and prejudicial statements," about "the quality of the President's memory in sweeping, quasi-medical terms."[58]

### B.    The Committee conducts oversight and attempts to obtain relevant investigatory materials voluntarily from DOJ

31.    Throughout the 118th Congress, the Committee has pursued a sustained effort to oversee the Executive Branch's commitment to impartial justice.  Since early 2023, the Committee has been conducting oversight of DOJ's activities with the aim of ensuring that DOJ's operations are consistent with its mission.  One aspect of the Committee's oversight has

---

[54] Letter from Richard Sauber, Special Couns. to the President, et al., to Robert K. Hur, Special Couns., et al., DOJ, at 1 (Feb. 5, 2024) (attached as Ex. F).

[55] *Id.* at 1-2.

[56] Letter from Edward N. Siskel, Assistant to the President & White House Couns., et al., to Merrick Garland, Att'y Gen., DOJ, at 2-3 (Feb. 7, 2024) (Siskel to Garland Feb. 7, 2024 Letter) (attached as Ex. G).

[57] *Remarks in the Diplomatic Reception Room*, White House (Feb. 8, 2024), https://perma.cc/X6KC-Z4WL.

[58] Letter from Richard Sauber, Special Couns. to the President, et al., to Bradley Weinsheimer, Assoc. Deputy Att'y Gen., DOJ, at 3-4 (Feb. 12, 2024) (Sauber to Weinsheimer Feb. 12, 2024 Letter) (attached as Ex. H).

focused on "the politicization of criminal investigations and prosecutorial decisions."[59]  For example, the Committee has conducted oversight of Special Counsel Jack Smith's investigation of President Donald Trump for retaining classified documents to determine whether it was being handled in a manner consistent with the Department's commitment to impartial justice.[60]  For the same reason, the Committee moved quickly to investigate the circumstances surrounding the appointment of Special Counsel Hur and his investigation generally.

32.     On January 13, 2023, the day after the Attorney General appointed the Special Counsel, the Committee wrote to DOJ regarding its "oversight of the Justice Department's actions with respect to former Vice President Biden's mishandling of classified documents," seeking documents related to the Special Counsel's appointment, the selection of Lausch to conduct the initial investigation, and President Biden's retention of classified documents more generally.[61]

33.     After the release of the Special Counsel's Report, the Committee ramped up its investigation.  On February 12, 2024, the Committee, along with the other two impeachment committees, requested from DOJ a specific set of materials relevant to the Special Counsel's Report to inform its ongoing oversight of DOJ's commitment to impartial justice—the same four categories of documents it would later be forced to seek via subpoena, including all audio

---

[59] Authorization and Oversight Plans for All House Committees, H. Rep. No. 118-36, at 128 (2023), https://perma.cc/ARW9-J8GV.

[60] *See, e.g.*, Letter from Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary, to Jack Smith, Special Couns., DOJ (Sep. 7, 2023) (attached as Ex. I).

[61] *See generally* Letter from Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary, et al., to Merrick Garland, Att'y Gen., DOJ (Jan. 13, 2023) (attached as Ex. J).

recordings of the Special Counsel's interview with President Biden.[62]  The requested materials

were:

a.   All documents and communications, including audio and video recordings,
related to Special Counsel Robert Hur's interview of President Joseph R. Biden,
Jr.;

b.   All documents and communications, including audio and video recordings,
related to Special Counsel Hur's interview of Mr. Mark Zwonitzer;

c.   The documents identified as "A9" and "A10" in Appendix A of the Special
Counsel's Report, which related to Vice President Biden's December 11, 2015 call
with then-Ukrainian Prime Minister Arseniy Yatsenyuk; and

d.   All communications between or among representatives of DOJ, including the
Office of the Special Counsel, the Executive Office of the President, and
President Biden's personal counsel referring or relating to the Special Counsel's
Report.[63]

34.   DOJ responded on February 16, 2024, informing the Committee that several of

the requested records required review to assess classification, national defense, confidentiality,

and privacy interests.[64]  DOJ neither offered a timeframe by which it expected to produce

responsive documents nor committed to produce all the material requested.

**C.   The Committee issues the Subpoena, and Attorney General Garland defies it**

35.   On February 27, 2024, the Committee issued the Subpoena for records to

Attorney General Garland that is the subject of this suit.[65]  The Committee explained that it

---

[62] Letter from Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary, et al., to Merrick
Garland, Att'y Gen., DOJ, at 3 (Feb. 12, 2024) (Jordan to Garland Feb. 12, 2024 Letter)
(attached as Ex. K).

[63] *Id.*

[64] Letter from Carlos Uriarte, Asst. Att'y Gen., DOJ, to Rep. Jim Jordan, Chairman, H.
Comm. on the Judiciary, et al., at 2 (Feb. 16, 2024) (attached as Ex. L).

[65] Ex. A (Subpoena).  The same day, the Committee on Oversight and Accountability of
the U.S. House of Representatives (Oversight Committee) issued a subpoena for the same

required the subpoenaed materials "for its ongoing oversight of the Department's commitment to impartial justice" and as part of its efforts "to consider potential legislative reforms to [DOJ] and its use of a special counsel to conduct investigations of current and former Presidents of the United States."[66]  The Committee also stated that these materials were directly relevant to its impeachment inquiry.[67]  The Committee offered to review any classified materials separately from other materials, while adding that it believed most of the subpoenaed information was not classified.[68]

36.     The Subpoena specifically required Attorney General Garland to produce the same four categories of documents requested in the Committee's February 12, 2024, letter by March 7, 2024. [69]

37.     The Subpoena further notified the Attorney General that, in the event a document were withheld on the basis of privilege, he would be required to provide a privilege log detailing certain information about the document and the basis for the privilege assertion.[70]

---

materials.  *See* Press Release, H. Comm. on Oversight & Accountability, *Chairman Comer and Jordan Subpoena DOJ for Special Counsel Hur Investigation Documents* (Feb. 27, 2024), https://perma.cc/6BU2-HX4H.

[66] Letter from Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary, et al., to Merrick Garland, Att'y Gen., DOJ, at 2 (Feb. 27, 2024) (Jordan to Garland Feb. 27, 2024 Letter) (attached as Ex. M).

[67] *See id.*

[68] *See id.* at 2-3.

[69] Ex. A (Subpoena) at Schedule A.

[70] *Id.* at Instructions (page 4, number 17).

38.     On March 7, 2024, DOJ provided its initial response to the Subpoena on the Attorney General's behalf.[71]  Claiming to "supplement[]" its nearly substance-free February 16 letter, DOJ informed the Committee that it would permit review of the two classified documents referenced in Paragraph 3 of the Subpoena *in camera*, an offer the Committee quickly accepted.[72]  DOJ also produced six communications responsive to Paragraph 4 of the Subpoena.[73]

39.     However, DOJ offered a spate of vague reasons for why it needed more time to review the other responsive materials, including the classification, confidentiality, and privacy interests it had previously noted.  DOJ also mentioned the need to protect internal deliberations about prosecutorial decisions and investigative steps and stated that some of the subpoenaed information may be "subject to other privileges and Executive Branch confidentiality interests," but did not actually assert any privilege over any of the subpoenaed materials.[74]

40.     By March 9, 2024, the Committee still had not received all the subpoenaed records.  Accordingly, it extended the deadline for a complete production of responsive materials to March 11, 2024.[75]

---

[71] Letter from Carlos Uriarte, Asst. Att'y Gen., DOJ, to Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary, at 1 (Mar. 7, 2024) (Uriarte to Jordan Mar. 7, 2024 Letter) (attached as Ex. N).

[72] *Id.*; E-mail from Greta Gao, Off. of Legis. Affs., DOJ, to Stephen Castor, Gen. Couns., H. Comm. on the Judiciary, et al. (Mar. 8, 2024, 12:24 PM) (attached as Ex. O).

[73] *See* Ex. N (Uriarte to Jordan Mar. 7, 2024 Letter) at 3.

[74] *Id.* at 2-3.

[75] Letter from Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary, et al., to Merrick Garland, Att'y Gen., DOJ, at 1 (Mar. 9, 2024) (attached as Ex. P).

41.    On March 12, 2024, a little more than two hours before a Committee hearing with Special Counsel Hur, DOJ produced two redacted transcripts of the Special Counsel's interviews with President Biden to the Committee.[76]  Before the Committee received these transcripts, they had already been provided to reporters.  (It has been reported that DOJ later released a redacted transcript of Special Counsel Hur's interview with Zwonitzer to a reporter, pursuant to a Freedom of Information Act request.[77])  DOJ did not produce the audio recordings of these interviews as the Subpoena required.

