**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMITTEE ON THE JUDICIARY, UNITED STATES HOUSE OF REPRESENTATIVES, <br><br> *Plaintiff*, <br><br> v. <br><br> MERRICK GARLAND, in his official capacity as Attorney General of the United States, <br><br> *Defendant*. | Case No.  1:24-cv-1911-ABJ |

## <u>PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION</u>
## <u>OR, IN THE ALTERNATIVE, FOR EXPEDITED SUMMARY JUDGMENT</u>

Plaintiff moves for a preliminary injunction, pursuant to Rule 65(a) of the Federal Rules of Civil Procedure, or, in the alternative, for summary judgment pursuant to Rule 56(a), on the preliminary injunction schedule, *see* LCvR 65.1(c), (d), or on an otherwise expedited schedule ordered by the Court, to require Defendant Merrick Garland to produce to the Committee on the Judiciary of the United States House of Representatives the audio recordings of Special Counsel Robert Hur's interviews with President Joseph Biden and Mr. Mark Zwonitzer.  Plaintiff's motion is based on the attached memorandum of law, the Declaration of Stephen Castor, the Declaration of Todd B. Tatelman, the statement of material facts as to which Plaintiff contends there is no genuine issue, *see* LCvR 7(h)(1), and any oral argument presented at the hearing on Plaintiff's motion.

Respectfully submitted,

*/s/ Matthew B. Berry*
Matthew B. Berry (D.C. Bar No. 1002470)
  *General Counsel*
Todd B. Tatelman (VA Bar No. 66008)
  *Deputy General Counsel*
Brooks M. Hanner (D.C. Bar No. 1005346)
  *Associate General Counsel*
Sarah E. Clouse (MA Bar No. 688187)
  *Associate General Counsel*
Bradley Craigmyle (IL Bar No. 6326760)
  *Associate General Counsel*
Andy T. Wang (D.C. Bar No. 1034325)
  *Assistant General Counsel*
Rachel A. Jankowski (D.C. Bar No. 1686346)
  *Assistant General Counsel*

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, D.C. 20515
(202) 225-9700
Matthew.Berry@mail.house.gov

*Counsel for Plaintiff Committee on the Judiciary of the U.S. House of Representatives*

July 12, 2024

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMITTEE ON THE JUDICIARY, UNITED STATES HOUSE OF REPRESENTATIVES, | |
| *Plaintiff*, | |
| v. | Case No.  1:24-cv-1911 |
| MERRICK GARLAND, in his official capacity as Attorney General of the United States, | |
| *Defendant*. | |

## PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION OR, IN THE ALTERNATIVE, FOR EXPEDITED SUMMARY JUDGMENT

# TABLE OF CONTENTS

**Page**

TABLE OF EXHIBITS ................................................................................................ iii

TABLE OF AUTHORITIES ...................................................................................... vi

INTRODUCTION ...................................................................................................... 1

BACKGROUND ........................................................................................................ 2

I.  The Committee's investigation into DOJ's commitment to impartial justice and oversight of the Special Counsel's investigation into President Biden ............................ 2

II.  The critical importance of the audio recordings to the Committee's investigation ............ 6

III.  The Committee's efforts to obtain the audio recordings reach an impasse given the privilege assertion ......................................................................................... 12

IV.  The Committee's constitutional authority to conduct investigations, as part of and including an impeachment inquiry, and to issue subpoenas to advance its investigations ................................................................................................. 14

ARGUMENT ............................................................................................................ 16

I.  This Court has authority to resolve this case ......................................................... 17

    A.  The Committee has standing under binding D.C. Circuit precedent ..................... 17

    B.  The Court has subject matter jurisdiction under 28 U.S.C. § 1331 ..................... 18

    C.  The Committee may bring this action to enforce its Subpoena ........................... 19

        1.  The Committee has an equitable cause of action .................................... 19

        2.  The Committee has a cause of action under the Declaratory Judgment Act .................................................................................. 26

    D.  This case is otherwise justiciable ....................................................... 27

II.  President Biden's privilege assertion lacks merit ................................................... 28

    A.  Garland has a legal duty to comply with the Subpoena ................................... 28

    B.  The privilege claim here, which relies on a purported common-law privilege, lacks merit ................................................................................... 29

        1.  The privilege has been waived ......................................................... 30

|   | 2. | The law-enforcement privilege—which is rooted in the common law—is not enforceable against Congress | 34 |
|---|---|---|---|
|   | 3. | Even if the privilege did apply, it is qualified, and the Committee's need for the recordings outweighs DOJ's interest in secrecy | 37 |

III. The Committee's ability to exercise its Article I powers is impeded, and it is entitled to injunctive relief ................................................................ 41

    A.   Garland's refusal to produce the audio recordings is causing the Committee irreparable harm ........................................................... 42

    B.   Allowing the Committee's investigation to proceed with the audio recordings serves equity and advances the public interest................... 45

CONCLUSION............................................................................................................ 45

**TABLE OF EXHIBITS**

The exhibits listed below are those attached to this motion.  For the Court's and the

parties' convenience, where those exhibits were also attached to the complaint in this case, they

are labeled consistently with the exhibits as attached to the complaint.

**Exhibits to Declaration of Stephen Castor (July 12, 2024)**

Exhibit A        Subpoena from the House Committee on the Judiciary to Merrick Garland, Attorney General, Department of Justice (DOJ) (Feb. 27, 2024)

Exhibit B        Memorandum from Representative James Comer, Chairman, House Committee on Oversight & Accountability, et al., to Members of the House Committee on Oversight & Accountability, et al. (Sept. 27, 2023)

Exhibit D        *Hearing on the Report of Special Counsel Robert K. Hur: Before the H. Comm. on the Judiciary*, 118th Cong. (Mar. 12, 2024)

Exhibit G        Letter from Edward N. Siskel, Assistant to the President & White House Counsel, et al., to Merrick Garland, Attorney General, DOJ (Feb. 7, 2024)

Exhibit H        Letter from Richard Sauber, Special Counsel to the President, et al., to Bradley Weinsheimer, Associate Deputy Attorney General, DOJ (Feb. 12, 2024)

Exhibit J        Letter from Representative Jim Jordan, Chairman, House Committee on the Judiciary, et al., to Merrick Garland, Attorney General, DOJ (Jan. 13, 2023)

Exhibit K        Letter from Representative Jim Jordan, Chairman, House Committee on the Judiciary, et al., to Merrick Garland, Attorney General, DOJ (Feb. 12, 2024)

Exhibit L        Letter from Carlos Uriarte, Assistant Attorney General, DOJ, to Representative Jim Jordan, Chairman, House Committee on the Judiciary, et al. (Feb. 16, 2024)

Exhibit M        Letter from Representative Jim Jordan, Chairman, House Committee on the Judiciary, et al., to Merrick Garland, Attorney General, DOJ (Feb. 27, 2024)

Exhibit N        Letter from Carlos Uriarte, Assistant Attorney General, DOJ, to Representative Jim Jordan, Chairman, House Committee on the Judiciary (Mar. 7, 2024)

Exhibit P        Letter from Representative Jim Jordan, Chairman, House Committee on the Judiciary, et al., to Merrick Garland, Attorney General, DOJ (Mar. 9, 2024)

Exhibit Q        Letter from Representative Jim Jordan, Chairman, House Committee on the Judiciary, et al., to Merrick Garland, Attorney General, DOJ (Mar. 25, 2024)

Exhibit R      Jason Leopold, *New Transcript Details Biden's Handling of Classified Records*, Bloomberg News (June 13, 2024, 9:46 AM)

Exhibit S      Letter from Carlos Uriarte, Assistant Attorney General, DOJ, to Representative Jim Jordan, Chairman, House Committee on the Judiciary, et al. (Apr. 8, 2024)

Exhibit T      Letter from Representative Jim Jordan, Chairman, House Committee on the Judiciary, et al., to Merrick Garland, Attorney General, DOJ (Apr. 15, 2024)

Exhibit U      Letter from Carlos Uriarte, Assistant Attorney General, DOJ, to Representative Jim Jordan, Chairman, House Committee on the Judiciary, et al. (Apr. 25, 2024)

Exhibit V      Letter from Edward N. Siskel, Assistant to the President & White House Counsel, to Representative Jim Jordan, Chairman, House Committee on the Judiciary, et al. (May 16, 2024)

Exhibit W      Letter from Carlos Uriarte, Assistant Attorney General, DOJ, to Representative Jim Jordan, Chairman, House Committee on the Judiciary, et al. (May 16, 2024) (attaching Letter from Merrick Garland, Attorney General, DOJ, to Joseph R. Biden, Jr., President of the United States (May 15, 2024))

Exhibit X      House Report No. 118-527 (2024)

Exhibit Y      Letter from Carlos Uriarte, Assistant Attorney General, DOJ, to Representative Mike Johnson, Speaker of the House (June 14, 2024)

Exhibit Z      Declaration of Bradley Weinsheimer, *Judicial Watch, Inc. v. DOJ*, No. 1:24-cv-00700 (D.D.C. May 31, 2024), ECF No. 34-2

Exhibit DD     Transcript of Interview of Devon Archer (July 31, 2023)

Exhibit GG     Glenn Kessler, *Inside VP Biden's linking of a loan to a Ukraine prosecutor's ouster*, Washington Post (Sept. 15, 2023, 7:10 AM)

Exhibit HH     Paul Sonne et al., *The gas tycoon and the vice president's son: The story of Hunter Biden's foray into Ukraine*, Washington Post (Sept. 28, 2019, 8:08 PM)

**Exhibits to Declaration of Todd B. Tatelman (July 12, 2024)**

Exhibit C      Office of the Attorney General, DOJ, Order No. 5588-2023, *Appointment of Robert K. Hur as Special Counsel* (Jan. 12, 2023)

Exhibit EE     James Burnham, Opinion, *Biden, Nixon and the Hur Report*, Wall Street Journal (May 20, 2024, 5:42 PM)

Exhibit FF     Shahla Farzana et al., *How You Say It Matters: Measuring the Impact of Verbal Disfluency Tags on Automated Dementia Detection*, Proceedings of the 21st Workshop on Biomedical Language Processing 37 (2022)

Exhibit II      *Environmental Crimes at the Rocky Flats Nuclear Weapons Facility: Hearings Before the Subcommittee on Investigations & Oversight of the House Committee on Science, Space & Technology*, volume I, 102d Congress 25-29 (1992)

Exhibit JJ      *International Uranium Cartel: Hearings Before the Subcommittee on Oversight & Investigations of the House Committee on Interstate & Foreign Commerce*, volume I, 95th Congress 46, 123 (1977)

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                      **Page(s)**

*Alexander v. Sandoval*,
    532 U.S. 275 (2001).............................................................................................23

*Anderson v. Dunn*,
    19 U.S. (6 Wheat.) 204 (1821).............................................................................22

*Armstrong v. Exceptional Child Ctr., Inc.*,
    575 U.S. 320 (2015).............................................................................20, 21, 25

*Bell v. Hood*,
    327 U.S. 678 (1946).............................................................................................20

*Black v. Sheraton Corp. of Am.*,
    564 F.2d 531 (D.C. Cir. 1977).............................................................................35

*C&E Servs., Inc. v. D.C. Water & Sewer Auth.*,
    310 F.3d 197 (D.C. Cir. 2002).............................................................................26

*Carroll v. Safford*,
    44 U.S. (3 How.) 441 (1845).................................................................................20

*\*Citizens for Resp. & Ethics in Wash. v. DOJ* (*CREW*),
    658 F. Supp. 2d 217 (D.D.C. 2009) .........................................................39, 40, 41

*Clark v. Falls*,
    124 F.R.D. 91 (E.D. Pa. 1988).......................................................................31, 32

*Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*,
    589 U.S. 327 (2020).............................................................................................23

*\*Comm. on Judiciary v. McGahn*,
    415 F. Supp. 3d 148 (D.D.C. 2019) ............................18, 19, 22, 23, 24, 25, 26, 27

*Comm. on Judiciary v. McGahn*,
    951 F.3d 510 (D.C. Cir. 2020).............................................................................19

*\*Comm. on Judiciary v. McGahn* (*McGahn En Banc*),
    968 F.3d 755 (D.C. Cir. 2020) (en banc)..............................................17, 19, 20

*Comm. on Judiciary v. McGahn* (*McGahn Vacated Panel*),
    973 F.3d 121 (D.C. Cir. 2020)..........................................................19, 23, 25, 27

*Comm. on Judiciary v. McGahn*,
   Order, No. 19-5331 (D.C. Cir. Oct. 15, 2020) ........................................................................23

*Comm. on Judiciary v. McGahn*,
   Order, No. 19-5331 (D.C. Cir. July 13, 2021) .......................................................................23

*\*Comm. on Judiciary v. Miers (Miers I)*,
   558 F. Supp. 2d 53 (D.D.C. 2008) .........................16, 17, 18, 19, 20, 21, 24, 26, 27, 28, 29, 34