42.    During the Committee's March 12 hearing, Committee members questioned the Special Counsel about his conclusions and how he went about his investigation.  At the hearing, the Special Counsel acknowledged that, for his decision to be credible, "[t]he need to show my work was especially strong here."[78]  He explained that his decision was based on "not only the words in the cold record of the transcript of the interview," but also the "President's overall demeanor," including "the fact that he was prompted on numerous occasions by the members of the White House Counsel's office."[79]

43.    On March 25, 2024, the Committee once again extended the deadline for a complete production of responsive materials, this time to April 8, 2024.[80]  On April 8, DOJ

---

[76] *See* Letter from Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary, et al., to Merrick Garland, Att'y Gen., DOJ, at 2 (Mar. 25, 2024) (Jordan to Garland Mar. 25, 2024 Letter) (attached as Ex. Q).

[77] Jason Leopold, *New Transcript Details Biden's Handling of Classified Records*, Bloomberg News (June 13, 2024, 9:46 AM) (attached as Ex. R).

[78] Ex. D (Special Counsel Hearing Transcript) at 7-8.

[79] *Id.* at 65.

[80] Ex. Q (Jordan to Garland Mar. 25, 2024 Letter) at 2.

produced a transcript of the Special Counsel's interview with Zwonitzer.[81]  But DOJ's response also made clear that it would not produce all of the subpoenaed materials, including the audio recordings of the Special Counsel's interviews with President Biden and Zwonitzer.  DOJ justified the Attorney General's refusal to comply with the Subpoena by labeling the outstanding requests as political in nature and contending that they only sought cumulative information.[82]  It further argued that withholding the audio recordings from the Committee would promote voluntary witness cooperation with future special counsel investigations.[83]  It reiterated that the President had decided "not to assert executive privilege over the report or his interview transcript."[84]  Before deciding to produce that information to the Committee, DOJ had considered the relevant "protections for privacy, security, law enforcement, and Executive Branch confidentiality interests."[85]

44.     On April 15, 2024, the Committee, working with the Oversight Committee, made one final attempt to obtain the subpoenaed information without resorting to a lawsuit or contempt proceedings.  It sent a letter to DOJ explaining its rationale for requesting the materials and addressing how DOJ had waived any privilege over the audio recordings of the interviews when

---

[81] Letter from Carlos Uriarte, Asst. Att'y Gen., DOJ, to Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary, et al., at 1 (Apr. 8, 2024) (attached as Ex. S).

[82] *Id.* at 3-4.

[83] *Id.* at 5.

[84] *Id.* at 4.

[85] *Id.* at 5.

it released the transcripts of those same interviews to the press.[86]  The Committee explained that it needed the audio recordings because they offer unique and invaluable insight about information that cannot be captured in a transcript, such as vocal tone, pace, inflections, verbal nuance, and other idiosyncrasies.[87]  In a final accommodation, the Committee offered to allow a complete production of materials by April 25, 2024.[88]

45.     The day of that deadline, DOJ responded on the Attorney General's behalf with a letter explaining why he would not be producing any additional records to the Committee.[89]  In short, DOJ quibbled with the Committee's reasons for seeking the materials, incorrectly asserting that DOJ had provided the Committee with information sufficient to "know why [the Special Counsel] made [his] determinations."[90]

46.     Notwithstanding the fact that the Special Counsel investigation was closed and DOJ had disclosed the Report and interview transcripts, DOJ refused to produce the audio recordings due to a generalized risk of harm to prosecutorial decision-making, the privacy interests of witnesses and uncharged parties, and the purported need to protect investigatory sources and methods.[91]  Even though DOJ had already decided not to assert executive privilege

---

[86] Letter from Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary, et al., to Merrick Garland, Att'y Gen., DOJ (Apr. 15, 2024) (Jordan to Garland Apr. 15, 2024 Letter) (attached as Ex. T).

[87] *Id.* at 3.

[88] *Id.* at 4.

[89] *See generally* Letter from Carlos Uriarte, Asst. Att'y Gen. DOJ, to Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary, et al. (Apr. 25, 2024) (attached as Ex. U).

[90] *Id.* at 2.

[91] *Id.* at 5.

over the interview transcripts, it resisted producing the audio recordings to avoid "undermining confidence in the Department's ability to protect sensitive law enforcement information."[92]  DOJ also claimed that it was "particularly concerned about the chilling effect of producing the specific files requested here. ...  [I]f potential witnesses expected that volunteering for an interview and allowing it to be recorded might result in the release of that recording to Congress or the public, that could dissuade them from cooperating or agreeing to be recorded."[93]

47.     DOJ relied on the vocal tone, inflections, and other idiosyncrasies in the audio recordings as a basis to not produce them to the Committee, arguing that "the privacy interest in one's voice—including tone, pauses[,] emotional reactions, and cues—is distinct from the privacy interest in a written transcript of one's conversation."[94]  DOJ also cited the "potential for misuse" of an audio recording, such as through "cutting, erasing, and splicing."[95]

### E.     President Biden asserts executive privilege over the audio recordings and other subpoenaed materials moments before the Committee meets to consider a contempt citation for Attorney General Garland

48.     Despite the Committee's repeated efforts to give the Attorney General more time to complete his production of the subpoenaed materials, the Committee and the Attorney General were at an impasse.  As a result, the Committee scheduled a public business meeting for May 16, 2024, to consider whether to recommend to the full House that Attorney General Garland be held in contempt of Congress for his refusal to comply with the Subpoena.  As of the early morning of

---

[92] *Id.* at 6.

[93] *Id.* at 6-7.

[94] *Id.* at 7.

[95] *Id.* at 7-8 (quoting *United States v. McDougal*, 103 F.3d 651, 654 (8th Cir. 1996)).

May 16, the Attorney General had not yet asserted any privilege to justify his failure to comply with the Subpoena.

49.     However, less than two hours before the meeting was scheduled to begin, the Committee received a letter from the White House conveying the President's assertion of executive privilege over the audio recordings of Special Counsel Hur's interviews with the President and Zwonitzer.[96]  DOJ also wrote to the Committee that morning, explaining that President Biden had made a protective executive privilege claim over any other materials responsive to the Subpoena that had not been produced and arguing that the disclosure of the audio recordings to the Committee would damage future law enforcement efforts.[97]  DOJ included a copy of the Attorney General's letter from the previous day, in which he had requested that the President assert executive privilege over the audio recordings and any other responsive materials that had not already been produced.[98]  Among the Attorney General's reasons for recommending that the President assert privilege, he argued that DOJ's prior disclosure of the interview transcripts did not constitute a waiver of privilege because "audio recordings have distinct features and law enforcement uses, which implicate privacy interests and risks of misuse

_____

[96] Letter from Edward N. Siskel, Assistant to the President & White House Couns., to Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary, et al., at 1 (May 16, 2024) (attached as Ex. V).

[97] Letter from Carlos Uriarte, Asst. Att'y Gen., DOJ, to Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary, et al., at 1, 2 (May 16, 2024) (Uriarte to Jordan May 16, 2024 Letter) (attached as Ex. W).

[98] Letter from Merrick Garland, Att'y Gen., DOJ, to Joseph R. Biden, Jr., President of the United States, at 1 (May 15, 2024) (Garland to Biden May 15, 2024 Letter) (attached as part of Ex. W).

to a greater degree than transcripts, and disclosure to Congress of the recordings would have a chilling effect on future cooperation in similar investigations."[99]

50.     At the meeting, the Committee marked up its report detailing the Committee's basis for seeking the subpoenaed materials, its attempts to obtain them voluntarily, and the reasons why the Attorney General's failure to comply with the Subpoena warranted a contempt citation.[100]

51.     In particular, the Committee rejected the President's executive privilege claim.[101] The Committee's Report noted that the President had waived any potential assertion of executive privilege over the information discussed in his interviews with Hur when he released the transcripts to the public and media.[102]  And while the Department could have taken steps to attempt to protect the confidentiality of the transcripts when it produced them to Congress, it chose not to do so.[103]  Furthermore, the Committee found that the privilege claim was not timely and, therefore, was invalid.[104]  Indeed, the Attorney General did not assert any privilege by March 7, 2024, the Subpoena return date, nor has he provided a privilege log of any kind since then.  Finally, even if the privilege claim had been timely and valid, the Committee determined that it had been overcome because the audio recordings were necessary to evaluate potential

---

[99] *Id.* at 7.

[100] *See generally Markup of Report Recommending that the House of Representatives Cite Attorney General Merrick Garland for Contempt of Congress: Before the H. Comm. on the Judiciary*, 118th Cong. (May 16, 2024), https://perma.cc/DN7E-VALV.