*\*Comm. on Judiciary v. Miers (Miers II)*,
   575 F. Supp. 2d 201 (D.D.C. 2008) ......................................................................................44

*\*Comm. on Oversight & Gov't Reform v. Holder*,
   979 F. Supp. 2d 1 (D.D.C. 2013) .........................................................17, 18, 19, 22, 26, 27, 28

*Di Lapi v. City of New York*,
   Nos. 06–CV–3101, 06–CV–2864, 2012 WL 37576 (E.D.N.Y. Jan. 6, 2012).........................31

*Dunlap v. Presidential Advisory Comm'n on Election Integrity*,
   286 F. Supp. 3d 96 (D.D.C. 2017) ........................................................................................42

*Eastland v. U.S. Servicemen's Fund*,
   421 U.S. 491 (1975)...........................................................................................28, 35, 43

*Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*,
   266 F. Supp. 3d 297 (D.D.C. 2017) ......................................................................................44

*Exxon Corp. v. FTC*,
   589 F.2d 582 (D.C. Cir. 1978)..........................................................................................33, 45

*Fonville v. District of Columbia*,
   230 F.R.D. 38 (D.D.C. 2005)................................................................................................34

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
   561 U.S. 477 (2010)..........................................................................................................21, 26

*Friedman v. Bache Halsey Stuart Shields, Inc.*,
   738 F.2d 1336 (D.C. Cir. 1984).........................................................................................35, 37

*FTC v. Owens-Corning Fiberglass Corp.*,
   626 F.2d 966 (D.C. Cir. 1980) ..............................................................................................33

*Gordon v. Holder*,
   721 F.3d 638 (D.C. Cir. 2013)..........................................................................................42, 45

*Hernandez v. Mesa,*
  589 U.S. 93 (2020) ...................................................................................................23

*Hobley v. Chi. Police Commander Burge,*
  445 F. Supp. 2d 990 (N.D. Ill. 2006) ....................................................................31

*In re Provident Life & Accident Ins.,*
  No. 90-cv-219, 1990 U.S. Dist. LEXIS 21067 (E.D. Tenn. June 13, 1990) ...........35

*In re Rep. & Recommendation of June 5, 1972,*
  370 F. Supp. 1219 (D.D.C. 1974) .....................................................................35, 39

*In re Sealed Case (Espy),*
  121 F.3d 729 (D.C. Cir. 1997) ...................................................................32, 35, 37

*Jacobs v. United States,*
  290 U.S. 13 (1933) ...................................................................................................21

*Jesner v. Arab Bank, PLC,*
  584 U.S. 241 (2018) .................................................................................................23

*Marshall v. Gordon,*
  243 U.S. 521 (1917) .................................................................................................36

*Maryland v. King,*
  567 U.S. 1301 (2012) ...............................................................................................42

*McGrain v. Daugherty,*
  273 U.S. 135 (1927) ...........................................................................................15, 20

*Mims v. Arrow Fin. Servs., LLC,*
  565 U.S. 368 (2012) .................................................................................................19

*Nixon v. Sirica,*
  487 F.2d 700 (D.C. Cir. 1973) .................................................................................31

*Quinn v. United States,*
  349 U.S. 155 (1955) .................................................................................................19

*Senate Select Comm. on Presidential Campaign Activities v. Nixon,*
  498 F.2d 725 (D.C. Cir. 1974) (en banc) ......................................................27, 28, 34

*Sikorsky Aircraft Corp. v. United States,*
  106 Fed. Cl. 571 (Fed. Cl. 2012) ............................................................................34

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) ..................................................................................26

*Swan v. Clinton*,
    100 F.3d 973 (D.C. Cir. 1996) .................................................................17

*Trump v. Mazars USA, LLP*,
    591 U.S. 848 (2020) ...................................................................26, 29, 36

*United States v. AT&T (AT&T I)*,
    551 F.2d 384 (D.C. Cir. 1976) ............................................................18, 27

*United States v. AT&T (AT&T II)*,
    567 F.2d 121 (D.C. Cir. 1977) .......................................................26, 27, 33

*United States v. Bryan*,
    339 U.S. 323 (1950) ..............................................................................29, 33

*United States v. Burr*,
    25 F. Cas. 30 (C.C.D. Va. 1807) ...............................................................33

*United States v. House of Representatives*,
    556 F. Supp. 150 (D.D.C. 1983) ...............................................................34

*United States v. Mitchell*,
    377 F. Supp. 1326 (D.D.C. 1974) .............................................................31

*United States v. Nixon*,
    418 U.S. 683 (1974) ...................................................................33, 34, 37

*United States v. Poindexter*,
    727 F. Supp. 1501 (D.D.C. 1989) .............................................................34

*United States v. Stanley*,
    483 U.S. 669 (1987) ..................................................................................24

*Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*,
    535 U.S. 635 (2002) ..................................................................................19

*Watkins v. United States*,
    354 U.S. 178 (1957) ...................................................................29, 36, 45

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ......................................................................................17

*Ziglar v. Abbasi*,
  582 U.S. 120 (2017).................................................................23

**Constitution**

U.S. Const. art. I, § 1, cl. 1.......................................................14

U.S. Const. art. I, § 2, cl. 5.......................................................15

U.S. Const. art. I, § 5, cl. 2.......................................................28

**Statutes and Rules**

2 U.S.C. § 288d........................................................................25

28 U.S.C. §§ 591-98.................................................................11

28 U.S.C. § 1331......................................................................18

28 U.S.C. § 1365.................................................................18, 25

28 U.S.C. § 2201(a)..................................................................26

Fed. R. Civ. P.

  Rule 45(d)(2)(B).....................................................................34

  Rule 45(e)(2)...........................................................................34

**Legislative Authorities**

4 J. Richardson, *A Compilation of the Messages and Papers of the Presidents*,
  H. Misc. Doc. 53-210 (1897), https://perma.cc/82XR-DWJ2 ...............15

170 Cong. Rec. H3970-71 (daily ed. June 12, 2024)
  https://perma.cc/ZM69-EA7D ...................................................13

Cong. Globe, 34th Cong., 3d Sess. (1857)......................................36

*Constitution, Jefferson's Manual,*
  *and Rules of the House of Representatives of the United States*,
  H. Doc. 117-161 (2023), https://perma.cc/3HCB-WYMP .....................15

H. Rep. No. 108-414 (2004), https://perma.cc/Z9XB-AMJN .................34

H. Res. 5, 118th Cong. § 3(k)(3) (2023), https://perma.cc/28AM-XD4R ......36

H. Res. 917, 118th Cong. (2023), https://perma.cc/57G5-C54Y ...............................................16, 29

H. Res. 918, 118th Cong. (2023), https://perma.cc/69QX-U332...................................................16

H. Res. 1287, 118th Cong. (2024), https://perma.cc/J2X7-UDVM...............................................13

H. Res. 1293, 118th Cong. (2024), https://perma.cc/P6WT-U866................................................13

*Investigation into Allegations of Justice Department Misconduct in New England:*
   *Hearings Before the H. Comm. on Gov't Reform*, vol. 1,
   107th Cong. (2002), https://perma.cc/RQ85-X9TT.................................................................34

Rule IV(a), Rules of the Committee on the Judiciary of the U.S. House of Representatives,
   118th Cong. (2023), https://perma.cc/6UUS-LYEH ..............................................................28

Rules of the House of Representatives,
   118th Cong. (2023), https://perma.cc/3UX4-2YG5

   House Rule X.1 ....................................................................................................................15

   House Rule X.1(*l*)(1) .......................................................................................................14, 15

   House Rule X.1(*l*)(7) ...........................................................................................................14

   House Rule XI.1(b)(1) ...........................................................................................................28

   House Rule XI.2(m)................................................................................................................15

   House Rule XI.2(m)(1)(B).......................................................................................................28

   House Rule XI.2(m)(3)(A).......................................................................................................28

**Other Sources**

2 *The Records of the Federal Convention of 1787* (Max Farrand ed., 1911) ...............................43

*A Sitting President's Amenability to Indictment and Criminal Prosecution*,
   24 Op. O.L.C. 222, 2000 WL 33711291 (Oct. 16, 2000) ........................................................44

Alissa M. Dolan & Todd Garvey, Cong. Rsch. Serv., R42811,
   *Cong. Investigations of the Dep't of Just. 1920-2012: Hist., Law, Prac.* (2012),
   https://perma.cc/N5JE-B6CP ..................................................................................................33

*Black's Law Dictionary* (12th ed. 2024).......................................................................................36

Luther Stearns Cushing, *Elements of the Law and Practice of Legislative Assemblies*
   *in the United States of America* (1856)......................................................................................36

Rebecca White Berch, *A Proposal to Amend Rule 30(b) of the Federal Rules of*
    *Civil Procedure: Cross-Disciplinary and Empirical Evidence Supporting*
    *Presumptive Use of Video to Record Depositions*,
    59 Fordham L. Rev. 347 (1990)............................................................................7

*Remarks in the Diplomatic Reception Room*,
    White House (Feb. 8, 2024), https://perma.cc/X6KC-Z4WL.................................10

Robert K. Hur, *Report on the Investigation Into Unauthorized Removal, Retention,*
    *and Disclosure of Classified Documents Discovered at Locations Including the*
    *Penn Biden Center and the Delaware Private Residence of.*
    *President Joseph R. Biden, Jr* (Feb. 2024),
    https://perma.cc/X5MV-RU8J .............................................2, 3, 8, 9, 10, 11, 12, 38

*Special Counsel Jack Smith Delivers Statement*,
    DOJ (June 9, 2023), https://perma.cc/74NK-LQ6U .............................................10

Thomas Erskine May, *A Treatise on the Law, Privileges, Proceedings*
    *and Usage of Parliament* (20th ed. 1983)...............................................................36

Transcript of Special Counsel Interview with President Biden (Oct. 8, 2023),
    https://perma.cc/FN87-B2XK .............................................................................7, 8

# INTRODUCTION

The Executive Branch is refusing to comply with a lawful Congressional subpoena because it claims that the President's voice—but not the substance of what he said, which is publicly available—is privileged.  In response to a subpoena issued by the Committee on the Judiciary of the U.S. House of Representatives (Committee or Judiciary Committee), Attorney General Merrick Garland produced the written transcript of Special Counsel Robert Hur's interview with President Joseph Biden.  And the Executive Branch released it to the press.  But the President now, at Garland's request, asserts a common-law privilege (that he calls executive privilege) over the audio of this interview.  This claim falls flat.  The Executive Branch waived any privilege by releasing the interview transcript.  Indeed, the Department of Justice (DOJ) has not pointed to a single example where it claimed privilege only over nuances in an audio recording, like voice inflection, tone, emphasis, and hesitation, that are not captured by a written transcript.  And the Executive Branch's claim that producing the audio recording to Congress would have a chilling effect on future investigations—even after the written transcript of the same interview has already been produced—defies common sense.

The Committee is conducting oversight of DOJ's commitment to impartial justice— including the Special Counsel's conclusions.  The Special Counsel recommended that President Biden not be charged with unlawfully retaining and disclosing classified information, in part, because of how he believed a jury would view the President's mental state and memory.  That belief, in turn, was informed by the entire manner in which the President presented himself when he was interviewed by the Special Counsel.  The Committee thus requires the best evidence of how the President presented himself during that interview, which is the audio recording.

The Court should reject the Executive Branch's novel privilege claim and order Garland to produce this audio recording along with the audio recording of the Special Counsel's

interview with Mark Zwonitzer, the ghostwriter of the President's memoir.  With the clock on the 118th Congress ticking, the Committee urges the Court to quickly grant its motion.

## BACKGROUND

I.     **The Committee's investigation into DOJ's commitment to impartial justice and oversight of the Special Counsel's investigation into President Biden**

**A.**  In late 2022 and early 2023, President Biden's personal counsel discovered classified documents from his time as Vice President in his former office at the Penn Biden Center for Diplomacy and Global Engagement and in the garage and basement den of the President's Delaware home.[1]  On January 12, 2023, Garland appointed Hur as Special Counsel to investigate President Biden's possible unauthorized removal, retention, and disclosure of classified material.  *See generally* Decl. of Todd B. Tatelman (Tatelman Decl.), Ex. C.  During the Special Counsel's investigation, the FBI located additional classified documents in the President's home and in his Senate papers at the University of Delaware.  Report at 26-28.

Throughout the course of its investigation, the Special Counsel's team interviewed 147 witnesses, including President Biden and Mark Zwonitzer, the ghostwriter of his 2017 memoir. *Id.* at 29, 98, 336.  The team also listened to the audio recordings of Zwonitzer's 2017 interviews with the President—recordings that had been deleted following the Special Counsel's appointment but were recovered by investigators because they "had significant evidentiary value."  *Id.* at 103, 334.  During these interviews with Zwonitzer, the President openly disclosed classified information by reading aloud classified passages from his notebook nearly verbatim multiple times.  *Id.* at 9, 103.  And in a February 2017 interview with Zwonitzer, President

---

[1] Robert K. Hur, *Report on the Investigation Into Unauthorized Removal, Retention, and Disclosure of Classified Documents Discovered at Locations Including the Penn Biden Center and the Delaware Private Residence of President Joseph R. Biden, Jr.* 19-26 (Feb. 2024) (Report), https://perma.cc/X5MV-RU8J.