[101] *See* H. Rep. 118-527, at 10, 14-16 (2024) (attached as Ex. X).

[102] *Id.* at 14.

[103] *Id.*

[104] *Id.*

reforms to DOJ.[105]  As a result, the Committee voted 18-15 to report the Attorney General's

contumacious conduct to the full House.[106]

### F.      The House finds Attorney General Garland in contempt of Congress

52.      The House passed House Resolution 1292 on June 12, 2024, which found

Attorney General Garland in contempt of Congress in violation of 2 U.S.C. § 192, by a vote of

216-207.[107]  The Resolution provides that Attorney General Garland "shall be found to be in

contempt of Congress for failure to comply with a congressional subpoena."[108]  When it voted,

the House had before it the Committee's Report, which contained detailed information regarding

the conduct of Attorney General Garland and the facts and circumstances warranting the

contempt finding, and Dissenting Views.[109]  The Committee Report was filed with the Clerk of

the House the same day.[110]

---

[105] *See id.* at 14-15.

[106] *Id.* at 16.

[107] 170 Cong. Rec. H3970 (daily ed. June 12, 2024), https://perma.cc/SBZ9-J7WQ.  The same day, the House adopted House Resolution 1293, which found Attorney General Garland in contempt for failing to comply with the subpoena from the Oversight Committee.  H. Res. 1293, 118th Cong. (2024), https://perma.cc/P6WT-U866; H. Res. 1287, 118th Cong. § 6 (2024) (adopting House Resolution 1293 upon adoption of House Resolution 1292), https://perma.cc/J2X7-UDVM.

[108] H. Res. 1292, 118th Cong. (2024), https://perma.cc/HFQ7-MPW9.

[109] *See* 170 Cong. Rec. H3739-59 (daily ed. June 12, 2024), https://perma.cc/V6RJ-YE3W.

[110] 170 Cong. Rec. H3970-71 (daily ed. June 12, 2024), https://perma.cc/GG73-E6DH.

53.     On June 14, 2024, DOJ informed Speaker of the House Mike Johnson that it would not bring the congressional contempt citation before a grand jury or take any other action to prosecute the Attorney General.[111]

54.     Speaker Johnson certified the Committee's report to Matthew Graves, U.S. Attorney for the District of Columbia, on June 14, 2024.

55.     On June 26, 2024, Speaker Johnson called Attorney General Garland in a last-ditch attempt to find a way to resolve this dispute before the Committee filed this complaint. However, during their conversation, Attorney General Garland indicated that the matter was out of his hands because he had received a direct order from President Biden.  When the Speaker's Office then reached out to the White House, its effort to find a solution to this impasse was rebuffed.

56.     The same day, the Bipartisan Legal Advisory Group (BLAG), which is authorized by House Rules to speak for the House in litigation matters, authorized the House Office of General Counsel to initiate this suit on behalf of the Committee to enforce the Attorney General's legal obligations to comply with the Subpoena.[112]  Moreover, House Resolution 917 specifically authorizes the Committee to seek enforcement of subpoenas issued in furtherance of the impeachment inquiry.[113]

---

[111] Letter from Carlos Uriarte, Asst. Att'y Gen., DOJ, to Rep. Mike Johnson, Speaker of the House (June 14, 2024) (attached as Ex. Y).

[112] BLAG is comprised of the Honorable Mike Johnson, Speaker of the House, the Honorable Steve Scalise, Majority Leader, the Honorable Tom Emmer, Majority Whip, the Honorable Hakeem Jeffries, Minority Leader, and the Honorable Katherine Clark, Minority Whip.  *See* House Rule II.8(b).  The Speaker of the House, the Majority Leader, and the Majority Whip voted to authorize this litigation; the Minority Leader and Minority Whip did not.

[113] H. Res. 917, 118th Cong. § 4 (2023), https://perma.cc/B3JT-WEZT.

**III.    The Committee needs the audio recordings to investigate DOJ's commitment to impartial justice**

56.     The Committee needs the audio recordings—not simply the cold, incomplete transcripts—of the interviews with President Biden and Zwonitzer to fully assess for itself the Special Counsel's recommendations.  For example, the Special Counsel's conclusions hinged, in part, on his assessment of how the President presented himself, and an audio recording of an interview captures critical verbal and nonverbal context that a transcript does not.  Additionally, an audio recording will include all the words spoken during the interviews, while DOJ has admitted that the transcript of the Special Counsel's interview of President Biden is missing certain words.  The audio recordings are therefore critical to allowing the Committee to make its own complete assessment of the Special Counsel's conclusions.  That assessment, in turn, will help it decide whether legislative reforms aimed at DOJ's use of special counsels are needed (and what any reforms should look like).  It will also shed light on whether the President willfully retained the classified materials to benefit either his family (through their foreign business deals) or himself (through a book deal), which bears directly on the Committee's impeachment inquiry.

**A.    A cold transcript has limits and does not fully replicate an interview the way an audio recording does**

57.     A transcript is not a carbon copy of an oral interview and thus is undeniably inferior evidence to an audio recording.  By its nature, a transcript is an incomplete accounting of an interview; it can reflect the words uttered (although oftentimes not every single word) but not verbal context, such as tone and tenor, and nonverbal context, such as pauses.  An audio recording, by contrast, paints a more complete picture of an interview because it captures aspects of the interview that a transcript cannot and, unlike a transcript, is not manipulated by a human transcriber.

58.     DOJ readily admits that "audio recordings have distinct features."[114]  As the Special Counsel acknowledged in his Report, "there is unique evidentiary value in a subject's own voice as captured on an audio recording."[115]  When transcribing spoken words, certain aspects of the communication are lost.[116]  Transcripts do not and cannot capture emphasis, inflection, intonation, nuance, pace, pauses, pitch, rhythm, tone, and other verbal and nonverbal cues and idiosyncrasies that convey meaning to a listener.[117]  A witness communicates even when he or she hesitates, pauses, or remains silent—all of which have no replication in a transcript.[118]  These aspects of an interview provide immeasurable insight into a witness's credibility and mental state and help in evaluating and understanding a witness's answers.

59.     Research indicates that paralinguistic cues—the vocalized aspects of communication other than words—can be better deception predictors than even visual cues.[119]  For example, deceptive communications tend to be higher pitched, slower, and shorter, and they tend to include more filler words and hesitations, such as "ah," "uh," or "um."[120]  On the other

---

[114] Ex. W (Garland to Biden May 15, 2024 Letter at 7).

[115] Report at 343.

[116] Rebecca White Berch et al., *A Proposal to Amend Rule 30(b) of the Federal Rules of Civil Procedure: Cross-Disciplinary and Empirical Evidence Supporting Presumptive Use of Video to Record Depositions*, 59 Fordham L. Rev. 347, 347, 358 (1990).

[117] *Id.* at 347; Ex. T (Jordan to Garland Apr. 15, 2024 Letter) at 3; Clifford S. Fishman, *Recordings, Transcripts & Translations as Evidence*, 81 Wash. L. Rev. 473, 519 (2006).

[118] Berch, *supra* note 116, at 361 (using as an example the effect of a long pause prior to answering a question).

[119] *Id.* at 358, 365.

[120] *Id.* at 365-66.

hand, heightened volume and faster and more fluent speech, along with more narrative, rather than fragmented, responses, enhance a witness's credibility.[121]

60.     Relying solely on transcripts can "elevate the importance of the words and word order … over the communicative importance of the form."[122]  The absence of non-verbal communicative features increases the chance that a transcript fails to represent the speaker's communication accurately.[123]

61.     Because transcripts cannot capture verbal and nonverbal cues, they do not adequately capture the way that a witness gives an answer.[124]  For example, the Special Counsel noted that during Zwonitzer's interviews with President Biden, the president would "struggle" and "strain at times."[125]  These are elements that cannot be conveyed in a written transcript.  A reader thus has no way to evaluate whether the struggling and straining were due to memory lapses, evasiveness, or some other reason.

62.     Not only do transcripts fail to capture nuance and context, they can also be incomplete or inaccurate.  Although witnesses constantly manipulate the precise words they use, experts agree that nonverbal cues are generally involuntary, meaning witnesses are unable to modify their nonverbal cues.[126]  Transcripts, on the other hand, have certain shortfalls because they require a transcriber to listen to the testimony and then record what the transcriber perceived

---

[121] *Id.* at 366.

[122] *Id.* at 349.

[123] *Id.*

[124] *See id.* at 347, 349-350.

[125] Report at 207.