Biden, when living at a rented home in Virginia, said he had "just found all the classified stuff downstairs." *Id.* at 3-4, 110-15.  The Special Counsel concluded this likely referred to the classified documents the FBI later found in his garage in 2022.  *Id.* at 4, 114-15, 201-03.

Special Counsel Hur publicly released his Report about his investigation on February 8, 2024.  The Report concluded that while the "investigation uncovered evidence that President Biden willfully retained and disclosed classified materials after his vice presidency when he was a private citizen," "no criminal charges [were] warranted."  *Id.* at 1.  Hur's explanation for declining to recommend criminal charges was based, in part, on his belief that "jurors would likely find reasonable doubt" that the President willfully retained and disclosed classified information because some jurors would likely believe the President "made an innocent mistake, rather than acting willfully."  *Id.* at 4-5.  The Report explained that President Biden "would likely present himself to a jury, as he did during [Hur's] interview of him, as a sympathetic, well-meaning, elderly man with a poor memory."  *Id.* at 6.  In coming to his conclusion, Hur considered "not just the words from the cold record of the transcript, but the entire manner in living color in real time of how the President presented himself" and the President's overall demeanor.  Decl. of Stephen Castor (Castor Decl.), Ex. D at 50.  Thus, the Special Counsel's conclusion that the President lacked the requisite mens rea rested on his analysis of how the President appeared and presented.

But not everyone agreed with the Special Counsel's conclusions.  Leading up to the Report's release, the White House Counsel wrote to Garland, arguing that Hur made a "global and pejorative judgment on the President's powers of recollection" and pointing to a portion of the Report that he believed undermined Hur's conclusions about President Biden's memory.  Castor Decl., Ex. G at 2-3.  Four days after the Report's release, the President's attorneys sent

another letter to DOJ criticizing the Report for its "repeated unnecessary, inflammatory, and prejudicial statements" about "the quality of the President's memory in sweeping, quasi-medical terms" and "unsupported personal opinion."  Castor Decl., Ex. H at 3-4.

**B.**  Early in 2023, the Committee began conducting oversight of DOJ to ensure it was acting consistently with its commitment to impartial justice.  Castor Decl. ¶ 5.  The Committee had become increasingly concerned that DOJ's investigation into President Biden's alleged mishandling and disclosure of classified materials was not being treated the same way as DOJ's investigation into President Donald Trump's alleged mishandling of classified materials.  *Id.*  The Committee thus began its own oversight of the Special Counsel's investigation.  *Id.*  After the release of the Report declining to recommend charges against the President, the Committee ramped up its investigation to focus on assessing whether Hur's recommendations were consistent with a commitment to impartial justice on the part of DOJ.  *Id.* ¶ 6.

Most notably, on February 12, 2024, the Committee, along with the House Committees on Oversight and Accountability and Ways and Means (respectively, Oversight Committee and Ways and Means Committee), asked DOJ to voluntarily produce the following materials: all documents and communications, "including audio and video recordings," related to the Special Counsel's interviews of President Biden and Zwonitzer; two Ukraine-related classified documents identified in the appendix to the Special Counsel's Report; and all communications between or among DOJ, the White House, and the President's personal counsel regarding the Special Counsel's Report.  Castor Decl., Ex. K at 3.  While DOJ responded to inform the Committee that several of these records required review to assess "classification," "national defense information," and "confidentiality interests," it neither offered a timeframe by which it

expected to produce responsive records nor committed to producing all the material requested.

Castor Decl., Ex. L at 2.

Accordingly, on February 27, the Committee subpoenaed Garland to produce those same records.  Castor Decl., Ex. A at Schedule A.  The Committee explained that the subpoenaed materials would further its "ongoing oversight of [DOJ's] commitment to impartial justice" and inform consideration of "potential legislative reforms to [DOJ] and its use of a special counsel to conduct investigations of current and former Presidents of the United States."  Castor Decl., Ex. M at 2.  The materials, the Committee noted, were also directly relevant to the ongoing impeachment inquiry into the President.  *Id.*  To that end, the Committee is investigating whether President Biden may have committed an impeachable offense by, among other things, abusing his position of public trust to enrich himself or his family.  *See* Castor Decl. ¶¶ 11-12 & Ex. B.

DOJ did not produce the audio recordings or any other records related to the Special Counsel's interviews with President Biden and Zwonitzer by the return date; nor did it provide a privilege log, despite the Subpoena's requirement to provide one for any information withheld based on privilege.  *See* Castor Decl., Ex. A at Instructions (page 4, number 17).  Instead, DOJ agreed to allow the Committee to review the subpoenaed classified documents *in camera* and produced six communications responsive to the demand for communications involving DOJ and the White House.  *See* Castor Decl. ¶ 13 & Ex. N at 1.  DOJ claimed that the remaining responsive materials, including the transcripts and audio recordings, may be subject to other privileges and noted that it needed more time to review those materials.  Castor Decl., Ex. N at 2-3.  To accommodate DOJ, the Committee extended the production deadline to March 11, the day before its scheduled public hearing with Special Counsel Hur.  Castor Decl., Ex. P at 1.

Barely two hours before the Committee's March 12 hearing with Special Counsel Hur began, DOJ finally provided the Committee transcripts of the Special Counsel's interviews with President Biden—after they had already been given to reporters—but it continued to withhold the audio recordings.  *See* Castor Decl., Ex. Q at 2.[2]  Next, on March 25, after approximately two more weeks during which DOJ continued to withhold records, the Committee again extended the deadline for a complete production of subpoenaed materials to April 8.  *Id.*

DOJ subsequently produced only the transcript of the Special Counsel's interview with Zwonitzer.  Castor Decl. ¶ 18 & Ex. S at 1.  While DOJ acknowledged that President Biden had not asserted privilege over the Report or transcript of his interview, it made clear it would not produce the audio recording of either interview.  Castor Decl., Ex. S at 4, 5.  DOJ claimed the Subpoena sought "cumulative" information and argued that withholding the audio recordings was necessary to promote voluntary witness cooperation with future special counsel investigations.  *Id.* at 3-4, 5.

## II.    The critical importance of the audio recordings to the Committee's investigation

Although the Committee has received the cold transcripts of the Special Counsel's interviews with President Biden and Zwonitzer, it needs, for investigatory purposes, the best available evidence of those interviews: the audio recordings.  The transcripts of these interviews are not carbon copies of the audio recordings; they do not reflect nuances like tone and hesitation.  Nor does President Biden's interview transcript show every word he spoke.

---

[2] It has been reported that DOJ later released a redacted transcript of Special Counsel Hur's interview with Zwonitzer to a reporter, pursuant to a Freedom of Information Act (FOIA) request.  Castor Decl. ¶ 15 & Ex. R at 2.  (For exhibits (like this one) that do not include internal pagination, the numbers in our pincites still reflect the internal pages of the exhibit.)

**A.**   The cold transcripts are incomplete accounts of the Special Counsel's interviews and fall short of the audio recordings in two ways.   *First*, the transcripts do not capture either verbal context (tone, emphasis, inflection, volume, and pace) or nonverbal context (hesitating and pausing).   This matters because speakers convey unique information with these verbal and nonverbal nuances.   *See, e.g.*, Rebecca White Berch, *A Proposal to Amend Rule 30(b) of the Federal Rules of Civil Procedure: Cross-Disciplinary and Empirical Evidence Supporting Presumptive Use of Video to Record Depositions*, 59 Fordham L. Rev. 347, 347 (1990) ("Whenever spoken words are transcribed, some part of the communication is lost, because speakers use more than words to communicate ….").   Listeners then rely on these nuances to judge a speaker's credibility, and they "can be even better predictors of deception than … visual cues." *See id.* at 365.   The Committee does not have access to these nuances, and, as we explain below, it cannot fully evaluate the Special Counsel's recommendations without them.

*Second*, DOJ has admitted that these transcripts do not reflect every word that was spoken: President Biden's interview transcript does not always include "filler words (such as 'um' or 'uh')" or repeated words.   *See* Castor Decl., Ex. Z at 5, ¶ 14.   But these words are important because they can bear on a witness's credibility.   *See* Berch, *supra*, at 365 ("Hesitation cues such as 'um,' 'ah' or 'uh' are particularly indicative of deception.").   They can also shed light on a witness's state of mind and memory.   *See* Tatelman Decl., Ex. FF at 38 ("Verbal disfluency comprises several major subcategories: *false starts*, *repetitions*, *filled pauses* (e.g., 'uh,' 'um,' etc.), and *sentence corrections* ….   Studies have found that verbal fluency is an effective indicator of cognitive decline ….").   Separately, the transcript of President Biden's interview with the Special Counsel notes that some words are "indiscernible." *See* Transcript of Special Counsel Interview with President Biden at 42, 43, 46, 47, 57, 58, 72, 73, 79, 84, 85, 104,

119, 130, 132, 143, 145, 147, 149 (Oct. 8, 2023), https://perma.cc/FN87-B2XK.  Although a DOJ official has attested that those words are, in fact, indiscernible, *see* Castor Decl., Ex. Z at 5, ¶ 13, public reporting has revealed that transcripts of other remarks made by President Biden sometimes indicate that words were indiscernible when they were not, *see* ECF No. 1, ¶ 65 & nn. 132-34.  The Committee thus needs the unedited audio recordings.

**B.**  The Special Counsel relied on the way that President Biden presented himself during their interview—not simply the words he spoke—in reaching his conclusion that President Biden should not be charged for unlawfully retaining or disclosing classified material.  Castor Decl. ¶ 16 & Ex. D at 50.  The Special Counsel's subjective view of the President's state of mind, including his memory, affected his recommendation in at least four ways.

*First*, the Special Counsel concluded that President Biden may have forgotten about the classified materials in his Virginia home, rather than willfully retained them, after telling Zwonitzer that he had just found classified materials downstairs.  Report at 204-05.  The Special Counsel conceded that "such a swift and permanent bout of forgetfulness may seem implausible." *Id.* at 205.  Yet he found that President Biden's memory, which "appeared to have significant limitations," supported this possibility.  *See id.* at 205, 207.  For example, according to the Special Counsel, President Biden "did not remember when he was vice president, forgetting on the first day of the interview when his term ended ('if it was 2013 — when did I stop being Vice President?'), and forgetting on the second day of the interview when his term began ('in 2009, am I still Vice President?')." *Id.* at 208.  And in the Special Counsel's view, the President's "memory appeared hazy when describing" the policy debate to which the classified materials about Afghanistan related. *Id.*

*Second*, the Special Counsel relied on President Biden's inability to recognize documents found at the Penn Biden Center to support his conclusion that it is possible the President mistakenly, not willfully, retained those materials.  *See id.* at 304, 306-07.

*Third*, the Special Counsel believed that President Biden's "diminished faculties in advancing age[] and his sympathetic demeanor" would make it difficult for jurors to conclude that he willfully retained his notebooks that included classified material.  *See id.* at 242.  The Special Counsel also relied on President Biden's "emphatic" tone—which is not captured by the transcript—to support his view that President Biden may not have intended to break the law by retaining the notebooks because he thought they were his personal property.  *Id.* at 232.

*Fourth*, the Special Counsel noted that President Biden should have realized that he was likely disclosing classified information when he read his classified notes "nearly verbatim to Zwonitzer" but concluded that this failure "will likely appear consistent with the diminished faculties and faulty memory he showed in … our interview of him."  *Id.* at 247-48.  He thus found that jurors would likely have reasonable doubts about whether the President willfully disclosed that material.  *Id.* at 247.

These examples confirm that the Special Counsel relied on the way that President Biden presented, not simply the words he spoke.  Castor Decl., Ex. D at 50.  Therefore, to fully assess the Special Counsel's conclusion, the Committee needs the audio recording, which provides a more complete picture of how the President presented himself during the interview.

The same goes for the audio recording of the Special Counsel's interview with Zwonitzer. The audio will allow the Committee to better assess the Special Counsel's view of Zwonitzer's credibility, *see* Report at 336 (calling Zwonitzer "forthright"); *id.* at 341 (calling his explanation "plausible[ and] innocent"), which may shed light on President Biden's credibility.  Zwonitzer's

credibility also factored into the Special Counsel's conclusion that charges should not be brought against Zwonitzer for destroying evidence.  *See id.* at 343-44.  The Committee thus needs the audio of that interview—which captures nuances that the transcript does not and every spoken word—to fully assess his conclusions.