[126] *See* Berch, *supra* note 116, at 367.

was said.  Transcripts are thus more susceptible to unintentional modification or intentional

doctoring.[127]  This makes unedited audio recordings a much more accurate account of an

interview, capturing both the words said and how the words were expressed.  It is thus

unsurprising that, as an evidentiary matter, audio recordings control when audio recordings and

transcripts diverge.[128]

63.      That there might be discrepancies between the transcripts and audio recordings of

the interviews at issue here is not hypothetical: despite DOJ's assertions that it has "produced

unedited transcripts of the interviews to the Committees,"[129] it has admitted in an affidavit filed

in another case pending in this District that the transcripts are not, in fact, complete:

> The interview transcripts are accurate transcriptions of the words of the interview
> contained in the audio recording, except for minor instances such as the use of filler
> words (such as "um" or "uh") when speaking that are not always reflected on the
> transcripts, or when words may have been repeated when spoken (such as "I, I" or
> "and, and") but sometimes was only listed a single time in the transcripts.[130]

---

[127] *See id.* at 353.

[128] *See United States v. Nunez*, 532 F.3d 645, 651 (7th Cir. 2008) ("[T]ranscripts should
not ordinarily be given independent weight. … The jury should be instructed that it is the tape
recording itself which is the primary evidence, … and that if the jury determines that the
transcript is in any respect incorrect, it should disregard it to that extent and rely on its own
interpretation of the recording."); *United States v. Rosa*, 17 F.3d 1531, 1548 (2d Cir. 1994)
(holding that a trial court must "clearly" instruct the jury "that the transcripts themselves are not
evidence and may be used only as aids in listening to the audio tapes and as nonbinding guides
that are subject to the jurors' own assessment of the transcripts' accuracy").

[129] Ex. W (Garland to Biden May 15, 2024 Letter at 9).

[130] Decl. of Bradley Weinsheimer ¶ 14, *Citizens for Resp. & Ethics in Wash. v. DOJ*, No.
1:24-cv-00700 (D.D.C. May 31, 2024), ECF No. 32-2 (attached as Ex. Z).

64.     DOJ has also stated that the transcripts here sometimes "indicate that some words from the audio recording are indiscernible," and that in its view, "in those instances[,] the words are indiscernible."[131]

65.     But the Biden Administration has claimed before that spoken words were indiscernible when they were not.  For example, on April 24, 2024, President Biden gave a speech, which was recorded by audio and by video, where he can be seen and heard reading a teleprompter instruction to pause during the speech: "Imagine what we could do next.  Four more years, pause."[132]  However, the official transcript of the speech that the White House initially released did not reflect President Biden saying "pause"—instead the transcript used "(inaudible)" in place of "pause."[133]  This is just one example showing that transcripts often do not fully capture all words actually spoken, including President Biden's.  Others abound.[134]

---

[131] *Id.* ¶ 13.

[132] PBS NewsHour, *Biden Delivers Campaign Remarks at Construction Union Conference*, YouTube, at 25:00-25:09 (Apr. 24, 2024), https://perma.cc/9ZKS-JL79.

[133] *Compare Remarks by President Biden at the North America's Building Trades Union National Legislative Conference*, White House (Apr. 24, 2024) (original version posted and archived as of Apr. 25, 2024) ("Folks, imagine what we can do next. Four … more years (inaudible)."), https://web.archive.org/web/20240425002537/https://www.whitehouse.gov/briefing-room/speeches-remarks/2024/04/24/remarks-by-president-biden-at-the-north-americas-building-trades-unions-national-legislative-conference/, *with Remarks by President Biden at the North America's Building Trades Union National Legislative Conference*, White House (Apr. 24, 2024) (current version reflecting edits available as of June 25, 2024) (showing the word "pause" in the transcript"), https://perma.cc/7W3M-RD3F.

[134] *See, e.g.*, *Remarks by President Biden at a Campaign Event*, White House (May 19, 2024), https://perma.cc/UMN4-F227 (making several changes to President Biden's speech in official White House transcript, including correcting his claim that he served as vice president during the COVID-19 pandemic); Reagan Reese, *White House Officially Claims Biden Has Made 148 Mistakes During 2024 Public Remarks*, Daily Caller (Apr. 29, 2024, 6:30 PM) ("In several cases, official statements had to be changed to convey the exact opposite of what Biden actually said."), https://perma.cc/7BZE-3EE5.

66.     As DOJ itself admits, audio recordings "provide a mechanism … to ensure that a transcript accurately records the interviewee's testimony."[135]  The Committee agrees.  Given the inherent limits of a transcript, and the known edits to the transcript at issue here, the audio recordings are the evidence that best captures what actually transpired during the interviews.

**B.     The interviews are relevant to the Committee's investigation of whether the Special Counsel made appropriate recommendations and whether those recommendations are consistent with a commitment to impartial justice**

67.     The Committee's investigation (assessing the Special Counsel's recommendations and conclusions) depends on it having access to the best evidence of the Special Counsel's interviews.  The Committee thus needs the audio recordings.

68.     The Committee is investigating whether the Special Counsel's recommendation—that criminal charges against President Biden are not warranted even though the Special Counsel found evidence that President Biden willfully retained and disclosed classified documents—followed the facts and law without prejudice or improper influence.[136]  The Special Counsel interviewed President Biden over two days, and he relied on that interview when reaching his conclusion.  He likewise relied on his interview with Zwonitzer in evaluating President Biden's credibility and making his recommendations.  The interviews with President Biden and Zwonitzer are thus crucial to the Committee's investigation, and it cannot fairly evaluate the Special Counsel's conclusions without the audio recordings of those interviews.

69.     To determine whether criminal charges should be brought against President Biden, the Special Counsel considered, among other things, whether a jury would find that the

---

[135] Ex. W (Garland to Biden May 15, 2024 Letter at 5).

[136] *Cf. Organization, Mission and Functions Manual*, DOJ (noting that DOJ "works each day to earn the public's trust by following the facts and the law wherever they may lead, without prejudice or improper influence"), https://perma.cc/6D87-5C44.

government had proven President Biden's guilt beyond a reasonable doubt.[137]  And because the relevant charge requires a mental state of willfulness, the Special Counsel evaluated President Biden's state of mind—including his memory—and predicted how a jury would view President Biden's state of mind.[138]

70.     On that issue, the Special Counsel concluded that President Biden "is someone for whom many jurors will want to identify reasonable doubt."[139]  In the Special Counsel's view, "[i]t would be difficult to convince a jury that they should convict [President Biden]—by then a former president well into his eighties—of a serious felony that requires a mental state of willfulness."[140]  This was based, in part, on the Special Counsel's subjective view that President "Biden would likely present himself to a jury, as he did during our interview of him, as a sympathetic, well-meaning, elderly man with a poor memory."[141]

71.     The Special Counsel's assessment that the President presents as an elderly man with a poor memory was relevant to his ultimate conclusion for a number of reasons.  *First*, the

---

[137] *See, e.g.*, Report at 1, 4, 10.

[138] Ex. D (Special Counsel Hearing Transcript) at 8 ("My task was to determine whether the President retained or disclosed national defense information willfully.  That means knowingly and with the intent to do something the law forbids.  I could not make that determination without assessing the President's state of mind.  For that reason, I had to consider the President's memory and overall mental state and how a jury likely would perceive his memory and mental state in a criminal trial."); *see also* Letter from Bradley Weinsheimer, Assoc. Deputy Att'y Gen., DOJ, to Edward N. Siskel, Assistant to the President & White House Couns., et al., at 2 (Feb. 8, 2024) (explaining that the statements about President Biden's memory were "offered to explain Special Counsel Hur's conclusions about the President's state of mind in possessing and retaining classified information") (attached as Ex. AA).

[139] Report at 6.

[140] *Id.*

[141] *Id.*

Special Counsel relied on President Biden's memory when assessing whether the evidence showed that he willfully retained classified documents he found at the Virginia home.  In February 2017, while sitting at the Virginia home, President "Biden told Zwonitzer he had 'just found all the classified stuff downstairs.'"[142]  But the Special Counsel concluded "[i]t is possible" that President Biden simply forgot about the classified materials "soon after" he told Zwonitzer about finding them.[143]  The Special Counsel acknowledged that "such a swift and permanent bout of forgetfulness may seem implausible" but concluded that "several pieces of evidence"—including President Biden's memory—"provide some support for this possibility."[144]

72.     The Special Counsel also noted that President Biden was unable to remember during their interview when he served as Vice President.[145]  Moreover, President Biden's "memory appeared hazy," in the Special Counsel's view, when he described a policy debate about Afghanistan, an issue "that was once so important to him."[146]  And the Special Counsel concluded that President Biden made a "mistake[]" when he said that he disagreed with someone who was, in fact, an ally with whom President Biden had agreed while serving as Vice President.[147]  The Special Counsel concluded that these examples were evidence of the

---

[142] *Id.* at 204 (citation omitted).