**C.**  The audio recordings are critically important to the Committee's oversight of DOJ and the Special Counsel.  It must have access to the best available evidence of the Special Counsel's interviews with President Biden and Zwonitzer to fully assess whether the outcome here is consistent with impartial justice.  After all, the Special Counsel's conclusions are open to interpretation: a White House lawyer called the Special Counsel's statements about the President's memory "unsupported personal opinion," Castor Decl., Ex. H at 3, and the President himself disputed the Special Counsel's view when he said at a press conference that his "memory is fine."  *Remarks in the Diplomatic Reception Room*, White House (Feb. 8, 2024), https://perma.cc/X6KC-Z4WL.

The Committee's need is heightened because a different special counsel is currently prosecuting President Trump for allegedly mishandling classified information.  *Special Counsel Jack Smith Delivers Statement*, DOJ (June 9, 2023), https://perma.cc/74NK-LQ6U.  The Committee therefore must assess whether Special Counsel Hur's divergent conclusion is consistent with DOJ's commitment to following the facts and the law wherever they lead.

The Committee's oversight will help it determine whether legislative reforms of DOJ and its use of special counsels are necessary.  If the Committee concludes that the Special Counsel's investigation did not deliver impartial justice, it may decide that reforms are necessary to promote actual justice and the appearance of justice.  To that end, the Committee could consider proposals such as readopting (in full or in part) the Ethics in Government Act.  The Act, among

other things, created a mechanism for a three-judge panel to appoint an independent counsel when the Attorney General received specific information that certain persons, including the President, had committed a federal crime.  *See* 28 U.S.C. §§ 591-98 (sunset 1999); *see also* ECF No. 1, ¶ 94 (explaining other proposals).  The Committee instead may decide that legislative reforms are unnecessary, but it cannot make that decision until after it fully assesses the Special Counsel's recommendations.  And it needs the audio recordings to do that.

**D.**  The audio recordings will also advance the Committee's impeachment inquiry.  *First*, they will shed light on whether President Biden willfully retained classified information to assist his family's business dealings.  The Special Counsel found that he retained two documents related to a December 2015 call he had with the Ukrainian Prime Minister (one with talking points for a call and the other with a transcript of the call).  *See* Report at 281, 310, A-2.  That call came shortly after the President's son—who sat on the board of a Ukrainian company whose owner was being investigated by Ukrainian prosecutors, *see* Castor Decl., Exs. GG & HH— "called his dad" after the company's owner asked him to get help from "D.C."  Castor Decl. ¶ 11 & Ex. DD at 34-37.  Days after his son called (but before his call with the Ukrainian Prime Minister), Vice President Biden, according to one source, made a unilateral decision to condition a loan from the United States on the firing of the Ukrainian Prosecutor General.  *See* Castor Decl. ¶ 11 & Ex. GG. Given his son's connection to the Ukrainian company, the Committee needs to know if President Biden willfully took the classified information to benefit his family's business dealings in Ukraine, which remained active at the time he left the vice presidency.

*Second*, the Committee is investigating whether President Biden retained and disclosed sensitive information to enrich himself through a book deal.  *See* Report at 231-32 (observing the President had "strong motivations" to flout the rules for properly handling classified materials in

light of the book deal); *id.* at 141 (noting the book deal netted the President "an advance of $8 million").  The classified materials were an "invaluable resource that [President Biden] consulted liberally" while writing his book.  *See id.* at 231.  If President Biden willfully retained classified information to carry out a multimillion-dollar book deal, that may also be an abuse of his office of public trust meriting impeachment.

Listening to the audio recordings—which capture tone, pace, hesitation, reluctance, and every spoken word—will help the Committee determine whether President Biden retained classified material to benefit his family's business dealings or to enrich himself.

### III.   The Committee's efforts to obtain the audio recordings reach an impasse given the privilege assertion

The Committee made one last-ditch attempt to obtain the subpoenaed records without resorting to a lawsuit or contempt proceedings on April 15, when it wrote to DOJ to explain its need for the materials and to address DOJ's waiver of any privilege over the audio recordings of the interviews.  Castor Decl., Ex. T.  In a final accommodation, the Committee extended the deadline for a complete production—for a third time—to April 25.  *Id.* at 4.

DOJ responded on April 25 with a letter explaining why it would not produce any additional records to the Committee.  Castor Decl., Ex. U.  In short, DOJ quibbled with the Committee's reasons for seeking the materials and theorized that producing the audio recordings could pose a generalized risk of harm to prosecutorial decision-making and the privacy interests of witnesses and uncharged parties.  *Id.* at 4-5.  DOJ expressed concern that producing the audio recordings could "undermin[e] confidence in [DOJ's] ability to protect sensitive law enforcement information."  *Id.* at 6.  Specifically, DOJ relied on the vocal tone, inflections, and other idiosyncrasies in the audio recordings as a basis to withhold them from the Committee, arguing

that "the privacy interest in one's voice—including tone, pauses[,] emotional reactions, and cues—is distinct from the privacy interest in a written transcript of one's conversation." *Id.* at 7.

After the Committee's repeated efforts to give Garland more time to complete his production of the subpoenaed materials had failed, the Committee scheduled a public business meeting for May 16 to consider recommending that Garland be held in contempt of Congress. Less than two hours before the meeting was scheduled to begin, the Committee received a letter from DOJ conveying the President's assertion of executive privilege over the subpoenaed audio recordings, at Garland's request. Castor Decl., Ex. W at 1.[3]  Garland argued that disclosing the audio "would have a chilling effect on future cooperation in similar investigations." *Id.* (attached letter at 7).  He also claimed that the prior disclosure of the interview transcripts did not waive the privilege because "audio recordings have distinct features and law enforcement uses, which implicate privacy interests and risks of misuse to a greater degree than transcripts." *Id.*

On June 12, consistent with the Committee's recommendation, the House found Garland in contempt of Congress.[4]  The House considered the Committee's Report, which rejected the executive privilege claim as untimely and having been waived when the President released the transcripts to the public and media.  *See generally* Castor Decl., Ex. X at 14.  And while DOJ could have taken steps to attempt to protect the confidentiality of the transcripts when it

---

[3] At Garland's behest, President Biden also asserted a protective claim of executive privilege over any other materials responsive to the Subpoena that had not been produced. Castor Decl., Ex. W at 1.

[4] 170 Cong. Rec. H3970-71 (daily ed. June 12, 2024) (adopting House Resolution 1292, which found Garland in contempt of Congress in violation of 2 U.S.C. § 192), https://perma.cc/ZM69-EA7D.  The same day, the House adopted House Resolution 1293, which found Garland in contempt for failing to comply with an identical subpoena from the Oversight Committee.  H. Res. 1293, 118th Cong. (2024), https://perma.cc/P6WT-U866; H. Res. 1287 § 6, 118th Cong. (2024) (adopting House Resolution 1293 upon adoption of House Resolution 1292), https://perma.cc/J2X7-UDVM.

produced them to Congress, the Committee noted that DOJ chose not to do so.  *Id.*  Finally, even

if the privilege claim had been timely and valid, the Committee determined that it had been

overcome because the audio recordings are necessary to evaluate potential reforms to DOJ.  *Id.*

at 14-15.  On June 14, DOJ informed Speaker of the House Mike Johnson that it would not bring

the Congressional contempt citation before a grand jury or take any other action to prosecute

Garland.  Castor Decl., Ex. Y.

On June 26, the Speaker called Garland to see if they could resolve this dispute.  But

Garland explained that the matter was out of his hands because he had received a direct order

from the President.  When the Speaker's Office then reached out to the White House, its effort to

find a solution was rebuffed.  Having reached an impasse, the Committee is left with no other

option but to seek judicial enforcement of its Subpoena.

## IV.    The Committee's constitutional authority to conduct investigations, as part of and including an impeachment inquiry, and to issue subpoenas to advance its investigations

The Committee's authority to conduct this investigation—and to issue subpoenas to

execute it—comes from Article I of the Constitution.  The Committee's ability to investigate the

Special Counsel's recommendations rests on two independent constitutional bases.

Article I of the Constitution vests Congress with "[a]ll legislative Powers."  U.S. Const.

art. I, § 1, cl. 1.  Those powers include the authority to investigate matters relating to subjects

within its broad legislative purview; conduct oversight of Executive Branch agencies; examine

whether agencies are faithfully, effectively, and efficiently executing the laws; and determine

whether changes to federal law are necessary and proper.  DOJ is one of the agencies over which

the Committee has oversight authority.  Castor Decl. ¶ 4; *see also* Rule X.1(*l*)(1), (7), Rules of

the House of Representatives, 118th Cong. (2023) (House Rules), https://perma.cc/3UX4-

2YG5.[5]  For nearly a century, the Supreme Court has recognized that the Constitution vests the House with the "power of inquiry—with process to enforce it"—commensurate with the House's Article I legislative authority to investigate any subject on which "legislation could be had." *McGrain v. Daugherty*, 273 U.S. 135, 174, 177 (1927).  This power has been delegated to the Committee.  *See, e.g.*, House Rule XI.2(m) (delegating subpoena power).

Separate from the Committee's legislative oversight authority, the impeachment power is textually committed by the Constitution to the House and the House alone.  U.S. Const. art. I, § 2, cl. 5.  This power is far-reaching.  Even prior presidents have admitted that an impeachment inquiry "penetrate[s] into the most secret recesses of the Executive Department" and includes the authority to "command the attendance of any and every agent of the Government, and compel them to produce all papers, public or private, official or unofficial, and to testify on oath to all facts within their knowledge."  4 J. Richardson, *A Compilation of the Messages and Papers of the Presidents*, H. Misc. Doc. 53-210, at 434 (1897) (statement of President James K. Polk), https://perma.cc/82XR-DWJ2.

The Committee's jurisdiction includes impeachment.  *Constitution, Jefferson's Manual, and Rules of the House of Representatives of the United States*, H. Doc. 117-161, § 605, at 329 (2023), https://perma.cc/3HCB-WYMP.  In September 2023, the Committee launched its impeachment inquiry along with the Oversight and Ways and Means Committees.  *See* Castor Decl. ¶ 13.  This inquiry seeks to assess whether President Biden has abused his office of public trust to enrich himself or his family, including in connection with his family's business dealings with foreign parties.  Castor Decl. ¶ 10 & Ex. B at 27-28.  The full House formalized that inquiry

---

[5] The House Rules establish various standing committees, including the Judiciary Committee, and delegate to each committee "jurisdiction and related functions."  *See generally* House Rule X.1.

in December 2023, *see generally* H. Res. 918, 118th Cong. (2023), https://perma.cc/69QX-U332,

and confirmed that the Committee has the authority to issue subpoenas as part of its

investigation, *see id.* § 6 (adopting House Resolution 917); H. Res. 917, 118th Cong. § 2 (2023),

https://perma.cc/57G5-C54Y.

In sum, the Judiciary Committee has plenary authority—under its constitutional authority

to conduct legislative oversight and from its solemn power of impeachment—to investigate the

Special Counsel's recommendations and to compel Garland to produce the audio recordings.

## **ARGUMENT**

Garland has violated his legal duty to comply with the Committee's lawfully issued

Subpoena, and his defiance is obstructing the Committee's investigation.  President Biden's

assertion of executive privilege over the audio recordings of the Special Counsel's interviews

with him and Zwonitzer has no merit.  Any privilege over those interviews has been waived.

DOJ has released transcripts of both interviews to the public (and the Committee), and neither

the President nor DOJ invoked executive privilege before the Subpoena's return date.

Additionally, as three Judges of this Court have found, this is the type of case the Court has the

power to resolve, and the Committee's requested relief—which will protect its legal right to the

audio recordings—is within the Court's authority to grant.

Given the gravity of the Committee's duties and the irreparable harm it is suffering, a

preliminary injunction ordering Garland to comply with its Subpoena is justified and appropriate.

Alternatively, the Committee moves for summary judgment, and permanent relief, on the issue

of whether the audio recordings are covered by executive privilege.  That and any related

questions (like waiver) are "strictly … legal issue[s]," *see Comm. on Judiciary v. Miers*, 558 F.

Supp. 2d 53, 97 (D.D.C. 2008) (*Miers I*), and are appropriately addressed on summary judgment, *see Swan v. Clinton*, 100 F.3d 973, 976 (D.C. Cir. 1996).

In either case, the Committee with this motion seeks an injunction, preliminary or permanent, ordering Garland to comply with the Committee's Subpoena, and a declaration that his failure to do so due to the President's claim of executive privilege is unlawful.  The standards for preliminary and permanent injunctions are "essentially the same," *see Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008) (citation omitted), and either would provide the Committee with the same relief here.  As to declaratory relief, *Miers I*, which involved another dispute where the Executive Branch refused to comply with a subpoena based on a claim of executive privilege, explains why this Court should exercise its discretion under the Declaratory Judgment Act in favor of review.  *See* 558 F. Supp. 2d at 94-99.  Perhaps most importantly, "entertaining this case will reinforce" the constitutional "separation of powers."  *See id.* at 99.

As we explain below, this Court has jurisdiction (Part I), the Committee prevails on the merits (Part II), and it has satisfied the other requirements for injunctive relief (Part III).