[143] *Id.* at 205.

[144] *Id.* at 205, 207-08.

[145] *Id.* at 208.

[146] *Id.*

[147] *Id.*

"significant limitations" in President Biden's memory, an issue that he believed President Biden's attorneys would emphasize at trial.[148]

73.   *Second*, the Special Counsel relied on President Biden's inability to recognize documents recovered from the Penn Biden Center when concluding that there was insufficient evidence to show that President Biden willfully retained an envelope that contained classified information.  The Special Counsel concluded that President Biden's staff "unwittingly" took the envelope out of the West Wing at the end of the Obama Administration and eventually moved it to the Penn Biden Center.[149]  As support for that conclusion, the Special Counsel noted that President Biden "did not appear to recognize the documents during his interview with the special counsel."[150]

74.   *Third*, the Special Counsel pointed to President Biden's "diminished faculties in advancing age, and his sympathetic demeanor," as evidence supporting his conclusion that it would be difficult for jurors to conclude that President Biden had criminal intent when retaining his classified notebooks.[151]

---

[148] *Id.* at 207-08.  When a witness says that he or she cannot remember something, both verbal and nonverbal nuances can shed light on whether the witness truly cannot remember or is instead choosing to be less than forthcoming.  *See, e.g.*, *Roberts v. Printup*, No. 02-2333-CM, 2008 WL 2725807, at *3 (D. Kan. July 10, 2008) ("Her mannerisms and tone suggested that she remembered what was beneficial to her case, but either forgot or chose not to remember the answers to many of defense counsel's questions.  The court's impression of plaintiff was that she elected not to search her memory to answer questions for defense counsel.  This weakened her overall credibility."), *rev'd and remanded on other grounds*, 595 F.3d 1181 (10th Cir. 2010).

[149] Report at 304-05.

[150] *Id.* at 306.

[151] *Id.* at 242.

75.     Beyond influencing the Special Counsel's conclusions about whether President Biden willfully retained classified information, the Special Counsel's perception of President Biden's memory also affected his view of whether the government could prove that the President willfully disclosed national defense information to Zwonitzer.  President Biden read to Zwonitzer from notes that he took during national security meetings.[152]  The Special Counsel explained that President Biden should have realized that the notes likely contained classified information.[153]  But some jurors may have reasonable doubts, the Special Counsel concluded, because President Biden's "apparent lapses and failures" when disclosing information to Zwonitzer "will likely appear consistent with the diminished faculties and faulty memory he showed in Zwonitzer's interview recordings and in [the Special Counsel's] interview of him."[154]

76.     As these examples show and the Special Counsel himself has stated,[155] the Special Counsel relied on the way that President Biden presented during their interview to draw many of his conclusions about whether criminal charges would be appropriate.  The audio recording will give the Committee a much more complete picture of how the President presented himself than the cold transcripts and will thus allow the Committee to better assess the Special Counsel's conclusions.

77.     The Special Counsel also relied on verbal nuances in another way to reach his conclusion about whether the government could prove that President Biden possessed the necessary mental state when he retained classified materials.

---

[152] *Id.* at 244.

[153] *Id.* at 247.

[154] *Id.* at 247-48.

[155] *See, e.g.*, Ex. D (Special Counsel Hearing Transcript) at 50.

78.     The Special Counsel questioned whether the government could prove that President Biden intended to break the law because, among other things, President Biden believed the notebooks that contained classified material were his property and because other presidents have done similar things.[156]  The Special Counsel noted that President Biden was "emphatic" in making these declarations during their interview.[157]  The audio recording, unlike the transcript, will allow the Committee to hear President Biden's tone and evaluate for itself the Special Counsel's characterization .

79.     Not everyone agrees with the Special Counsel's views.  For example, a White House lawyer called the Special Counsel's statements about President Biden's memory "unsupported personal opinion."[158]  The White House Counsel himself also wrote to the Attorney General and suggested that the Special Counsel had made "[a] global and pejorative judgment on the President's powers of recollection in general."[159]  And he also pointed to one part of the report that, in his view, undermined the Special Counsel's views about President Biden's memory.[160]

80.     The objections from the White House Counsel's Office show that the Special Counsel's conclusions are open to interpretation.  And the Committee cannot meaningfully assess the Special Counsel's ultimate conclusion that criminal charges are not warranted unless it

---

[156] Report at 8, 232.

[157] *Id.* at 232.

[158] Ex. H (Sauber to Weinsheimer Feb. 12, 2024 Letter) at 3.

[159] Ex. G (Siskel to Garland Feb. 7, 2024 Letter) at 2.

[160] *Id.* at 3 (quoting from the Special Counsel's Report and arguing "[t]his is hardly the picture of a man struggling to recall events as Mr. Hur unfairly paints").

can evaluate the Special Counsel's views about (1) President Biden's memory and (2) the way that President Biden's memory would affect the government's odds of securing a conviction. Given the inherent limits of a cold transcript, the Committee needs the audio recording to do that.[161]

81.    That a different special counsel is currently prosecuting a former president and current presidential candidate for allegedly mishandling classified information makes it even more important for the Committee to fairly assess the Special Counsel's conclusion here.[162]  The Committee must assess whether the Special Counsel's divergent conclusion (that criminal charges are not warranted despite discovering evidence that President Biden willfully retained classified materials) is consistent with DOJ's commitment to following the facts and the law wherever they lead.

82.    The cold transcript will not allow the Committee to assess whether the Special Counsel's recommendations here are consistent with the other special counsel's decision to pursue charges.  The transcript does not capture nuances such as voice inflection and pace, nuances that the Special Counsel relied on when assessing the President's mental state and ultimately deciding not to recommend criminal charges.  The Committee needs access to those same nuances to evaluate the Special Counsel's recommendations.  The audio recordings, which capture those nuances and are the best evidence of what took place during the interview, are thus not cumulative of the transcript.

---

[161] *See e.g.*, *United States v. French*, 291 F.3d 945, 951 (7th Cir. 2002) (suggesting that things like "tone of voice" and "confused or nervous speech patterns"—which are not reflected in "the cold pages of an appellate record"—go to a witness's credibility (citation omitted)).

[162] *See Special Counsel Jack Smith Delivers Statement*, DOJ (June 9, 2023), https://perma.cc/74NK-LQ6U.

83.    Separately, the Committee—not DOJ, which is the focus of this oversight investigation—determines how best to execute its investigation.  Here, it has concluded that it needs the audio recordings to evaluate the Special Counsel's recommendations.  DOJ cannot second guess that conclusion and micromanage the Committee's investigation.[163]

84.    In sum, to fairly evaluate the Special Counsel's recommendations, the Committee has concluded that it must have access to the audio recording of the President's interview with the Special Counsel.  That decision—which is the Committee's to make, not DOJ's—is reasonable because the Special Counsel relied on verbal (tone) and non-verbal (pace) nuances that are not captured by the cold transcript.  The Committee is simply seeking access to that same information.

85.    The Committee also needs the audio recording of the Special Counsel's interview with Zwonitzer to, at a minimum, have a full understanding of what took place during that interview.  Indeed, DOJ has admitted that the transcript of President Biden's interview is not a carbon copy of the audio—it leaves out certain filler words and repeated words.  It is reasonable to assume the transcript of Zwonitzer's interview includes similar deviations.

86.    Beyond that, the Special Counsel assessed Zwonitzer's credibility—calling him "forthright" and crediting his explanations as "plausible[ and] innocent"[164]—which could potentially bear on President Biden's credibility.  The Special Counsel's view of Zwonitzer's credibility also factored into his decision not to bring charges against Zwonitzer for obstruction

---

[163] *Cf. Bragg v. Jordan*, 669 F. Supp. 3d 257, 271 n.9 (S.D.N.Y. 2023) ("Although [a subpoena recipient] contends that he has 'little if anything to say that will advance the purported legislative purpose,' … it is not this Court's role to prescribe the most effective manner for congressional inquiry."  (citation omitted)), *appeal dismissed sub nom. Bragg v. Pomerantz*, No. 23-615, 2023 WL 4612976 (2d Cir. Apr. 24, 2023).

[164] Report at 336, 341, 344.

of justice,[165] a decision that also bears on DOJ's commitment to impartial justice. The Committee thus needs the audio recording of Zwonitzer's interview (and the nuances the audio captures) to fully assess the Special Counsel's recommendations.