**I.     This Court has authority to resolve this case**

**A.     The Committee has standing under binding D.C. Circuit precedent**

Binding D.C. Circuit precedent holds that the Committee has Article III standing to sue to enforce a subpoena for records, including audio recordings.  *See Comm. on Judiciary v. McGahn*, 968 F.3d 755, 763 (D.C. Cir. 2020) (en banc) (*McGahn En Banc*) ("[W]e hold that the Committee has Article III standing to protect against the denial of that to which it alleges it is entitled, namely McGahn's testimony in response to its duly issued subpoena.").  The failure of Garland to comply with his Subpoena has injured the Committee; that injury is directly traceable to him; and this Court can remedy it.  *See Comm. on Oversight & Gov't Reform v. Holder*, 979 F.

Supp. 2d 1, 20 (D.D.C. 2013) ("[I]t [is] well established that a legislative body suffers a redressable injury when that body cannot receive information necessary to carry out its constitutional responsibilities." (alterations in original) (citation omitted)).

**B.    The Court has subject matter jurisdiction under 28 U.S.C. § 1331**

The Committee brought this suit to enforce the Subpoena that it issued as part of its Article I authority.  The case thus arises under the Constitution, and the Court has subject matter jurisdiction under § 1331.  *See* 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution.").

Here, the Committee seeks to enforce a subpoena for audio recordings that are relevant to its ongoing legislative oversight investigation and impeachment inquiry.  Because the Committee's "subpoena power derives implicitly from Article I of the Constitution, the case ar[ises] under the Constitution for purposes of section 1331." *Holder*, 979 F. Supp. 2d at 17; *accord Miers I*, 558 F. Supp. 2d at 64-65; *see also United States v. AT&T*, 551 F.2d 384, 388-89 (D.C. Cir. 1976) (*AT&T I*).

Congress did not impliedly withdraw federal courts' jurisdiction to hear House subpoena-enforcement cases under § 1331 when it enacted a statute that explicitly provides jurisdiction over Senate subpoena-enforcement cases without mentioning the House at all.  *See generally* 28 U.S.C. § 1365.  Two Judges of this Court have considered whether the Senate statute prevents courts from exercising jurisdiction over a House subpoena-enforcement case, and both concluded that it does not.  *See Comm. on Judiciary v. McGahn*, 415 F. Supp. 3d 148,

175-76 (D.D.C. 2019);[6] *Holder*, 979 F. Supp. 2d at 17-20.[7]  Indeed, "jurisdiction conferred by 28 U.S.C. § 1331 should hold firm against 'mere implication flowing from subsequent legislation.'"  *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 383 (2012) (citation omitted); *see also Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 643 (2002) ("The mere fact that some acts are made reviewable should not suffice to support an implication of exclusion as to others."  (citation omitted)).

### C.      The Committee may bring this action to enforce its Subpoena

The Committee has a constitutional right—under Article I—to the audio recordings.  This Court may remedy the constitutional violation here by requiring Garland to produce them.  The Court does not need statutory authorization to do so because we are dealing with a constitutional right, not a statutory one.  And regardless, the Declaratory Judgment Act provides any necessary authorization.

### 1.      The Committee has an equitable cause of action

Just as Article I gives the Committee the power to investigate—and to compel testimony by subpoena as part of that investigative authority—it confers on the Committee the corollary power to sue to enforce a subpoena.  *See Quinn v. United States*, 349 U.S. 155, 160-61 (1955) (noting that Congress has "the authority to compel testimony, either through its own processes or

---

[6] The *McGahn* decision was reversed on Article III standing grounds by a D.C. Circuit panel.  *Comm. on Judiciary v. McGahn*, 951 F.3d 510, 513 (D.C. Cir. 2020).  The en banc Court reversed the panel, holding that the Committee did have standing, and remanded the case back to the panel, *McGahn En Banc*, 968 F.3d at 778, which then held that the Committee lacked a cause of action, *Comm. on Judiciary v. McGahn*, 973 F.3d 121, 123 (D.C. Cir. 2020) (*McGahn Vacated Panel*).  The en banc Court again vacated the panel decision, but the parties settled, and the appeal was dismissed before the Court could rehear the case en banc.

[7] The defendants in *Miers I* conceded that the Court had jurisdiction under § 1331.  *Miers I*, 558 F. Supp. 2d at 64.

through judicial trial" (footnote omitted)); *McGrain*, 273 U.S. at 174 ("We are of [the] opinion that the power of inquiry—with process to enforce it—is an essential and appropriate auxiliary to the legislative function."). Indeed, two Judges of this Court have expressly found that a House committee has a cause of action under the Constitution to enforce a subpoena.

**a.** The Committee filed this suit to vindicate a constitutional right, and courts regularly protect constitutional rights by preventing Executive Branch officials from violating them. This case is no different. The Committee has a legal right—one that flows directly from its Article I authority—to the audio recordings. *See, e.g.*, *Miers I*, 558 F. Supp. 2d at 91 ("[B]y utilizing its power to issue subpoenas and proceed with an investigation via compulsory process, Congress creates a *legal right* to the responsive information that those subpoenas will yield."). By refusing to comply with the Subpoena, Garland is depriving the Committee of information to which it is entitled and thus is interfering with its Article I legislative oversight authority and impeachment power. *Cf. McGahn En Banc*, 968 F.3d at 765 ("The House … has a long-recognized right, based in the Constitution, to have McGahn appear to testify and produce documents. … By refusing to testify in response to the Committee's concededly valid subpoena, McGahn has denied the Committee something to which it alleges it is entitled by law.").

This Court has the equitable authority to prevent Garland from violating the Committee's constitutional rights by enjoining him to produce the audio recordings. *See, e.g.*, *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) ("[I]n a proper case, relief may be given in a court of equity ... to prevent an injurious act by a public officer." (second alteration in original) (quoting *Carroll v. Safford*, 44 U.S. (3 How.) 441, 463 (1845))); *Bell v. Hood*, 327 U.S. 678, 684 (1946) ("[I]t is established practice for this Court to sustain the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution ….."). Indeed, the

20

Supreme Court has noted that "[t]he ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England."  *Armstrong*, 575 U.S. at 327.

Finally, the Supreme Court has allowed plaintiffs to bring suits to vindicate constitutional rights directly under the Constitution, just as the Committee has done here.  *See, e.g.*, *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010) (rejecting the government's argument that faulted the plaintiffs for not pointing to any Supreme Court case that recognized "an implied private right of action directly under the Constitution to challenge governmental action under the Appointments Clause or separation-of-powers principles"); *Jacobs v. United States*, 290 U.S. 13, 16 (1933) (permitting plaintiff to bring suit directly under the Fifth Amendment based on allegations that the United States had taken his property for public use without just compensation).  Thus, the Committee may bring this suit to enforce the Subpoena.

**b.**  Two Judges of the Court have expressly recognized the House can sue under Article I to enforce a subpoena.  In *Miers I*, this Court "conclude[d] that the Committee has an implied cause of action derived from Article I to seek a declaratory judgment concerning the exercise of its subpoena power."  558 F. Supp. 2d at 94.  This conclusion flowed from Supreme Court precedent "constru[ing] Article I … to find an implied right of investigation, and … an implied right to compel compliance with that investigative power, accruing to Congress."  *Id.* at 90.  The Court recognized that the Committee has other ways to try to compel compliance with subpoenas and concluded that those alternative remedies did not preclude the Committee from bringing a civil suit under Article I.  *See id.* at 91-92 (discussing the inherent contempt authority).  Finally, the Court explained why recognizing the Committee's implied cause of action does not raise the same concerns that recognizing an implied cause of action for damages might.  *See id.* at 94

21

(explaining that the Court's decision allows only the House and its committees to sue, and thus would not "lead[] to a deluge of additional litigation" to enforce subpoenas and would not negatively impact government employees or operations the way suits for damages might).[8]

More recently, this Court in *McGahn* reached the same conclusion. 415 F. Supp. 3d at 193 ("[A]s Judge Bates recognized in *Miers [I]*, Article I of the Constitution is all the cause that a committee of Congress needs to seek a judicial declaration from the court regarding the validity and enforceability of a subpoena that it has allegedly issued in furtherance of its constitutional power of inquiry."). Its decision found that this result flowed directly from Supreme Court precedent. *See id.* at 193-94. The Court also rejected the claim that recognizing a House committee's ability to file a civil lawsuit to enforce a subpoena contradicts Supreme Court precedent related to implied causes of action. *Id.* at 194. Rather, the Court emphasized that the power to enforce subpoenas is just as much a part of the Article I power as the authority to conduct investigations. *See id.*

This makes sense. As Supreme Court precedent recognizes, when the Constitution grants a power, it also grants auxiliary powers that are necessary to exercising it. *Id.* ("There is not in the whole of [the Constitution], a grant of powers which does not draw after it others, not expressed, but vital to their exercise …." (alteration in original) (quoting *Anderson v. Dunn*, 19 U.S. (6 Wheat.) 204, 225-26 (1821))). And the ability to enforce subpoenas is necessary to the House's ability to execute investigations by obtaining records and documents. Because the House Committee in the *McGahn* litigation had the constitutional right to enforce its subpoena,

---

[8] The Court in *Holder* "d[id] not take issue" with the *Miers I* Court's conclusion that the House has an implied cause of action under Article I, but the Court in *Holder* found it unnecessary to reach that issue after it found that the Declaratory Judgment Act provides a cause of action. *See* 979 F. Supp. 2d at 23 n.11.

and because "the judiciary is clearly discernible as the primary means through which constitutional rights may be enforced," the Court concluded that the Committee had a cause of action to bring its suit.  *See id.* (citation omitted).

While a divided D.C. Circuit panel later held during the *McGahn* litigation that the House does not have a cause of action to enforce subpoenas, *see McGahn Vacated Panel*, 973 F.3d at 123, that decision was incorrect for several reasons, which is presumably why the full D.C. Circuit ultimately vacated it and agreed to rehear the case en banc.  *See* Order, *Comm. on Judiciary v. McGahn*, No. 19-5331 (D.C. Cir. Oct. 15, 2020) (granting petition for rehearing en banc and vacating the panel decision).[9]

*First*, the panel's majority opinion improperly conflated recognition of a House committee's implied right to sue under the Constitution for injunctive relief to enforce a subpoena, with recognition of an implied right to sue under a statute or to sue for damages. Indeed, the majority's analysis started from the premise that courts should "hesitate before finding implied causes of action."  *See McGahn Vacated Panel*, 973 F.3d at 123.  But the cases it relied on to support that proposition dealt with recognizing implied causes of action either pursuant to a Congressional statute, *see id.* (citing *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 333-34 (2020); *Jesner v. Arab Bank, PLC*, 584 U.S. 241, 262-63 (2018); and *Alexander v. Sandoval*, 532 U.S. 275, 286-87 (2001)), or for damages against federal officials, *see id.* (citing *Hernandez v. Mesa*, 589 U.S. 93, 99-102 (2020); and *Ziglar v. Abbasi*, 582 U.S. 120, 135 (2017)).  While courts should hesitate before recognizing a cause of action in these scenarios, there is no reason for the Court to hesitate here.

---

[9] Before the D.C. Circuit could rehear the case en banc, the parties settled, and McGahn's appeal was dismissed as moot.  *See* Order, *Comm. on Judiciary v. McGahn*, No. 19-5331 (D.C. Cir. July 13, 2021).

That is because a House committee's right to sue to enforce a subpoena involves a constitutional right and recognizing that right does not create the same separation-of-powers issues that recognizing an implied right to sue under a Congressional statute might.  "It is the judiciary, rather than Congress, that is traditionally regarded as the arbiter of constitutional rights and it is self-evident why courts do not look to congressional intent when construing the Constitution."  *Miers I*, 558 F. Supp. 2d at 88.  But Congressionally conferred statutory rights are meaningfully different.  Courts should hesitate before recognizing an implied right to sue under a statute because it is Congress, not the Judiciary, that determines whether to allow a private person to sue to enforce a right that Congress itself has provided.  *See id.* ("Numerous Supreme Court decisions … establish that plaintiffs seeking to imply a cause of action from a federal statute bear the heavy burden of proving that Congress clearly meant for the statute to provide a private *right* to a class of individuals and that Congress also intended the statute to create a private federal *remedy*.").

Relatedly, recognizing a right to sue federal officials for damages raises concerns that recognizing a House committee's right to sue to enforce a subpoena does not, just as this Court explained in *Miers I*.  *See id.* at 94; *see also McGahn*, 415 F. Supp. 3d at 208 ("Nor can DOJ reasonably rely on the well-established body of case law that applies to the very different circumstance of immunity from civil damages.").  Indeed, given the Judiciary's long history of preventing federal officials from violating constitutional rights, the Supreme Court has explained that cases seeking redress "designed to halt or prevent [a] constitutional violation rather than the award of money damages … 'd[o] not ask the Court to imply a new kind of cause of action.'" *United States v. Stanley*, 483 U.S. 669, 683 (1987) (citation omitted).