### C.   The Committee's investigation will inform its decision on whether legislative reforms to special counsel investigations are necessary, and if so, what those reforms should be

87.     The Committee is considering whether legislative reforms of DOJ and its use of special counsels are necessary. The Committee's investigation into the Special Counsel's recommendations here will help it make that decision.[166] If the Committee concludes that the Special Counsel's investigation into the sitting President did not deliver impartial justice, it may very well determine that legislative reforms are necessary to advance in the future both actual justice and the appearance of justice.

88.     But as explained above, the Committee cannot accurately evaluate the Special Counsel's recommendations unless it has access to the audio recordings of the Special Counsel's interviews with President Biden and Zwonitzer. As the Supreme Court has explained, Congress "cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change."[167]

89.     Here, if the Committee has concerns after properly assessing the Special Counsel's recommendations, it may consider legislative reforms to address those concerns. For example, the Committee could conclude that, moving forward, special counsels should have

---

[165] *See id.* at 343-44.

[166] *Cf. Watkins v. United States*, 354 U.S. 178, 187 (1957) (explaining that Congress may conduct "surveys of defects in our social, economic or political system for the purpose of enabling the Congress to remedy them").

[167] *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 504 (1975) (citation omitted).

more independence from the Attorney General or the President.  Indeed, the Committee has led previous Congressional efforts to provide such independence with the Ethics in Government Act,[168] which, among other things, created a mechanism for a three-judge panel to appoint an independent counsel when the Attorney General received specific information that certain persons, including the President, had committed a federal crime.[169]

90.     The Committee might consider reauthorizing the independent counsel statute in full, as Congress has done in the past.  The Committee could also adopt discrete aspects of the independent counsel statute that it concludes are most likely to produce impartial outcomes.  The Committee could even consider tweaking aspects of the independent counsel statute or adopting new proposals.  The Committee's investigation will inform its consideration of all potential reforms.

91.     *First*, the Committee could consider legislation that governs the way that special counsels are appointed.  Congress could, for example, follow the independent counsel statute's approach and have a three-judge panel appoint the relevant official.[170]  Or it could chart a

---

[168] *See generally* Ethics in Government Act of 1978, Pub. L. 95-521, 92 Stat. 1824 (1978) (codified as amended at 28 U.S.C. §§ 49, 591-98); *see also* H. Rep. 103-224 (1993) (describing the Judiciary Committee's consideration of legislation to reauthorize the independent counsel statute) (attached as Ex. BB); Special Counsel Act of 1999, H.R. 2083, 106th Cong. (1999) (introduced and referred to the Judiciary Committee).

[169] *See* Ethics in Government Act secs. 601-02, §§ 49, 591-93, 92 Stat. 1867-69, 1873-74. The original statutory language referred to the position as a special prosecutor.  *See, e.g.*, *id.* sec. 601, 92 Stat. 1867 (adding new chapter called "Special Prosecutor").  Congress later amended the statute and replaced the term special prosecutor with independent counsel.  Act of Jan. 3, 1983, Pub. L. 97-409, § 2(a)(1)(A), 96 Stat. 2039.  For simplicity, we refer to the position as independent counsel.

[170] *See also* Transparency in Government Act of 2021, H.R. 2055, 117th Cong. § 622(a)(3), (b)(2) (requiring a three-judge panel to appoint a special prosecutor when DOJ refuses to prosecute after the Speaker certifies a violation of 2 U.S.C. § 194).

different path and require the Attorney General to nominate a special counsel and a three-judge panel appointed by the Chief Justice to approve the nominee.  Each approach would prevent the Attorney General from unilaterally installing a special counsel, as he did here, which could create independence from the Attorney General.  Indeed, each reform could avoid a situation where a special counsel feels a sense of loyalty to the Attorney General—who singlehandedly gave him or her the job—or to the Attorney General's political party.

92.    *Second*, the Committee could explore adopting statutory removal protections for special counsels.  Indeed, bills that would have done just that have been introduced in previous Congresses.[171]  Here, the Committee could borrow from the independent counsel statute, which allowed only the Attorney General to remove the official in narrow circumstances.[172]  Or it could consider a different removal standard.[173]  Greater protections—prescribed by statute rather than by DOJ's own regulations[174]—may give future special counsels the freedom to take actions and

---

[171] *See, e.g.*, H.R. 2055, § 622(d)(1) (requiring a special counsel appointment when DOJ refuses to prosecute after the Speaker certifies a violation of 2 U.S.C. § 194 and providing that the "special counsel may be removed from office, other than by impeachment and conviction, only by the personal action of the Attorney General, and only for good cause, physical or mental disability, or any other condition that substantially impairs the performance of that special counsel's duties"); Special Counsel Independence and Integrity Act, H.R. 197, 116th Cong. § 2 (2019) ("A special counsel … may be removed only for misconduct, dereliction of duty, incapacity, conflict of interest, or other good cause, including violation of policies of the Department of Justice."); Special Counsel Independence and Integrity Act, H.R. 5476, 115th Cong. § 2(b) (2018) (same); Special Counsel Independence Protection Act, H.R. 3654, 115th Cong. § 2 (2017) ("A special counsel … may be removed only after the [three-judge] court has issued an order finding misconduct, dereliction of duty, incapacity, conflict of interest, or other good cause, including violation of policies of the Department of Justice.").

[172] Ethics in Government Act sec. 601(a), § 596(a)(1), 92 Stat. 1872.

[173] *See, e.g.*, 5 U.S.C. § 1202(d) (members of the Merit Systems Protection Board "may be removed … only for inefficiency, neglect of duty, or malfeasance in office").

[174] Based on the relevant DOJ regulation, the Attorney General could have removed this Special Counsel for reasons that neither the independent counsel statute nor the Merit Systems

make recommendations without having to worry about whether they will be removed by their political superiors, including a superior appointed by the same person they are investigating.

93.     *Third*, just as the independent counsel statute did, the Committee may consider insulating future special counsels from DOJ control.  The Special Counsel here, for example, was obligated under DOJ regulations to notify the Attorney General of certain "significant events" in his investigation.[175]

94.     In considering legislative reforms, the Committee is not limited to the independent counsel statute or deviations from it.  Congress could, for example, expand the jurisdiction of the U.S. Office of Special Counsel, which (among other things) currently investigates certain allegations of employment misconduct and enforces the Hatch Act's prohibition on political activities.  Or it could create a new agency that is similar to the U.S. Office of Special Counsel that would handle investigations into high-ranking government officials when there are allegations of criminal conduct.  A more permanent and formalized approach to the special counsel's role could bring stability and autonomy that case-by-case appointments do not and improve the public's confidence in the justice system.

95.     Finally, the Committee may conclude that legislative reforms are unnecessary at this time because the current special counsel process is working well, but it cannot make that decision until after it fully assesses the Special Counsel's recommendations.  And it needs the audio recordings to do that.

---

Protections Board statute would have permitted.  *See* 28 C.F.R. § 600.7(d) ("The Attorney General may remove a Special Counsel for misconduct, dereliction of duty, incapacity, conflict of interest, or for other good cause, including violation of Departmental policies.").

[175] *See id.* § 600.8(b).

**D.      The interviews are relevant to the impeachment inquiry**

96.      The Committee also subpoenaed the audio recordings to help it determine

whether sufficient grounds exist to draft articles of impeachment against President Biden for

consideration by the full House of Representatives.[176]

97.      Among other things, the impeachment inquiry is assessing whether President

Biden has abused his federal office to enrich himself or his family members.  The Committee

believes that the audio recordings will shed light on whether President Biden willfully retained

classified information to assist his family's business dealings with foreign nationals or companies

or to enrich himself with a book deal.

98.      *First*, the Committee is concerned that President Biden may have willfully

retained sensitive documents related to certain countries involving his family's foreign business

dealings, including Ukraine, to enrich his family, as doing so would be an abuse of his office of

public trust.[177]

99.      Evidence gathered during the impeachment inquiry raises the prospect this could

have happened.  As Vice President, Biden served as the "point man" for the Obama

Administration's anti-corruption efforts in Ukraine at the same time his son Hunter Biden served

on the board of Burisma Holdings Ltd., a Ukrainian energy company.[178]  Also, by 2015,

Ukrainian prosecutors had begun investigating the owner of Burisma for "unlawful enrichment"

---

[176] *See* Ex. X (H. Rep. 118-527) at 2; Ex. M (Jordan to Garland Feb. 27, 2024 Letter) at 1
(citing H. Res. 918, 118th Cong. (2023)); Ex. B (Impeachment Memorandum) at 1-3.

[177] *See* Ex. X (H. Rep. 118-527) at 7; Ex. K (Jordan to Garland Feb. 12, 2024 Letter) at 1;
Ex. M (Jordan to Garland Feb. 27, 2024 Letter), at 1.