*Second*, the majority opinion in *McGahn* wrongly assumed that Congress must authorize the House's right to enforce a subpoena, even though that right comes directly from Article I. Working from this flawed premise, the majority opinion concluded that Congress had declined to do so by authorizing the Senate, but not the House, to bring subpoena-enforcement actions. *See McGahn Vacated Panel*, 973 F.3d at 123 (citing 2 U.S.C. § 288d and 28 U.S.C. § 1365(b)). But this analysis misunderstands the nature of the right: the House's ability to sue to enforce a subpoena comes directly from Article I, and it does not require any Congressional authorization. The Senate-specific statutes are thus beside the point. And if the House did need Congressional authorization, as we explain below, the Declaratory Judgment Act provides it. *See, e.g.*, *McGahn*, 415 F. Supp. 3d at 195.

*Third*, when considering whether courts have traditionally provided the equitable relief that the House Committee sought, the majority opinion considered only whether there were historical examples that involved the same facts. *See McGahn Vacated Panel*, 973 F.3d at 372 ("The Committee cannot point to a single example in which a chamber of Congress brought suit for injunctive relief against the Executive Branch prior to the 1970s."). But when considering whether a litigant is asking for relief that courts of equity have traditionally provided, it makes more sense to focus on the type of relief, not the specific facts at issue. The House Committee in *McGahn* was simply asking the court to remedy the Executive Branch's unconstitutional action. *See McGahn*, 415 F. Supp. 3d at 194 n.23. Courts have long provided that relief as part of their equitable authority. *See, e.g.*, *Armstrong*, 575 U.S. at 325.

**c.** Finally, there are no special cause-of-action rules for cases that pit two government branches against each other. In *Free Enterprise Fund*, the Supreme Court found no barrier to an "implied private right of action directly under the Constitution to challenge governmental action

under … separation-of-powers principles."  561 U.S. at 491 n.2 (citation omitted).  And in other cases involving Congressional subpoenas, both the D.C. Circuit and the Supreme Court have permitted the Executive Branch as well as the President in his personal capacity to seek equitable relief to vindicate their constitutional prerogatives.  *See United States v. AT&T*, 567 F.2d 121, 130-31 (D.C. Cir. 1977) (*AT&T II*); *Trump v. Mazars USA, LLP*, 591 U.S. 848 (2020).  It cannot be the case that the Executive Branch may pursue equitable relief when its constitutional interests are impacted, but the House cannot.

### 2. The Committee has a cause of action under the Declaratory Judgment Act

Three Judges of this Court have concluded that a House committee may sue under the Declaratory Judgment Act to enforce a subpoena.  *See Miers I*, 558 F. Supp. 2d at 88; *Holder*, 979 F. Supp. 2d at 23-24; *McGahn*, 415 F. Supp. 3d at 195.  This Court should do the same.

The analysis is straightforward.  The Act empowers courts to declare parties' "rights" and "legal relations" where there is (1) an actual case or controversy and (2) federal jurisdiction.  28 U.S.C. § 2201(a).  Both these requirements are met here.  *First*, because, as explained above, the Committee has standing, it necessarily follows that there is an actual case or controversy.  *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) ("Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy.").  *Second*, also as explained above, the Court has jurisdiction under 28 U.S.C. § 1331.  There are no other requirements under the Declaratory Judgment Act, and it thus authorizes the Committee to seek a judicial declaration of its right to compliance with its issued Subpoenas.

To be sure, the Act "presupposes the existence of a judicially remediable right."  *C&E Servs., Inc. v. D.C. Water & Sewer Auth.*, 310 F.3d 197, 201 (D.C. Cir. 2002) (citation omitted).  But that judicially remediable right exists: "[t]he Constitution itself is the source of the right of

compulsory process that the Committee seeks to vindicate here." *McGahn Vacated Panel*, 973 F.3d at 127-29 (Rogers, J., dissenting); *see also Miers I*, 558 F. Supp. 2d at 88 ("It is the Constitution, and not any independent cause of action, that supplies the basis for Congress's right to invoke the DJA here."); *Holder*, 979 F. Supp. 2d at 23 (explaining that the House committee "has alleged an actual injury to rights derived from the Constitution"). Relying on its mistaken conclusion that the Constitution does not give the House a right to sue to enforce a subpoena, the majority opinion in *McGahn Vacated Panel* wrongfully concluded that the House Committee could not sue under the Act. *See* 973 F.3d at 124-25. This Court should instead follow the logic of *Miers I* and *Holder* and conclude that the Committee may bring its suit under the Act.

### D.     This case is otherwise justiciable

There is no other reason that prevents the Court from hearing this case. As outlined above, the Committee repeatedly extended the Subpoena's return date to accommodate the Executive Branch's purported needs. But now that the President has invoked executive privilege, the parties are at an impasse. With further negotiations now futile, and the damage to the Committee growing every day, this Court's speedy intervention is warranted. *See Holder*, 979 F. Supp. 2d at 25 ("It is sufficient that [the Court] finds the conclusion that there is an impasse to be inescapable, and that under those circumstances, it does not appear that there would be any point to sending this matter back.").

Moreover, the "mere fact that there is a conflict between the legislative and executive branches over a congressional subpoena does not preclude judicial resolution of the conflict." *AT&T I*, 551 F.2d at 390. Courts have found justiciable numerous separation-of-powers disputes between the Executive and Congress. *See, e.g.*, *McGahn*, 415 F. Supp. 3d at 177; *Holder*, 979 F. Supp. 2d at 4; *Miers I*, 558 F. Supp. 2d at 84-85; *AT&T II*, 567 F.2d at 125-130; *Senate Select*

*Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 728 (D.C. Cir. 1974) (en

banc).  And when it comes to cases about subpoena enforcement, courts have been clear that they

> can identify no reason why that right cannot be vindicated by recourse to the federal
> courts ….  After all, courts routinely enforce subpoenas in favor of parties with
> rights to information.  The mere fact that this case involves a dispute between the
> political branches—or that such disputes are normally settled through negotiation
> and accommodation—is not sufficient to render the Committee's right non-
> judicially remedial.  That argument is foreclosed by precedent ….

*Miers I*, 558 F. Supp. 2d at 84-85.

 Given that the parties are at an impasse, and that judicial review is particularly

appropriate where, as here, "the narrow legal question posed by the complaint is precisely the

sort of crisp legal issue that courts are well-equipped to address and routinely called upon to

resolve," *Holder*, 979 F. Supp. 2d at 4, this Court should hear the case.

## II.      President Biden's privilege assertion lacks merit

### A.      Garland has a legal duty to comply with the Subpoena

The Supreme Court has consistently held that the "[i]ssuance of subpoenas … has long

been held to be a legitimate use by Congress of its power to investigate."  *Eastland v. U.S.*

*Servicemen's Fund*, 421 U.S. 491, 504 (1975).  Exercising its power to determine its "Rules of

its Proceedings," U.S. Const. art. I, § 5, cl. 2, the House has delegated investigatory and

subpoena powers to various committees.  The House Rules empower all standing committees,

including the Judiciary Committee, to "conduct at any time such investigations and studies as it

considers necessary or appropriate in the exercise of its responsibilities" over matters within its

jurisdiction.  House Rule XI.1(b)(1).  To aid these inquiries, the Judiciary Committee—like all

standing committees—is authorized to issue subpoenas.  *See* House Rule XI.2(m)(1)(B),

(3)(A)(i); *see also* Rule IV(a), Rules of the Committee on the Judiciary of the U.S. House of

Representatives, 118th Cong. (2023), https://perma.cc/6UUS-LYEH.  Additionally, the full

House has confirmed that the Committee has the "authority to issue subpoenas" for purposes of the impeachment inquiry.  *See* H. Res. 917, § 2.  Thus, the Committee, in connection with both its oversight investigation into DOJ's commitment to impartial justice and its consideration of whether to recommend articles of impeachment against President Biden, has issued a legally valid Subpoena to Garland, who has not identified any procedural defect with the Subpoena itself.

Having received a lawfully issued Subpoena, Garland had an "unremitting obligation to respond … to respect the dignity of the Congress and its committees … with respect to matters within the province of proper investigations."  *Watkins v. United States*, 354 U.S. 178, 187-88 (1957); *see also Mazars*, 591 U.S. at 871 ("When Congress seeks information …, it 'unquestionably' remains 'the duty of *all* citizens to cooperate.'"  (quoting *Watkins*, 354 U.S. at 187)); *United States v. Bryan*, 339 U.S. 323, 331 (1950) ("We have often iterated the importance of this public duty [to comply with Congressional subpoenas], which every person within the jurisdiction of the Government is bound to perform ….").

By withholding the audio recordings called for by the Subpoena, Garland violated his legal obligation to comply with the Subpoena and has unlawfully deprived the Committee of its constitutional right to information.  *See, e.g.*, *Miers I*, 558 F. Supp. 2d at 99 ("The Supreme Court has made it abundantly clear that compliance with a congressional subpoena is a legal requirement.").

## B.    The privilege claim here, which relies on a purported common-law privilege, lacks merit

President Biden's claim of executive privilege over the audio recordings lacks any basis in law.  His unfounded assertion represents the latest step in the Executive Branch's continuing effort to expand the breadth and scope of executive privilege by repackaging common-law

privileges—such as the law enforcement privilege asserted here—as constitutionally based claims.  The fact that DOJ has already produced to the Committee and publicly released written transcripts of the interviews in question renders the assertion of executive privilege here to be, at best, over inflection, pace, emphasis, pauses, and other verbal and non-verbal indicators that would reveal themselves only on the audio recordings.  To the Committee's knowledge, such a broad privilege assertion is novel, and it reflects an unreasonably expansive view of executive privilege with no limiting principles.

As discussed below, the President's assertion of privilege over the audio recordings fails for three independent reasons.  *First*, any privilege has been waived both by the release and publication of the transcripts and because it was not timely asserted.  *Second*, the assertion of privilege fails because it is actually a common-law privilege not required to be recognized by Congress.  *Finally*, even assuming a valid privilege assertion, which this is not, the Committee's demonstrated need for the audio recordings outweighs any interest in maintaining the privilege.

### 1.  The privilege has been waived

**<u>Waived via public release.</u>**  Any claim of privilege over the audio recordings sought by the Committee was waived both when the White House disclosed the transcripts of those interviews to the Committee and when it released them to the public.  Indeed, the transcripts of President Biden's interviews were released to the news media by the Executive Branch *before* DOJ produced them in response to the Committee's subpoena.  *See* Castor Decl. ¶ 15 & Ex. Q at 2.  The audio recordings of those interviews thus cannot be privileged.

This Court has previously encountered a nearly identical fact pattern.  In 1974, when President Nixon caused transcripts of subpoenaed audio recordings to be published, this Court held that his subsequent claim of executive privilege over the audio recordings of those same

conversations had been relinquished.  *See United States v. Mitchell*, 377 F. Supp. 1326, 1330

(D.D.C. 1974).  According to this Court, "the privilege claimed [was] non-existent since the

conversations are ... no longer confidential."  *Id.* (citing *Nixon v. Sirica*, 487 F.2d 700, 718 (D.C.

Cir. 1973)).  The same is true in this case.  Here, the President did not assert executive privilege

over any portion of the interview transcripts prior to their disclosure to the Committee.

Additionally, no conditions were placed on the provision of the transcripts before DOJ turned

them over to the Committee.  No agreement was reached in advance between the parties that the

transcripts were not to be disclosed.  No restrictions were placed on Special Counsel Hur's

testimony before the Committee regarding the very interviews at issue here.  Accordingly, as the

D.C. Circuit has recognized, the substantive content of the audio recordings cannot possibly be

privileged at this point, after the content has been made public.  *See Sirica*, 487 F.2d at 718

("[T]he public testimony given … substantially diminishes the interest in maintaining the

confidentiality of conversations pertinent to Watergate.  The simple fact is that the conversations

are no longer confidential.  Where it is proper to testify about oral conversations, taped

recordings of those conversations are … as probative and corroborative of the truth concerning

the testimony.").

   *Mitchell* is consistent with the way similar privileges are treated in other contexts.

"Courts frequently deem otherwise valid privileges waived when information is disclosed to

third parties."  *Di Lapi v. City of New York*, Nos. 06–CV–3101, 06–CV–2864, 2012 WL 37576,

at *4 (E.D.N.Y. Jan. 6, 2012) (citing *Hobley v. Chi. Police Commander Burge*, 445 F. Supp. 2d

990, 999 (N.D. Ill. 2006) (finding waiver of privilege to protect a governor's thought processes

after public disclosure to a talk show host)); *see also Clark v. Falls*, 124 F.R.D. 91, 94 (E.D. Pa.

1988) (finding executive privilege waived due to disclosure of information to a newspaper and district justice).