[178] Alan Cullison, *Bidens in Ukraine: An Explainer*, Wall St. J. (Sept. 22, 2019, 6:03 PM)
(attached as Ex. CC).

and "abuse of power."[179]  Shortly after, Burisma executives approached Hunter Biden to get help

from "D.C."[180] to alleviate the pressure placed on the company from the investigation.

According to testimony provided to the Oversight Committee, Hunter Biden subsequently

"called his dad."[181]  In December 2015, then-Vice President Biden spoke with the Ukrainian

President and conditioned a $1 billion loan from the United States on firing the prosecutor,

Viktor Shokin—a policy change that, according to one source, he unilaterally made to the Obama

Administration's position on providing the loan.[182]

      100.    The Special Counsel's Report indicates that at least two classified documents

unlawfully retained by President Biden, A9 and A10, concerned his 2015 interactions with the

Ukrainian government.[183]  "Document A9 is a telephone call sheet setting forth the purpose and

talking points for a call between Mr. Biden and the Ukrainian Prime Minister."[184]  It included a

handwritten signed note to his executive assistant that said: "Get copy of this conversation from

---

[179] Paul Sonne et al., *The Gas Tycoon and the Vice President's Son: The Story of Hunter Biden's Foray Into Ukraine*, Wash. Post (Sept. 28, 2019, 8:08 PM), https://perma.cc/P6WY-L4Q5.

[180] Transcript of Interview of Devon Archer at 34-35 (July 31, 2023) (attached as Ex. DD).

[181] *Id.* at 36.

[182] Glenn Kessler, *Inside VP Biden's Linking of a Loan to a Ukraine Prosecutor's Ouster*, Wash. Post (Sept. 15, 2023, 7:10 AM) ("On the plane, … Biden 'called an audible'—he changed the plan."  Despite the original plan to have Poroshenko fire Shokin independently of the loan guarantee, the Vice President instead told "Poroshenko the loan would not be forthcoming until Shokin was gone."), https://perma.cc/8CAE-6JRQ.

[183] Report at 279-81, A-2.

[184] *Id.* at 281, 310, A-2.

Sit Rm for my Records please."[185]  A10 was "a transcript documenting the substance of a December 11, 2015 call between Mr. Biden and Ukrainian Prime Minister Yatsenyuk."[186]  The Special Counsel found that "given [the] handwritten note, documents A9 and A10 have additional indicia of *willful* retention by Mr. Biden."[187]

101.    Since President Biden retained classified information about Ukraine from the time prosecutors were investigating the Ukrainian company where Hunter Biden sat on the board and Hunter Biden still sat on the board at the time his father left office in 2017, the Committee needs to know if President Biden willfully took the classified information to benefit his family.  The audio recordings—which fully capture the interviews with President Biden and his ghostwriter—will help the Committee make that determination and decide whether any impeachment action is warranted.

102.    *Second*, the Committee is investigating whether President Biden willfully retained and disclosed classified documents to enrich himself.  Indeed, the Special Counsel found President Biden had "strong motivations" to flout the rules for properly handling classified materials, including to enrich himself by writing a memoir for "an advance of $8 million."[188]  While working with Zwonitzer on his 2017 memoir, President Biden read from classified materials aloud "nearly verbatim."[189]  The classified materials were an "invaluable resource that

---

[185] *Id.* at 310.

[186] *Id.* at A-2; *see also id.* at 310.

[187] *Id.* at 310 (emphasis added).

[188] *Id.* at 141, 231; *see generally id.* at 97-106.

[189] *Id.* at 7; *see also id.* at 104-06, 223, 244-47, 253-54.

he consulted liberally" while writing his book.[190]  If President Biden willfully retained classified information for the purpose of carrying out a multimillion-dollar book deal, that may constitute an abuse of his office of public trust meriting impeachment.

103.    Listening to the audio recordings, which capture President Biden's and Zwonitzer's tone and pace, as well as any hesitation or reluctance, will help the Committee determine whether President Biden retained classified material with an eye toward enriching himself through a book deal.  In particular, the audio recording of the Special Counsel's interview with Zwonitzer may shed light on this issue because President Biden shared classified information with him while writing the book.

104.    The Committee is under no obligation to rely exclusively on transcripts created, edited, and produced by executive agencies subordinate to the President—the subject of the impeachment inquiry—especially when superior evidence exists in the form of audio recordings that would ensure an accurate and complete record of the interviews.

105.    DOJ has not disputed that the House is entitled, as part of an impeachment inquiry, to investigate whether the President abused his office.  Indeed, DOJ has provided documents, including the transcripts of these audio recordings, to the Committee as part of its inquiry.

106.    By refusing to comply with the Committee's Subpoena, DOJ is impeding the Committee's impeachment inquiry and preventing the House from discharging its solemn power of impeachment—a power the Constitution specifically vests in the House to hold Executive and Judicial officers accountable for violations of law and abuses of power.[191]

---

[190] *Id.* at 231.

[191] The Federalist No. 65 (Alexander Hamilton).

**IV.    The President's assertion of executive privilege over the audio recordings lacks merit**

107.    President Biden's claim of executive privilege over the audio recordings lacks any basis in law.

108.    Any claim of executive privilege over the audio recordings sought by the Committee was waived when the White House disclosed the transcripts of those interviews to the Committee and released them to the public.  When President Nixon published transcripts of subpoenaed recordings, this Court held that his claim of privilege over audio recordings of those conversations had been relinquished, stating that "the privilege claimed [was] non-existent since the conversations [were] … no longer confidential."[192]  The same is true in this case.  Here, the President had not asserted executive privilege over any portion of the transcripts of the interviews prior to their disclosure to the Committee.  Additionally, no conditions had been placed on the provision of the transcripts before DOJ turned them over to the Committee.  No agreement was reached between the parties in advance that the transcripts were not to be disclosed, and DOJ failed even to ask the Committee not to release the transcripts.

109.    Moreover, the transcripts have also been released to the public.  Indeed, the transcripts of President Biden's interviews had been released to the news media by the Executive Branch *before* DOJ produced them in response to the Committee's subpoena.[193]  Both disclosure to the media and disclosure to the Committee of the transcripts constitute a waiver of privilege, and accordingly, the audio recordings of those interviews are now non-privileged.

---

[192] *See United States v. Mitchell*, 377 F. Supp. 1326, 1330 (D.D.C. 1974) (citing *Nixon v. Sirica*, 487 F.2d 700, 718 (D.C. Cir. 1973)).

[193] Ex. Q (Jordan to Garland Mar. 25, 2024 Letter) at 2.

110.    Finally, executive privilege was waived here because it was not timely invoked. Privilege had not been asserted as of the original Subpoena return date of March 7, 2024, nor on any of the subsequent return dates that resulted from extensions provided by the Committee, March 11, April 8, and April 25.  In fact, instead of making a proper and timely assertion of privilege, the only timely objections raised by DOJ were on the grounds of the "compressed time frame" and a vague claim related to "Executive Branch confidentiality interests."[194]  It was not until May 16, 2024, ten weeks after the Subpoena's original return date, and the morning that the Committee was scheduled to mark-up its report recommending that the full House hold the Attorney General in contempt of Congress, that the President publicly intervened to assert executive privilege over the audio recordings.[195]

111.    The President's privilege assertion also represents the latest step in the Executive Branch's continuing efforts to expand the breadth and scope of executive privilege by repackaging common-law privileges as constitutionally based assertions.  The President's assertion of privilege over the audio recordings is based on a faulty premise and lacks substantive merit.

112.    The underlying information sought by the Committee does not implicate presidential decision-making, involve communications with close presidential advisors, involve national security, or otherwise intrude into any other areas traditionally held to be within the narrow confines of executive privilege.[196]  Rather, the Committee seeks information related to a

---

[194] *See* Ex. N (Jordan Mar. 7, 2024 Letter) at 2-3.

[195] *See* Ex. W (Uriarte to Jordan May 16, 2024 Letter at 1).

[196] *See In re Sealed Case*, 121 F.3d 729, 744-45 (D.C. Cir. 1997) (distinguishing between the constitutionally based presidential communications privilege and other common-law privileges that may be asserted by the Executive Branch).

*closed* criminal investigation, making it subject at most to the common-law privilege afforded to law enforcement investigatory materials.

113.    DOJ conceded (and this Court accepted), in the context of *Citizens for Resp. & Ethics in Wash. v. DOJ*, that the law enforcement privilege is "co-extensive" with the scope of the exemption found under the Freedom of Information Act (FOIA) Exemption 7(A).[197] Exemption 7(A) applies only to materials reasonably expected to interfere with enforcement proceedings that are pending or reasonably anticipated.[198]  More specifically, the very argument advanced by the Attorney General here—that disclosure would have a chilling effect on White House participation in unspecified and undefined future criminal investigations—has been rejected by this very Court in the FOIA context.[199]  And Congress's right to access information when performing its constitutionally prescribed functions of oversight and impeachment must be greater than the access afforded based on the statutory rights of FOIA requestors.