The D.C. Circuit's admonition that "waiver should not be lightly inferred," *In re Sealed Case*, 121 F.3d 729, 741 (D.C. Cir. 1997) (*Espy*) (citation omitted), notwithstanding, the case for finding a waiver of privilege here is strong.  Waiver is not being inferred at all; in fact, it could not be more express.  The Executive Branch is attempting with one hand to release information by written transcript, presumably because it is favorable to its political position, but at the same time to assert privilege over that same information, albeit in a different format (audio recording) because it presumably deems that medium unfavorable to its political position.  Indeed, DOJ has not pointed to a single example where executive privilege was invoked only over aspects of an oral interview that are not reflected in a transcript—things like a witness's voice inflection, tone, pauses, and the like.  The apparent lack of any precedent shows how novel this privilege claim is.  This Court should see this charade for what it is and find that the release of the written transcripts constitutes an express waiver of any privilege over these audio recordings.

**Waived via failure to timely assert.**  The privilege claim here has also been waived because it was untimely and did not comply with the terms of the Subpoena.  The Subpoena contained an explicit return date of March 7, 2024, and required Garland to provide a privilege log if he withheld material based on a privilege.  *See* Castor Decl., Ex. A at Instructions (page 4, number 17).  Garland ignored these instructions by failing to either produce the audio recordings or provide a privilege log by the original March 7 return date (or the later deadlines provided by the Committee), instead waiting nearly ten weeks, until May 16, 2024, to assert any privilege over the audio recordings.

Supreme Court precedent is clear; the law requires timely assertions of privilege:

> [I]f [a] respondent [to a Committee's subpoena] ha[s] legitimate reasons for failing
> to produce the records … a decent respect for the House of Representatives, by
> whose authority the subpoenas issued, … require[s] that []he state h[is] reasons for
> noncompliance upon the return of the writ.

*Bryan*, 339 U.S. at 332.[10]

Belated privilege assertions, like the one at issue here, effectively undermine Congress's ability to carry out its constitutional responsibilities.[11]  Conversely, timely privilege assertions are necessary to enable committees to promptly (i) assess the policy considerations that favor or disfavor honoring a privilege claim in a given situation; (ii) evaluate the importance of the information at issue and whether that information can be obtained from other sources; and (iii) determine whether some accommodation is possible, all in the interest of moving the investigation along.  *See generally* Alissa M. Dolan & Todd Garvey, Cong. Rsch. Serv., R42811, *Cong. Investigations of the Dep't of Just. 1920-2012: Hist., Law, Prac.* 10-14 (2012) ("CRS Report"), https://perma.cc/N5JE-B6CP.  Historically, privilege assertions to Congressional subpoenas, including those by the Executive Branch, have been registered by the subpoena

---

[10] *See also Bryan*, 339 U.S. at 332-33 (rejecting, in context of contempt of Congress prosecution, objection to Congressional subpoena lodged after return date); *cf. United States v. Nixon*, 418 U.S. 683, 713 (1974) ("If a President concludes that compliance with a subpoena would be injurious to the public interest he may properly, as was done here, invoke a claim of privilege *on the return of the subpoena*."  (emphasis added)); *United States v. Burr*, 25 F. Cas. 30, 37 (C.C.D. Va. 1807) (Marshall, J.) (claims of presidential privilege "will have [their] due consideration on the return of the subpoena").

[11] *See, e.g.*, *Exxon Corp. v. FTC*, 589 F.2d 582, 588 (D.C. Cir. 1978) ("[E]nforced delay [of ten days] on the legitimate investigations of Congress … could seriously impede the vital investigatory powers of Congress and would be of highly questionable constitutionality."); *id.* at 594 (noting "clear public interest in maximizing the effectiveness of the investigatory powers of Congress"); *AT&T II*, 567 F.2d at 133 n.40 (noting, in context of Congressional subpoena, "there is a plain duty on both the executive and judicial branches to advance any problems for prompt consideration"); *FTC v. Owens-Corning Fiberglass Corp.*, 626 F.2d 966, 970 (D.C. Cir. 1980) ("[C]ourts may not require [subpoena recipient] to delay surrendering documents to Congress [pending advance notification of] affected parties …, for the judiciary must refrain from slowing or otherwise interfering with the legitimate investigatory functions of Congress.").

return date or, at the latest, soon thereafter.[12]

For the constitutionally mandated authority of Congress to issue compulsory

process to mean anything, it must mean that subpoena recipients—including the Attorney

General—cannot blithely ignore the terms of a Congressional subpoena without consequence.

Thus, the Court should hold that the privilege was waived because it was not timely asserted.[13]

### 2.     The law-enforcement privilege—which is rooted in the common law— is not enforceable against Congress

Permitting the Executive Branch to assert the common law-based law enforcement

privilege against the Committee effectively elevates judge-made common law above the

constitutional authority of Congress, a coordinate branch of government.

The underlying information sought by the Committee does not implicate presidential

decision-making, involve communications with close presidential advisors, involve national

security, or otherwise intrude into any other areas traditionally held to be within the narrow

---

[12] *See, e.g.*, *Senate Select Comm.*, 498 F.2d at 727 (privileges timely asserted in response to Congressional subpoena); *Miers I*, 558 F. Supp. 2d at 61-62 (presidential communications privilege asserted on or before subpoena return dates); *United States v. House of Representatives*, 556 F. Supp. 150, 151 (D.D.C. 1983) (same); H. Rep. No. 108-414, at 129-30, 134-35 (2004) (same), https://perma.cc/Z9XB-AMJN; Tatelman Decl., Ex. II at 25-29 (House hearing showing the same); *see also Investigation into Allegations of Justice Department Misconduct in New England: Hearings Before the H. Comm. on Gov't Reform*, vol. I, 107th Cong. 520-56 (2002) (statement of Prof. Charles Tiefer) (chronicling such instances), https://perma.cc/RQ85-X9TT; *cf. Nixon*, 418 U.S. at 687-88, 713 (privilege asserted by return date of criminal discovery subpoena); *United States v. Poindexter*, 727 F. Supp. 1501, 1503 (D.D.C. 1989) (same).

[13] *Cf.* Fed. R. Civ. P. 45(d)(2)(B), 45(e)(2) (persons objecting to subpoena under claim of privilege must lodge objection within "the earlier of the time specified for compliance or 14 days after the subpoena is served" and must provide information sufficient to "enable the parties to assess the claim"); *Sikorsky Aircraft Corp. v. United States*, 106 Fed. Cl. 571, 579-82 (Fed. Cl. 2012) (finding that privilege assertions are "subject to a timeliness requirement … and there is no basis to refrain from extending the waiver to instances of indiligence, indolence, or dawdling"; holding that Executive Branch waived privilege by untimely assertion (citing cases)); *Fonville v. District of Columbia*, 230 F.R.D. 38, 42 (D.D.C. 2005) (Executive Branch waived qualified, common-law deliberative process privilege by untimely assertion).

confines of the Constitutionally based executive privilege. *See Espy*, 121 F.3d at 745

(distinguishing between the constitutionally based presidential communications privilege and

other common-law privileges that may be asserted by the Executive Branch). Rather, the

Committee seeks information related to a *closed* criminal investigation, making it, at most,

subject to the common-law privilege afforded to law enforcement investigatory materials. *See,*

*e.g.*, *Black v. Sheraton Corp. of Am.*, 564 F.2d 531, 542 (D.C. Cir. 1977) (explaining that interests

implicated by the law enforcement privilege do "not have the constitutional dimension indicated

in *Nixon* and *Reynolds*," but rather "are rooted in common sense as well as common law");

*Friedman v. Bache Halsey Stuart Shields, Inc.*, 738 F.2d 1336, 1341 (D.C. Cir. 1984)

(recognizing law enforcement privilege as "a qualified common law privilege").

      In stark contrast, the Committee's investigation has two independent constitutional bases:

Congress's general Article I legislative authority and the impeachment power. The House cannot

effectively exercise either its legislative authority or its impeachment power without access to all

the relevant facts. *See Eastland*, 421 U.S. at 504; *see also In re Rep. & Recommendation of June*

*5, 1972*, 370 F. Supp. 1219, 1230 (D.D.C. 1974). Withholding relevant information from the

Committee therefore hinders its ability to carry out its constitutional functions.

      Nothing in the Constitution requires Congress to respect common-law privileges. Rather,

it is inherent in Congress's Article I investigatory power that it "mak[e] its own determination[]"

whether its need for legislative evidence should yield to the interests served by non-

constitutional privileges asserted in a legislative proceeding. *See, e.g.*, *In re Provident Life &*

*Accident Ins.*, No. 90-cv-219, 1990 U.S. Dist. LEXIS 21067, at *6 (E.D. Tenn. June 13, 1990).

This authority is strongly rooted in history. The Framers were familiar with the British

Parliament's longstanding practice of neither recognizing common-law privileges nor accepting

general claims of confidentiality.[14]  Furthermore, Congress has consistently exercised its

authority to reject witnesses' assertions of common-law privileges whenever it has deemed

appropriate.[15]  This unbroken history confirms Congress's exclusive Article I power to decide

whether and when to recognize non-constitutional privileges in legislative proceedings.

The Supreme Court's dictum in *Mazars* that subpoena "recipients have long been

understood to retain common law and constitutional privileges with respect to certain materials,

such as … governmental communications protected by executive privilege," 591 U.S. at 863,

does not compel a different result.  At most, the *Mazars* passage stands for the proposition that,

consistent with the ordinary meaning of the word "retain,"[16] parties do not automatically waive

---

[14] *See, e.g.*, Thomas Erskine May, *A Treatise on the Law, Privileges, Proceedings and Usage of Parliament* 746-47 (20th ed. 1983); Luther Stearns Cushing, *Elements of the Law and Practice of Legislative Assemblies in the United States of America* § 983 (1856); *cf. Watkins*, 354 U.S. at 188  (looking to "the pages of English history" to understand the scope of Congress's power); *Marshall v. Gordon*, 243 U.S. 521, 533 (1917) ("Undoubtedly what went before the adoption of the Constitution may be resorted to for the purpose of throwing light on its provisions.").

[15] In 1857, Congress debated whether common-law privileges should apply to Congressional proceedings.  *See* Cong. Globe, 34th Cong., 3d Sess. 431 (1857) (statement of Rep. Orr) ("With reference to communications made to counsel, … the common law of England does not exempt a witness from testifying .…  Either the House of Commons or House of Lords can extract such communication.").  The Senate defeated an amendment to the bill that would have explicitly recognized common-law evidentiary privileges.  *See id.* at 439 (proposal of Sen. Seward); *id.* at 443 (amendment defeated).  In 1977, a House subcommittee expressly rejected a witness's attorney-client privilege claim.  *See* Tatelman Decl., Ex. JJ at 46, 123.  Chairman John Moss observed that "the commonwealth precedents, customs of both the Commons and the House, fully sustain rejecting a claim of attorney-client privilege if it impedes in any manner whatsoever the necessary inquiries of the Congress in determining whether a law of the United States may have been violated or whether that law accords sufficient protection to the American people."  *Id.* at 123.

[16] *Retain*, *Black's Law Dictionary* (12th ed. 2024) ("To hold in possession or under control; to keep and not lose, part with, or dismiss.").

common-law privileges when they comply with a Congressional subpoena. It thus remains up to Congress to decide whether to accept a common-law privilege.

### 3. Even if the privilege did apply, it is qualified, and the Committee's need for the recordings outweighs DOJ's interest in secrecy

Because the privilege asserted here is qualified, *see Friedman*, 738 F.2d at 1341, even if it applies, the Court must balance the Committee's need for disclosure against the Executive Branch's need for confidentiality. *See, e.g.*, *Nixon*, 418 U.S. at 706-07 (rejecting a claim of "absolute, unqualified Presidential privilege"); *Espy*, 121 F.3d at 746 (noting "courts must balance the public interests at stake in determining whether the privilege should yield in a particular case, and must specifically consider the need of the party seeking privileged evidence"). Here, the Committee's need for the audio recordings significantly outweighs any Executive Branch interest in confidentiality.

**a.** As discussed above, the Committee cannot complete its oversight investigation without the audio recordings: it must have the evidence that best captures the way that President Biden presented himself during his interview with the Special Counsel. *See supra* at 6-11. Only after it reviews that evidence can the Committee fully assess whether the Special Counsel's recommendations are consistent with a commitment to impartial justice. The cold transcripts— which do not fully capture the way the President presented himself or even every word he uttered—do not allow the Committee to make its own informed assessment of the Special Counsel's conclusions. The Special Counsel himself confirmed that he did not rely solely on the words that President Biden spoke but also on the entire manner of how he presented himself. And as we explained above, the Special Counsel's subjective view of the President's mental state, including his memory, affected several of his conclusions.

The Committee cannot take the Special Counsel's characterizations of the President's mental state at face value.  As statements from the President and his lawyers show, the Special Counsel's views are up for debate.  Nor can the Committee compare this Special Counsel's decision not to bring charges with Special Counsel Jack Smith's decision to bring charges unless it has access to the same nuances and information on which this Special Counsel relied.