114.    Similarly, the Attorney General's argument that release of the audio recordings presents a "unique intrusion" into "privacy interests" inappropriately conflates release of the records to Congress with release to the general public in response to a request under FOIA.[200] The cases upon which the Attorney General relies relate to protecting certain privacy interests when publicly releasing information under FOIA and are inapplicable to Congressional oversight and impeachment proceedings.

---

[197] *See* 658 F. Supp. 2d 217, 232 (D.D.C. 2009).

[198] *Id.* at 225 (citing *Mapother v. DOJ*, 3 F.3d 1533, 1540 (D.C. Cir. 1993)).

[199] *See id.* at 228-29 (holding that "the category of proceedings must be more narrowly defined than simply any investigation that might benefit from the cooperation of some senior White House official at some undetermined future point regarding some undefined subject").

[200] *See* Ex. W (Garland to Biden May 15, 2024 Letter at 5-6).

115.    DOJ has already produced to the Committee written transcripts that reflect the subject matter of the interviews.  Thus, the assertion of privilege here appears, at best, to be over nuances from inflection, pace, emphasis, and other verbal indicators that would reveal themselves only on the audio recordings.  There is no claim of privilege over any substantive content from the interview.  As far as the Committee is aware, this is the first time such a broad privilege assertion has been made in these terms, and it reflects an expansive view of executive privilege with no limiting principle.

116.    The Attorney General's argument that release of the tapes will have a "chilling effect" on DOJ's ability to obtain information in future investigations does not withstand scrutiny.[201]  According to the Attorney General, if witnesses knew that audio recordings of their interviews could become public, the "ability to obtain vital cooperation in high-profile criminal investigations" might be impeded.[202]  Any possible "chilling" effect, however, more properly flows from the fact that the substance of the interview is being released, not the format the release takes.  The assertion that witnesses will be any less likely to participate in an interview with a future special counsel if the audio recordings of the interviews in question are produced to Congress strains credulity, considering that the transcripts of the underlying interviews have already been released without any assertions of privilege and made subject to scrutiny in the public sphere.  If the Attorney General were serious about this concern, executive privilege would have been asserted over the transcripts themselves in the first instance and the Executive Branch would not have released them to the media.

---

[201] *See id.* at 4.

[202] *See id.* at 5.

117.    The Attorney General for another reason grossly overstates the potential impact

that turning over the audio recordings to the Committee would have on future investigations.

DOJ's overemphasis on voluntary cooperation entirely ignores other, far more powerful,

investigative tools available to it, such as grand jury subpoenas, other forms of compulsory

process (search warrants, Stored Communications Act warrants, etc.), and the ability to prosecute

individuals for noncompliance therewith.  Indeed, DOJ "doesn't rely on strangers' munificence

or let witnesses dictate the terms of its investigations" but instead relies on compulsory

process.[203]  Any suggestion that DOJ's investigative efforts would be hampered is a frivolous

one.

118.    Even setting aside the fact that in this instance privilege has been waived and has

no substantive merit, executive privilege is a qualified privilege that can be overcome by a

sufficient showing of need.[204]  Here, the audio recordings are critically relevant to both the

Committee's oversight of DOJ's use of a special counsel in conducting this investigation as well

as its impeachment inquiry.

119.    As set forth above,[205] the Committee needs the audio recordings to fully assess for

itself the Special Counsel's recommendations and to carry out its constitutional oversight

functions and determine whether legislative reforms aimed at DOJ's use of special counsels are

needed.  The Committee has the authority and the obligation to examine the use, appointment,

---

[203] James Burnham, Opinion, *Biden, Nixon and the Hur Report*, Wall St. J. (May 20, 2024, 5:42 PM) (attached as Ex. EE).

[204] *Nixon*, 418 U.S. at 705-07.

[205] *See supra* ¶¶ 67-95.

funding, and functioning of special counsels to conduct sensitive investigations of high-ranking government officials.

120.    Additionally, the Committee has a constitutional obligation to make an independent assessment of whether articles of impeachment are warranted based on President Biden's actions.  And as set forth above,[206] the Committee believes that the audio recordings will shed light on whether President Biden abused his office of public trust to willfully retain classified information to assist his family's business dealings with foreign nationals or companies, or to enrich himself with a book deal.

121.    Failure to require the production of the audio recordings would impermissibly impede the Committee's ability to exercise the House's constitutionally delegated oversight and impeachment functions.  The Committee cannot and should not be precluded from access to this evidence by an assertion of a common-law privilege made by the very target of its investigation. Accordingly, even if executive privilege had not been waived, and were validly asserted here, the Committee's robust and unquestionable need for the information to carry out its core constitutional oversight and impeachment functions would be sufficient to overcome that privilege.

## SPECIFIC CLAIM FOR RELIEF

## COUNT I

122.    The Judiciary Committee incorporates by reference and realleges the preceding paragraphs, as if set forth fully here.

---

[206] *See supra* ¶¶ 96-106.

123.     The Subpoena was duly authorized, issued, and served pursuant to the Judiciary Committee's legislative and impeachment powers under Article I of the Constitution of the United States.

124.     The Subpoena required, and still requires, Defendant Garland to produce the documents and records as set forth in Schedule A of the Subpoena, including the audio recordings of the Special Counsel's interviews with President Biden and Mark Zwonitzer.

125.     The Judiciary Committee has attempted to make reasonable accommodations for Garland's production, including by agreeing to review two documents *in camera* and extending the return date of the Subpoena three times, but those efforts are at an impasse, and Garland continues to refuse to produce the audio recordings of the Special Counsel's interviews with President Biden and Mark Zwonitzer.

126.     There is no lawful basis for Garland's refusal to produce to the Committee the audio recordings of the Special Counsel's interviews with President Biden and Mark Zwonitzer.

127.     The audio recordings of the Special Counsel's interviews with President Biden and Mark Zwonitzer are not covered by executive privilege, and, even if they were, President Biden has waived that privilege.

128.     Garland violated, and continues to violate, his legal obligation by refusing to produce to the Committee the audio recordings of the Special Counsel's interviews with President Biden and Mark Zwonitzer when those recordings are not covered by executive privilege, and, even if they were, executive privilege has been waived.

129.     As a result, the Judiciary Committee has been, and will continue to be, injured by Garland's refusal to produce the audio recordings of the Special Counsel's interviews with President Biden and Mark Zwonitzer.

**PRAYER FOR RELIEF**

WHEREFORE, the Judiciary Committee respectfully prays that this Court:

A.      Pursuant to 28 U.S.C. §§ 2201 and 2202, enter declaratory and injunctive relief as follows:

1.      Declare that Garland's refusal to produce the audio recordings of the Special Counsel's interviews with President Biden and Mark Zwonitzer to the Committee lacks legal justification; and

2.      Issue an injunction ordering Garland to produce the audio recordings of the Special Counsel's interviews with President Biden and Mark Zwonitzer to the Committee.

B.      Retain jurisdiction to review any disputes that may arise over compliance with the Court's order.

C.      Grant the Committee such other and further relief as may be just and proper under the circumstances.

Respectfully submitted,

*/s/ Matthew B. Berry*
Matthew B. Berry (D.C. Bar No. 1002470)
   *General Counsel*
Todd B. Tatelman (VA Bar No. 66008)
   *Deputy General Counsel*
Brooks M. Hanner (D.C. Bar No. 1005346)
   *Associate General Counsel*
Sarah E. Clouse (MA Bar No. 688187)
   *Associate General Counsel*
Bradley Craigmyle (IL Bar No. 6326760)
   *Associate General Counsel*
Andy T. Wang (D.C. Bar No. 1034325)
   *Assistant General Counsel*
Rachel A. Jankowski (D.C. Bar No. 1686346)
   *Assistant General Counsel*

OFFICE OF GENERAL COUNSEL[207]
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, DC 20515
Telephone: (202) 225-9700
Matthew.Berry@mail.house.gov

*Counsel for Plaintiff Committee on the Judiciary of the U.S. House of Representatives*

July 1, 2024

---

[207] Attorneys for the Office of General Counsel for the U.S. House of Representatives are "entitled, for the purpose of performing the counsel's functions, to enter an appearance in any proceeding before any court of the United States or of any State or political subdivision thereof without compliance with any requirements for admission to practice before such court." 2 U.S.C. § 5571(a).