The Committee likewise needs the audio recording of the Special Counsel's interview with Zwonitzer.  The Special Counsel drew from this recording conclusions about Zwonitzer's credibility that factored into his conclusion that charges should not be brought against Zwonitzer for destroying evidence.  Conclusions about credibility may be informed by a witness's speaking pace and hesitation, but the transcripts do not contain that information.  The Committee thus cannot properly evaluate the Special Counsel's views about Zwonitzer's credibility or his ultimate conclusion not to bring charges against Zwonitzer without the audio recording.

Finally, determining whether the Special Counsel's recommendations are consistent with a commitment to impartial justice will, in turn, help the Committee to decide whether legislative reforms related to special counsels are necessary (and, if so, what those reforms should look like).

**b.**  As discussed earlier, the Committee also needs the audio recordings to advance its impeachment inquiry.  *See supra* at 11-12.  The Special Counsel found that President Biden retained two classified documents related to Ukraine.  Report at 281, 310, A-2.  Given his family's business dealings in Ukraine—which were ongoing when he left the vice presidency—the Committee must determine whether President Biden retained those documents to enrich his family.  The nuances that the audio recordings capture will help it do that.  They will also help the Committee determine whether the President retained classified material to help him execute a

multimillion-dollar book deal.  The Committee needs all the available evidence because "[i]t would be difficult to conceive of a more compelling need than that of this country for an unswervingly fair [impeachment] inquiry based on all the pertinent information."  *In re Rep. & Recommendation*, 370 F. Supp. at 1230.

**c.**  The Executive Branch's argument that its purported need to keep the audio recordings confidential outweighs the Committee's need to obtain them fails.  For instance, Garland's argument that release of the tapes will have a "chilling effect" on DOJ's ability to obtain information in unspecified and undefined future investigations does not withstand scrutiny.  *See* Castor Decl., Ex. W (attached letter at 4).  Any possible "chilling" effect would more properly flow from the public release of the content of the interview, not the format the release takes.

In particular, DOJ's assertion that if witnesses knew that audio recordings of their interviews could become public, the "ability to obtain vital cooperation in high-profile criminal investigations" might be impeded is without merit.  *See id.* at 5.  The assertion that witnesses will be any less likely to participate in an interview with a future special counsel if the audio recordings of the interviews in question are produced to Congress strains credulity, considering that the transcripts of the underlying interviews have already been released without any assertions of privilege, and made subject to scrutiny in the public sphere.  Additionally, there is always a risk that such information, even if not voluntarily released by DOJ, could eventually become public through FOIA, a risk known to any individual with sophisticated counsel participating in a high-profile investigation such as the present one.  *See Citizens for Resp. & Ethics in Wash. v. DOJ*, 658 F. Supp. 2d 217, 240-41 (D.D.C. 2009) (*CREW*) (ordering the release of documents relating to a special counsel interview of former Vice President Dick Cheney over which DOJ had previously asserted law enforcement privilege).  If Garland's stated

concern were a serious one, privilege would have been asserted over the transcripts and other related investigatory materials in the first instance, and the transcripts would not have been released to the media.

Furthermore, the Executive Branch's reliance on the voluntary cooperation of witnesses entirely ignores other, far more powerful, investigative tools available to them, such as grand jury subpoenas, other forms of compulsory process (search warrants, Stored Communications Act warrants, etc.), and the ability to prosecute individuals for noncompliance therewith.  Indeed, DOJ "doesn't rely on strangers' munificence or let witnesses dictate the terms of its investigations" but instead "relies on compulsory process."  *See* Tatelman Decl., Ex. EE at 2. For all of these reasons, any suggestion that DOJ's investigative efforts would be hampered by release of the audio recordings here is frivolous at best.

Moreover, DOJ's argument regarding such an abstract and amorphous future chilling effect has already been rejected by this Court in a FOIA case as insufficient.  *See CREW*, 658 F. Supp. 2d at 225-31.  Of critical importance to this dispute, DOJ conceded, in the context of the *CREW* litigation, that the common-law privilege over law enforcement documents was "co-extensive" with FOIA Exemption 7(A).  *See id.* at 232.  Consequently, the common-law privilege, whatever it does cover, cannot encompass more than that FOIA exemption permits. Exemption 7(A) allows an agency to withhold documents that were compiled for law enforcement purposes if disclosing them "could reasonably be expected to interfere with enforcement proceedings."  *Id.* at 225 (citation omitted).  DOJ argued there, just as Garland argues here, that "there are likely to be future law enforcement investigations requiring the participation of senior White House officials, and … disclosure of [the record at issue] could have a chilling effect and deter such officials from voluntarily cooperating in those

investigations."  *Compare id.*, *with* Castor Decl., Ex. W (attached letter at 3-4) ("Production of these recordings to the Committees would raise an unacceptable risk of undermining [DOJ]'s ability to conduct similar high-profile criminal investigations—in particular, investigations where the voluntary cooperation of White House officials is exceedingly important.").

This Court rejected DOJ's argument because it, like Garland here, failed to adequately describe the category of future law enforcement proceedings that might be interfered with.  *See CREW*, 658 F. Supp. 2d at 229 ("[T]he category of [law enforcement] proceedings must be more narrowly defined than simply any investigation that might benefit from the cooperation of some senior White House official at some undetermined future point regarding some undefined subject.").  Indeed, because DOJ failed to identify a category of enforcement proceedings, the Court could not even assess whether disclosing the record at issue would likely interfere with future law enforcement proceedings.  *See id.* at 230-31.

Because a risk to abstract and undefined future "high-profile criminal investigations" is all that Garland has used to justify the withholding of the audio recordings from the Committee here, Castor Decl., Ex. W (attached letter at 3-5), his reasoning fails, and the audio recordings must be produced.  Congress's ability to access information in the performance of its constitutional oversight and impeachment functions must be greater than the access afforded the general public based on the statutory right granted by FOIA.

**III.   The Committee's ability to exercise its Article I powers is impeded, and it is entitled to injunctive relief**

The very nature of the Committee's investigation speaks to its urgency: it is both assessing whether the Special Counsel's recommendations are consistent with a commitment to impartial justice and considering whether there are sufficient grounds to impeach a sitting President.  The audio recordings are critical to the Committee's investigation, and the President's

purported privilege claim is impeding the Committee's work.  For the reasons stated below, the Committee will suffer irreparable injury without injunctive relief, and the balance of the equities and the public interest are in its favor.  Under these circumstances, this Court should issue an injunction requiring Garland to produce the audio recordings.

> **A.**     **Garland's refusal to produce the audio recordings is causing the Committee irreparable harm**

The audio recordings are the best available evidence of how the President and Zwonitzer presented during their interviews with the Special Counsel.  And the Special Counsel expressly said that he did not rely solely on the words the President spoke when deciding whether criminal charges would be appropriate; he also relied on the way the President presented himself.  The Committee cannot get the information it seeks from any other source, including the transcripts, which do not capture verbal and non-verbal context and do not reflect every spoken word.  Thus, without the audio recordings, the Committee would be deprived of the information to which it is constitutionally entitled.  That alone constitutes irreparable harm because "where an obligation to disclose exists, plaintiffs may suffer irreparable harm if they are denied access to information that is highly relevant to an ongoing public debate."  *Dunlap v. Presidential Advisory Comm'n on Election Integrity*, 286 F. Supp. 3d 96, 110 (D.D.C. 2017).

Courts have also recognized that analogous invasions of constitutional prerogatives cause irreparable harm.  For example, "suits for declaratory and injunctive relief against the threatened invasion of a constitutional right do not ordinarily require proof of any injury other than the threatened constitutional deprivation itself."  *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) (alteration and citation omitted).  In addition, "any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."  *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (alteration

and citation omitted).  Here, Garland's disregard of a lawful Congressional subpoena is hindering the Committee's performance of its constitutionally mandated duties.  That constitutional injury is no less irreparable than those suffered by a private litigant enforcing a personal right or a state prevented from implementing a statute.

But the Committee's injury is temporal, too.  And the harm caused by the deprivation of information, compounded by the ticking clock, is particularly acute.  For starters, because the House of Representatives is not a "continuing body," *Eastland*, 421 U.S. at 512, the Committee is diligently working to wrap up its investigation by the end of the year.  But Garland, by refusing to produce the audio recordings, is interfering with the Committee's Article I authority to conduct oversight of DOJ and determine whether legislative reforms to special counsel investigations are necessary.  The Committee "cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change." *Id.* at 504 (citation omitted).  The Committee must assess for itself whether the Special Counsel's conclusions here are consistent with a commitment to impartial justice.  That, in turn, will help the Committee decide if legislative reforms are necessary to promote impartial justice in the future.  The audio recordings are key to that assessment.

By refusing to produce the audio recordings, Garland is also interfering with the House's urgent impeachment inquiry.  On the one hand, impeachment serves as a mechanism to remove the President before his term is over.  As James Madison explained, "[t]he limitation of the period of [the President's] service[] was not a sufficient security" against incapacity or corruption, which could be "fatal to the Republic." *See* 2 *The Records of the Federal Convention of 1787*, at 65-66 (Max Farrand ed., 1911).  Thus, "the Framers themselves" recognized "the public interest in immediately removing a sitting President whose continuation

43

in office poses a threat to the Nation's welfare." *A Sitting President's Amenability to Indictment and Criminal Prosecution*, 24 Op. O.L.C. 222, 2000 WL 33711291, at * 27 (Oct. 16, 2000).  On the other hand, the Committee is engaged in a thoughtful and time-intensive consideration of the facts needed to determine whether to exercise its solemn impeachment power.

Thus, each day that Garland refuses to produce the audio recordings—based on a privilege assertion from the very official who is the subject of the impeachment inquiry—he obstructs the Committee from deciding whether to recommend that the President be impeached, heightens the risk that crucial information relevant to this investigation will be lost or forgotten, and moves the President one day closer to running out the clock on the 118th Congress. "Indeed, the D.C. Circuit has held that 'stale information is of little value' and that the harm in delaying disclosure is not necessarily redressed even if the information is provided at some later date." *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 266 F. Supp. 3d 297, 319 (D.D.C. 2017) (alterations and citations omitted).

Here, Garland's refusal to produce the audio recordings is undermining the Committee's ability to complete its investigation with the urgency the Constitution requires, and that certainly suffices to constitute irreparable harm to the Committee.  *See Comm. on Judiciary v. Miers*, 575 F. Supp. 2d 201, 207 (D.D.C. 2008) (*Miers II*) ("The Committee has demonstrated that it will suffer substantial harm … [because] [the Executive would be able to] 'run out the clock on this Congress.'  'That outcome … would be extremely damaging to the Committee, as it seeks closure to this important [i]nvestigation prior to the end of the current Congress and Administration.'"  (citations omitted)).

### B.     Allowing the Committee's investigation to proceed with the audio recordings serves equity and advances the public interest

The balance of equities and the public interest are in the Committee's favor.  The Committee has subpoenaed audio recordings that are key to its investigation, and there is a "clear public interest in maximizing the effectiveness of the investigatory powers of Congress." *Exxon Corp.*, 589 F.2d at 594.

Garland, on the other hand, has no valid interest in defying the Committee's Subpoena, as it is his "unremitting obligation" to respond to it.  *See Watkins*, 354 U.S. at 187.  Indeed, DOJ has no more valid an interest in unlawfully preventing the Committee from accessing the audio recordings than it would have in the "enforcement of an unconstitutional law," which "is always contrary to the public interest."  *Gordon*, 721 F.3d at 653.  While DOJ claims an interest in purportedly privileged material, as we explained above, the privilege assertion here (over vocal, as opposed to substantive, elements of the interviews) is baseless.

At bottom, the audio recordings are important evidence as the Committee discharges its legislative oversight responsibility and investigates whether to recommend articles of impeachment against the President.

## <u>CONCLUSION</u>

For all these reasons, this Court should enter a preliminary injunction ordering Garland to comply with the Judiciary Committee's Subpoena.  Alternatively, the Court should grant summary judgment to the Committee on the issue of executive privilege, declare that Garland's refusal to produce the audio recordings is unlawful, and order Garland to produce the audio recordings to the Committee.

Respectfully submitted,

*/s/ Matthew B. Berry*
Matthew B. Berry (D.C. Bar No. 1002470)
  *General Counsel*
Todd B. Tatelman (VA Bar No. 66008)
  *Deputy General Counsel*
Brooks M. Hanner (D.C. Bar No. 1005346)
  *Associate General Counsel*
Sarah E. Clouse (MA Bar No. 688187)
  *Associate General Counsel*
Bradley Craigmyle (IL Bar No. 6326760)
  *Associate General Counsel*
Andy T. Wang (D.C. Bar No. 1034325)
  *Assistant General Counsel*
Rachel A. Jankowski (D.C. Bar No. 1686346)
  *Assistant General Counsel*

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, D.C. 20515
(202) 225-9700
Matthew.Berry@mail.house.gov

*Counsel for Plaintiff Committee on the Judiciary of the U.S. House of Representatives*

July 12, 2024