**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

COMMITTEE ON THE JUDICIARY,
UNITED STATES HOUSE OF
REPRESENTATIVES,

              *Plaintiff*,

    v.

MERRICK GARLAND, in his official
capacity as Attorney General of the United
States,

              *Defendant*.

Case No. 1:24-cv-1911-ABJ

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S
CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO
<u>PLAINTIFF'S MOTION FOR EXPEDITED SUMMARY JUDGMENT</u>**

## **<u>TABLE OF CONTENTS</u>**

INTRODUCTION ...................................................................................................................... 1

      A.    The Hur Investigation ................................................................................ 4

      B.    Congressional Requests for the Audio Recording and Department of
            Justice Accommodations in Response ...................................................... 5

      C.    Presidential Assertion of Executive Privilege and House Response ...................... 9

LEGAL STANDARDS ............................................................................................................ 10

ARGUMENT ........................................................................................................................... 10

I.     The Court lacks jurisdiction over this inter-branch dispute. .............................................. 10

      A.    The Court lacks Article III jurisdiction. ................................................. 10

      B.    Statutory subject-matter jurisdiction is lacking. .................................... 15

II.    Congress denied House committees a cause of action to enforce their subpoenas. ......... 20

      A.    The Committee does not have an implied cause of action under Article I to
            bring suit to enforce its subpoenas. ....................................................... 21

      B.    The Committee cannot infer a cause of action from Congress's grant of
            equity jurisdiction. ................................................................................. 23

      C.    The Declaratory Judgment Act does not supply a cause of action. ...................... 26

III.   The Court should exercise its equitable discretion to decline to adjudicate this
      suit………................................................................................................................... 27

IV.   Executive privilege bars enforcement of the subpoenas. ................................................. 30

      A.    The audio recordings are law enforcement files that fall within the scope
            of executive privilege. ............................................................................ 31

      B.    The Committee has not demonstrated sufficient need for the withheld
            audio recordings to overcome the President's assertion of executive
            privilege. ................................................................................................. 47

V.    In all events, a permanent injunction is unwarranted. .................................................... 56

CONCLUSION ....................................................................................................................... 57

## <u>TABLE OF AUTHORITIES</u>

**PAGE(S)**

**CASES**

*Ali v. Rumsfeld,*
    649 F.3d 762 (D.C. Cir. 2011) ................................................................................................ 27

*Al-Zahrani v. Rodriguez,*
    669 F.3d 315 (D.C. Cir. 2012) ................................................................................................ 15

*American School of Magnetic Healing v. McAnnulty,*
    187 U.S. 94 (1902) ............................................................................................................ 25, 26

*Amoco Prod. Co. v. Vill. of Gambell,*
    480 U.S. 531 (1987) ................................................................................................................ 56

*Armstrong v. Exceptional Child Ctr., Inc.,*
    575 U.S. 320 (2015) .............................................................................................. 23, 24, 25, 26

*Auster v. Ghana Airways Ltd.,*
    514 F.3d 44 (D.C. Cir. 2008) ................................................................................................. 10

*Barnes v. Kline,*
    759 F.2d 21 (D.C. Cir. 1984) ........................................................................................... 28, 29

*Becerra v. Empire Health Found., for Valley Hosp. Med. Ctr.,*
    597 U.S. 424 (2022) ................................................................................................................ 19

*Bilski v. Kappos,*
    561 U.S. 593 (2010) ................................................................................................................ 18

*Black v. Sheraton Corp. of Am.,*
    564 F.2d 531 (D.C. Cir. 1977) ......................................................................................... 36, 37

*Buck v. Am. Airlines, Inc.,*
    476 F.3d 29 (1st Cir. 2007) .................................................................................................... 27

*Burke v. Barnes,*
    479 U.S. 361 (1987) ................................................................................................................ 28

*Campbell v. Clinton,*
    203 F.3d 19 (D.C. Cir. 2000) ................................................................................................. 11

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ................................................................................................................ 10

*Cheney v. U.S. Dist. Ct. for D.C.*,
   542 U.S. 367 (2004) ................................................................ 32, 46

*Chenoweth v. Clinton*,
   181 F.3d 112 (D.C. Cir. 1999) ............................................................ 27

*Clark v. Twp. of Falls*,
   124 F.R.D. 91 (E.D. Pa. 1988) ........................................................... 45

*Comm. on Judiciary v. McGahn*,
   968 F.3d 755 (D.C. Cir. 2020) (en banc) ................................... 12, 13, 24

*Comm. on Judiciary v. McGahn* ("*McGahn III*"),
   973 F.3d 121 (D.C. Cir. 2020) ...................................................... *passim*

*Comm. on Oversight & Gov't Reform v. Holder*,
   979 F. Supp. 2d 1 (D.D.C. 2013) .................................................. *passim*

*Comm. on the Judiciary  v. Miers*,
   558 F. Supp. 2d 53 (D.D.C. 2008) ...................................................... 13

*Comm. on Oversight & Government Reform, U.S. House of Representatives v. Holder*,
   No. 12-cv-1332 (ABJ), 2014 WL 12662665 (D.D.C. Aug. 20, 2014),
   *modified*, 2014 WL 12662666 (D.D.C. Sept. 9, 2014) ........................... 41

*Ctr. for Biological Diversity v. McAleenan*,
   404 F. Supp. 3d 218  (D.D.C. 2019) .................................................... 10

*Davis v. United States*,
   499 F.3d 590 (6th Cir. 2007) .............................................................. 27

*Dellums v. Powell*,
   561 F.2d 242 (D.C. Cir. 1977) ........................................................... 32

*Di Lapi v. City of New York*,
   No. 06-CV-2864 RJD JMA, 2012 WL 37576 (E.D.N.Y. Jan. 6, 2012) ................. 45

*Ehrman v. United States*,
   429 F. Supp. 2d 61 (D.D.C. 2006) ...................................................... 10

*Elec. Priv. Info. Ctr. v. Dep't of Just. Crim. Div.*,
   82 F. Supp. 3d 307 (D.D.C. 2015) ...................................................... 39

*Fonville v. District of Colujmbia*,
   230 F.R.D. 38 (D.D.C. 2005) .............................................................. 47

*Food & Drug Admin. v. All. for Hippocratic, Med.*,
   602 U.S. 367 (2024) ......................................................................... 11

*Fund for Animals, Inc. v. Kempthorne*,
  472 F.3d 872 (D.C. Cir. 2006) ........................................................... 20

*Gila River Indian Cmty. v. U.S. Dep't of Veterans Affs.*,
  899 F.3d 1076 (9th Cir. 2018) ........................................................... 18

*Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*,
  527 U.S. 308 (1999) ................................................................... 24, 25

*Hanson v. Wyatt*,
  552 F.3d 1148 (10th Cir. 2008) ......................................................... 27

*Heckler v. Chaney*,
  470 U.S. 821 (1985) ................................................................... 31, 49

*Hernandez v. Mesa*,
  589 U.S. 93 (2020) ....................................................................... 26

*Hollingsworth v. Perry*,
  558 U.S. 183 (2010) ................................................................... 38, 39

*In re Application of the U.S. Senate Permanent Subcomm. on Investigations*,
  655 F.2d 1232 (D.C. Cir. 1981) ....................................................... 15, 19

*In re Chapman*,
  166 U.S. 661 (1897) ..................................................................... 23

*In re Dep't of Investigation*,
  856 F.2d 481 (2d Cir. 1988) ............................................................. 36

*In re Micron Tech., Inc. Sec. Litig.*,
  264 F.R.D. 7 (D.D.C. 2010) ............................................................. 37

*In re Rep. & Recommendation of June 5, 1972 Grand Jury Concerning Transmission of
  Evidence to House of Representatives*,
  370 F. Supp. 1219 (D.D.C. 1974) ....................................................... 53

*In re Sealed Case*,
  121 F.3d 729 (D.C. Cir. 1997) ..................................................... *passim*

*In re Sealed Case*,
  856 F.2d 268 (D.C. Cir. 1988) ....................................................... 37, 40

*In re The City of New York*,
  607 F.3d 923 (2d Cir. 2010) ............................................................. 53

*In re: the Search of Informatgion Stores at Premises Controlled by Twitter, Inc.*,
  No. 23-5044, 2024 WL 158766 (D.C. Cir. Jan. 16, 2024) ............................. 43

iv

*Jud. Watch, Inc. v. Nat'l Archives & Recs. Admin.*,
   876 F.3d 346 (D.C. Cir. 2017) ................................................................. 38

*Keene Corp. v. United States*,
   508 U.S. 200 (1993) ................................................................................. 18

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
   511 U.S. 375 (1994) ................................................................................. 10

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ................................................................................. 11

*McGrain v. Daugherty*,
   273 U.S. 135 (1927) .................................................................... 22, 23, 25

*MedImmune, Inc. v. Genentech, Inc.*,
   549 U.S. 118 (2007) ................................................................................. 27

*Medtronic, Inc. v. Mirowski Family Ventures, LLC*,
   571 U.S. 191 (2014) ................................................................................. 27

*MercExchange, LLC*,
   547 U.S. 388 (2006) ................................................................................. 56

*Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*,
   453 U.S. 1 (1981) ..................................................................................... 26

*Mims v. Arrow Fin. Servs., LLC*,
   565 U.S. 368 (2012) ................................................................................. 20

*Moore v. U.S. House of Representatives*,
   733 F.2d 946 (D.C. Cir. 1984) ................................................................. 28

*Morgan Drexen, Inc. v. Consumer Fin. Prot. Bureau*,
   785 F.3d 684 (D.C. Cir. 2015) ................................................................. 27

*Morrison v. Olson*,
   487 U.S. 654 (1988) ................................................................................. 31

*Nat'l Black Police Ass'n v. Dist. of Columbia*,
   108 F.3d 346 (D.C. Cir. 1997) ................................................................. 21

*New York Times Co. v. NASA*,
   920 F.2d 1002 (D.C. Cir. 1990) (*en banc*),
   *remanded* 782 F. Supp. 628 (D.D.C. 1991) .................................... 37, 43

*Nixon v. GSA*,
   433 U.S. 425 (1977) ...................................................................... 31, 39, 52

*Nixon v. Sirica,*
 487 F.2d 700 (D.C. Cir. 1973) ...................................................................... 44, 45

*Nixon v. Warner Communc'ns, Inc.,*
 435 U.S. 589 (1978) .................................................................................... 38

*Nken v. Holder,*
 556 U.S. 418 (2009) .................................................................................... 56

*NLRB v. Noel Canning,*
 573 U.S. 513 (2014) ............................................................................... 29, 40

*Pike v. Dep't of Justice,*
 306 F. Supp. 3d 400 (D.D.C. 2016) .............................................................. 44

*Pub. Citizen v. Dep't of State,*
 11 F.3d 198 (D.C. Cir. 1993) ...................................................................... 44

*Pub. Citizen v. U.S. Dep't of Just.,*
 491 U.S. 440 (1989) .................................................................................... 19

*Quinn v. United States,*
 349 U.S. 155 (1955) ....................................................................... 22, 23, 49, 52

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank,*
 566 U.S. 639 (2012) .................................................................................... 18

*Raines v. Byrd,*
 521 U.S. 811 (1997) ............................................................................... *passim*

*Reed v. County Comm'rs of Del. Cty.,*
 277 U.S. 376 (1928) ....................................................................... 21, 22, 23

*Russello v. United States,*
 464 U.S. 16 (1983) .................................................................................... 16

*Seatrain Shipbuilding Corp. v. Shell Oil Co.,*
 444 U.S. 572 (1980) .................................................................................... 17

*Senate Select Comm. on Presidential Campaign Activities v. Nixon,*
 498 F.2d 725 (D.C. Cir. 1974) ............................................................... *passim*

*Sikorsky Aircraft Corp. v. United States,*
 106 Fed. Cl. 571 (2012) .......................................................................... 46, 47

*Skelly Oil Co. v. Phillips Petroleum Co.,*
 339 U.S. 667 (1950) .................................................................................... 27

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016)................................................................................................ 10

*Talavera v. Shah*,
   638 F.3d 303 (D.C. Cir. 2011).............................................................................. 10

*Tobin v. United States*,
   306 F.2d 270 (D.C. Cir. 1962).............................................................................. 53

*Trump v. Mazars USA, LLP*,
   591 U.S. 848 (2020)....................................................................................... *passim*

*United States v. AT&T*,
   551 F.2d 384 (D.C. Cir. 1976)............................................................ 2, 3, 29, 57

*United States v. AT&T*,
   567 F.2d 121 (D.C. Cir. 1977)........................................................................ 44, 45

*United States v. Bryan*,
   339 U.S. 323 (1950)............................................................................................... 46

*United States v. Helstoski*,
   442 U.S. 477 (1979)............................................................................................... 43

*United States v. McDougal*,
   103 F.3d 651 (8th Cir. 1996)............................................................................... 38

*United States v. McDougal*,
   940 F. Supp. 224 (E.D. Ark. 1996).................................................................... 38

*United States v. Mitchell*,
   377 F. Supp. 1326 (D.D.C. 1974)................................................................... 44, 45

*United States v. Nixon*,
   418 U.S. 683 (1974)....................................................................................... *passim*

*United States v. Rumely*,
   345 U.S. 41 (1953)........................................................................................... 20, 53

*United States v. Texas*,
   599 U.S. 670 (2023)......................................................................................... 10, 11

*Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*,
   535 U.S. 635 (2002)............................................................................................... 20

*Virginia House of Delegates v. Bethune-Hill*,
   587 U.S. 658 (2019)............................................................................................... 13

*Walker v. Cheney*,
   230 F. Supp. 2d 51 (D.D.C. 2002) ................................................................ 13, 14, 29

*Washington v. Department of Justice*,
   658 F. Supp. 2d 217 (D.D.C. 2009) ........................................................................ 40

*Washington v. U.S. Dep't of Just.*,
   746 F.3d 1082 (D.C. Cir. 2014) ........................................................................ 39, 52

*Watkins v. United States*,
   354 U.S. 178 (1957) ................................................................................................ 49

*Wilton v. Seven Falls Co.*,
   515 U.S. 277 (1995) ................................................................................................ 27

*Winter v. NRDC, Inc.*,
   555 U.S. 7 (2008) .................................................................................................... 56

*Ziglar v. Abbasi*,
   582 U.S. 120 (2017) ...................................................................................... 23, 24, 26

## CONSTITUTION

U.S. Const. art. II, §3 ............................................................................................... 31

## STATUTES

2 U.S.C. § 192 ............................................................................................... 9, 20, 25

2 U.S.C. § 288b ................................................................................................. 15, 16

2 U.S.C. § 288d ........................................................................................................ 20

5 U.S.C. § 552(b)(7)(A) ............................................................................................ 40

28 U.S.C. § 1331 ...................................................................................................... 18

28 U.S.C. § 1365 ................................................................................................. *passim*

28 U.S.C. § 2201 ................................................................................................ 26, 27

47 U.S.C. § 227(b)(3) ............................................................................................... 20

47 U.S.C. § 252(e)(6) ............................................................................................... 20

Pub. L. No. 95-521 ................................................................................................... 15

Pub. L. No. 104-292 ................................................................................................. 19

## <u>FEDERAL RULES</u>

Fed. R. Civ. P. 12(h)(3)..............................................................................10

Fed. R. Civ. P. 56(a) ................................................................................10

## <u>ADMINISTARTIVE AND EXECUTIVE MATRIALS</u>

28 C.F.R. § 600.8(c)....................................................................................4

## <u>OTHER AUTHORITIES</u>

Exec. Order No. 12,667,
  54 Fed. Reg. 3403, 1989 WL 1180219 (1989) .......................................32

S. 495, 94th Cong. § 1364(a) (1976) ........................................................16

S. 2170, 94th Cong. § 343(b)(1) (1976).....................................................16

S. 2731, 94th Cong. § 6 (1976) .................................................................16

H. Res. 430, 116th Cong. (2019) ..............................................................13

H. Res. 917, 118th Cong. § 4 (2023) ........................................................14

H. Res. 918, 118th Cong. (2024) ..............................................................14

## INTRODUCTION

At the heart of this lawsuit is the demand, via subpoena, of Plaintiff Committee on the Judiciary ("the Committee") for still more material drawn from the investigation of Special Counsel Robert Hur.  Already, the Committee has received extraordinary accommodation to address its stated interests.  The Executive Branch supplied—even before the Committee had asked—the report of the Special Counsel with appendices and without redactions.  Special Counsel Hur appeared before the Committee voluntarily, for hours, and testified until the Committee exhausted its questions.  When the Committee requested classified documents referenced in an appendix to the Special Counsel's report, and communications concerning the report, the Executive Branch made those available as well.  And, with respect to demands for the Special Counsel's interviews of the President and his writing assistant, the Executive Branch supplied redacted transcripts of those interviews, capturing the content of those conversations relevant to the Committee's investigation.  The *sole* remaining materials requested but not produced are the audio recordings of those same interviews.  The Committee asserts that it cannot evaluate general legislative reforms on, or consider impeachment over, demonstrably unrelated issues unless it has access to these recordings.

But as to those recordings, the Attorney General determined that disclosure would damage core Executive Branch law enforcement interests by unacceptably risking harm to subsequent similar high-profile law enforcement investigations because witnesses in such investigations may refuse to cooperate in voluntary interviews if they know that recordings of those interviews may later be made public.  In light of the importance of voluntary interviews in such high-profile cases, and in particular those in which information from White House officials is needed, the Attorney General recommended an assertion of executive privilege to shield the recordings from disclosure.  The President accepted that recommendation and asserted executive privilege over the recordings.

The Committee now contends that—notwithstanding the extensive information it has already received about the Special Counsel's investigation in general, and the transcripts of the interviews in particular—its request for still more materials should override the President's and Attorney General's assessment of the nation's law enforcement interests.

The threshold issue in this case is whether the Court has jurisdiction. The Committee demands that the courts intervene in this impasse among coequal political branches, "select a victor" and "tilt the scales." *United States v. AT&T*, 551 F.2d 384, 394 (D.C. Cir. 1976). As this Court has recognized, "when a court is faced with an action that presents separation of powers concerns," *Comm. on Oversight & Gov't Reform v. Holder*, 979 F. Supp. 2d 1 (D.D.C. 2013)—as this one plainly does—Supreme Court precedent demands "'especially rigorous scrutiny'" of the plaintiff's standing to maintain the suit. *Id.* at 20-21 (quoting *Raines v. Byrd*, 521 U.S. 811, 819 (1997)). That inquiry requires, *inter alia*, an examination of historical practice concerning such interbranch clashes, and consideration of whether "the dispute is traditionally thought to be capable of resolution through the judicial process." *Id.* (quoting *Raines*, 521 U.S. at 819). Here, standing is lacking.

The intervention the Committee seeks in this case is unprecedented. Although the Committee demands that this Court intercede in this "nerve-center" separation of powers question, *AT&T*, 551 F.2d at 394, the Committee has neither sought nor received the authorization of the full House to pursue this action. Rather, the Committee seeks to proceed on the vote of just three Members of the House of Representatives, comprising a simple majority of the Bipartisan Legal Advisory Group (BLAG). This, under well-established Article III principles, it cannot do.

Nor is there a cause of action under which the Committee may advance this lawsuit. The statutory authorization for the judicial enforcement of congressional subpoenas includes only the

Senate, not the House, and *expressly* disallows the judicial enforcement of a subpoena in the face of a claim of executive privilege.  In light of that intentional and specific carve-out by Congress, the Committee's resort to other, general sources for an implied cause of action is unavailing.  For similar reasons, the Court lacks statutory subject matter jurisdiction.

But even if it were otherwise, and the Committee could establish both its standing and a cause of action on which to proceed, prudential considerations would strongly favor dismissal of this action.  Precedent teaches that the constitutionally mandated accommodation process, used by the political branches, "is most likely to meet their essential needs and the country's constitutional balance," *AT&T*, 551 F.2d at 394, and the Supreme Court has emphasized a "duty of care to ensure that [the court does not] needlessly disturb the compromises and working arrangements that [the political] branches . . . themselves have reached." *Trump v. Mazars USA, LLP*, 591 U.S. 848, 862 (2020).  This case—in which the accommodation process has functioned and resulted in extraordinary disclosures—is a particularly poor candidate for intervention.

Even if the Court were to reach the merits of this dispute, the Committee's claim would fail because executive privilege bars the enforcement of its subpoena.  Executive privilege is "fundamental to the operation of Government," deriving from the Executive's "assigned area of constitutional duties." *United States v. Nixon*, 418 U.S. 683, 708 (1974).  A committee issuing a subpoena under its legislative authority may overcome an assertion of executive privilege only if the subpoenaed materials are "demonstrably critical to the responsible fulfillment of the Committee's functions." *Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 731 (D.C. Cir. 1974).  The Committee cannot meet that standard here, where it already has accurate transcripts of both interviews and extensive other information about Special Counsel Hur's investigation and findings.  Given that reality, there is only a tenuous connection between

the privileged audio recordings and the Committee's stated purpose of potentially legislating on the Department of Justice's use of special counsels.   Nor can the Committee adequately demonstrate a need for the recordings in connection with its impeachment inquiry, because that inquiry focuses on the alleged retention of two specific classified documents in order to "enrich" the President's "family" or get a "book deal," Pl. Mem. 38-39, Dkt. 11.  That topic has no plausible connection to the demeanor and tone of the participants in Special Counsel Hur's interviews.

## BACKGROUND

### A.  The Hur Investigation

Attorney General Merrick Garland appointed Robert Hur as Special Counsel on January 12, 2023.  Ex. Z ("Weinsheimer Decl.")) ¶ 4.[1]  The Special Counsel's Office ("SCO") was authorized to investigate the possible unauthorized removal and retention of classified documents at various locations associated with President Biden.  *See id.*  At the conclusion of the investigation, Special Counsel Hur submitted a report to Attorney General Garland under Department regulations requiring an explanation of his declination decisions.  *See* 28 C.F.R. § 600.8(c).[2]  The Special Counsel "conclude[d] that no criminal charges are warranted," Hur Report at 1, and the Report provided extensive discussion of the investigation and the decisions he reached.

As part of the investigation, President Biden voluntarily agreed to sit for an interview with Mr. Hur.  Weinsheimer Decl. ¶ 9.  Special Counsel Hur requested that the interview be recorded, and the President voluntarily agreed to that request.  *Id.* ¶ 10.  At the interview, SCO created an

---

[1] For ease of reference, citations are to Plaintiff's exhibits attached to the Complaint and identified by letters, *see* Pl. Mem. iii-iv.

[2] *Report of the Special Counsel on the Investigation Into Unauthorized Removal, Retention, and Disclosure of Classified Documents Discovered at Locations Including the Penn Biden Center and the Delaware Private Residence of President Joseph R. Biden, Jr.* (Feb. 2024), *available at* https://www.justice.gov/sco-hur ("Hur Report"); *see also* Weinsheimer Decl. ¶ 7.

audio recording of the interview, *id.* ¶¶ 10, 12, and SCO, with the assistance of a court reporter,

later made a written transcript of the interview based on the audio recording, *id.* ¶ 13.  The Special

Counsel also conducted two voluntary interviews of Mr. Mark Zwonitzer (a writer who worked

with President Biden on his memoirs) creating audio recordings and transcripts of those recordings

with the assistance of a court reporter.  Ex. S at 5; *see* Hur Report at 57.

On February 8, 2024—three days after Special Counsel Hur submitted his report—the

Attorney General released to Congress and the public the Hur Report as Special Counsel Hur

provided it, *i.e.*, "without any further additions, redactions, or other modifications."  Ex E at 1.

The President did not assert executive privilege over any portion of the Hur Report or its

appendices.  *See id.*  Special Counsel Hur subsequently testified before the Committee concerning

his investigation and his decision to decline prosecution.  Ex. D.

### B. Congressional Requests for the Audio Recording and Department of Justice Accommodations in Response

Following the Attorney General's release of the Hur Report, three Committees of the

House of Representatives—Judiciary, Oversight and Accountability, and Ways and Means—

sought from the Department by letter on February 12, 2024, the following:

> 1.      All documents and communications, including audio and video recordings, related to the Special Counsel's interview of President Biden;
>
> 2.      All documents and communications, including audio and video recordings, related to the Special Counsel's interview of Mark Zwonitzer;
>
> 3.      The documents identified as "A9" and "A10" in Appendix A of Mr. Hur's report, which relate to President Biden's December 11, 2015 call with then-Ukrainian Prime Minister Arseniy Yatsenyuk; and
>
> 4.      All communications between or among representatives of the Department of Justice, including the Office of the Special Counsel, the Executive Office of the President, and President Biden's personal counsel referring or relating to Mr. Hur's report.

Ex. K at 4.  Two Committees—Judiciary and Oversight and Accountability—on February 27,

2024, then issued subpoenas mirroring the February 12 letter.  Weinsheimer Decl. ¶ 18.  Only the subpoena issued by the Judiciary Committee is at issue in this action.

The Department advised the Committees on February 16 and March 7 that the Executive Branch would review the requested information to assess and ensure protection of personal privacy and "substantial confidentiality interests regarding sensitive law enforcement and intelligence information."  *See* Ex. N at 2-3.

The Department subsequently provided extensive information responsive to each category of the subpoenas.  In particular, the Attorney General disclosed the transcripts of Special Counsel Hur's interviews of the President and Mr. Zwonitzer (Items 1 and 2 of the subpoenas).  *See* Ex. S at 2 & n.2, 5.  The Special Counsel and the FBI confirmed the accuracy of the transcript, and the Department's senior career official corroborated those representations in a sworn declaration in a parallel FOIA suit seeking disclosure of the audio files.  That official explained that the transcripts "are accurate transcriptions of the words of the interview contained in the audio recording, except for minor instances such as the use of filler words (such as 'um' or 'uh') when speaking that are not always reflected on the transcripts, or when words may have been repeated when spoken (such as 'I, I' or 'and, and') but sometimes only listed a single time in the transcripts."  Weinsheimer Decl. ¶ 14.  Hence, "[b]esides these exceedingly minor differences," the "transcripts accurately capture the words spoken during the interview on the audio recording with no material differences between the audio recording and transcripts."  *Id.*  The Department also provided the two classified documents the Committees requested (responding to Item 3 of the subpoena),[3] and

---

[3] The classified documents are designated "A9" and "A10" in Appendix A of the Hur Report.  The report notes Document A9 is a December 2015 "call sheet setting forth the purpose of a call between the Ukrainian Prime Minister and Mr. Biden and talking points," and document A10 "documents the substance of that call in the format of a non-verbatim transcript."  *See* Ex. S at 2 & n.3.

"correspondence regarding the Special Counsel's report" (responding to Item 4 of the subpoena). Ex. W at 1-2.

From the outset, however, the Department made clear that maintaining the confidentiality of the audio files was necessary to protect privacy interests and the integrity of law enforcement investigations. "[P]roducing sensitive law enforcement information to Congress," the Department explained, "risks seriously chilling our ability to conduct investigations and prosecutions, including securing cooperation from witnesses and targets." Ex. S at 4. "To go further by producing the audio files" absent a showing of particular need related to a legitimate congressional purpose, which the Committees had not proffered, "would compound the likelihood that future prosecutors will be unable to secure this level of cooperation. They might have a harder time obtaining consent to an interview at all. It is clearly not in the public interest to render such cooperation with prosecutors and investigators less likely in the future." *Id.* at 5.

### C.     The Committee's Articulated Needs and the Department's Responses

The Committee offered various explanations of why it needed the recordings in a series of letters. It argued that the recordings were necessary to explore the possibility that "President Biden may have retained sensitive documents related to specific countries involved in his family's foreign business dealings;" to examine whether President Biden took official actions or provided access to himself or his office "in exchange for payments to his family or him," or "obstructed the criminal investigation of his son, Hunter Biden;" to assess whether "the White House or President Biden's personal attorneys placed any limitations or scoping restrictions during the interviews with Special Counsel Hur or Mr. Mark Zwonitzer precluding or addressing any potential statements directly linking President Biden to troublesome foreign payments;" to assess whether the recordings included any relevant information regarding the Department's "commitment to

impartial justice" and the "handling of the investigation and prosecution" of former President Trump; and to consider whether there was a basis for legislative reforms to "codify[] certain qualifications and requirements of special counsels appointed by the Attorney General."  *See* Ex. U at 2-4 & nn. 4-5, 8-9, 11 (quoting Ex. B and Ex. M).  The Committee's correspondence focused almost exclusively on the recording of the President's interview; Mr. Zwonitzer's interviews with the Special Counsel's Office were hardly mentioned at all.

The Committee asserted that its subpoena was in furtherance of both its legislative authority and its impeachment authority.  To establish its impeachment purpose, the Committee cited a Resolution, H. Res. 918, passed in December 2023.  Ex. K at 1.  The Resolution incorporated by reference a memorandum drafted by three House committees in September 2023, which enumerated several topics the committees were investigating as part of their impeachment inquiry, *see* Ex. B.  The President's alleged retention of classified documents (which was the subject of Mr. Hur's investigation) was not among those topics, nor was the state of the President's memory.[4]

The Department provided detailed responses as to why the Committee's stated purposes would not be served by the release of the recordings—especially since the Committee had access to the redacted transcripts.  *See* Exs. S & U.  The Department stood fast in its protection of the audio recordings, stating that it was obligated to "take seriously the harm producing them could do to the public's interest in effective law enforcement investigations."  Ex. U at 5.

---

[4] The subject of Mr. Hur's investigation received only a passing mention in Footnote 188 on the penultimate page of the September 2023 memorandum.  Ex. B at 29.  There, it was mentioned not as a subject of the impeachment inquiry but only as an "example" of an area of the committees' interest where the committees felt the President had failed to cooperate.  *Id.*

### C. Presidential Assertion of Executive Privilege and House Response

The Committee scheduled a vote for May 16, 2024, to hold the Attorney General in contempt for failing to produce the recordings. The Attorney General informed the President on May 15, 2024, that the Department's Office of Legal Counsel had determined that the audio recordings fell within the scope of executive privilege and that executive privilege could properly be asserted in response to the subpoenas.  *See* Weinsheimer Decl. ¶ 19; *see also* Ex. W.  The Attorney General agreed with that conclusion and requested that President Biden assert executive privilege over the audio recordings.  Weinsheimer Decl. ¶ 19.  "[I]n my view," the Attorney General wrote, "disclosure of the audio recordings . . . poses an unacceptable risk of impairing cooperation in future high-profile investigations where voluntary cooperation is exceedingly important, such as those involving White House officials."  Ex. W at 6.  The President thereafter asserted executive privilege on May 16, 2024.  Weinsheimer Decl. ¶ 20.  That same day, the Department informed the Chairmen of the relevant Congressional Committees that President Biden had asserted executive privilege over the audio recordings.  *Id.*; *see* Ex. W.

Nevertheless, on May 16 the Committee proceeded to vote "to report the Attorney General's contumacious conduct to the full House."  Compl. ¶ 51.  The House passed House Resolution 1292 on June 12, 2024, which found the Attorney General in contempt of Congress in violation of 2 U.S.C. § 192, by a vote of 216-207.  Compl. ¶ 52.  The resolution called on the Speaker of the House to refer Attorney General Garland for prosecution under 2 U.S.C. §§ 192, 194.  The Department on June 14, 2024, informed Congress that the Department declined to prosecute Attorney General Garland, noting that "[t]he longstanding position of the Department" has been that "we will not prosecute an official for contempt of Congress for declining to provide subpoenaed information subject to a presidential assertion of executive privilege."  *See* Ex. Y at 1-2.  Resolution 1292 did not authorize litigation by any committee.

## LEGAL STANDARDS

Rule 56 requires a court to grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The "evidence is to be viewed in the light most favorable to the nonmoving party and the court must draw all reasonable inferences in favor of the nonmoving party," *Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011), but the question whether the Constitution grants the Executive or Legislative Branches "the power to act in a certain way is a pure question of law," *Ctr. for Biological Diversity v. McAleenan*, 404 F. Supp. 3d 218, 233 (D.D.C. 2019) (Ketanji Brown Jackson, J.).  "When, as in this case, both parties file cross-motions for summary judgment, each must carry its own burden under the applicable legal standard." *Ehrman v. United States*, 429 F. Supp. 2d 61, 67 (D.D.C. 2006).

A plaintiff bears the burden of demonstrating that the court has jurisdiction over the claim. *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).  At any time, if the plaintiff fails to carry that burden, the court must dismiss the action, including at the summary judgment stage.  Fed. R. Civ. P. 12(h)(3); *see Auster v. Ghana Airways Ltd*., 514 F.3d 44, 48 (D.C. Cir. 2008) ("When a court lacks subject matter jurisdiction, it must dismiss the case and not grant summary judgment.").

## ARGUMENT

**I.   The Court lacks jurisdiction over this inter-branch dispute.**

### A.  The Court lacks Article III jurisdiction.

Article III requires, as an "irreducible constitutional minimum," *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quotation omitted), that the Committee establish its standing to sue, including that it has sustained an injury in fact.  *Id.*  "[T]he alleged injury must be legally and judicially cognizable," *United States v. Texas*, 599 U.S. 670, 676 (2023) (quoting *Raines*, 521 U.S.

at 819).  This requires, *inter alia*, (1) "that the dispute is 'traditionally thought to be capable of resolution through the judicial process,'" *id.* at 676; and (2) "that the plaintiff have suffered 'an invasion of a legally protected interest which is . . . concrete and particularized,'" *Raines*, 521 U.S. at 819 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).

The Supreme Court has "examined history and tradition, among other things, as a meaningful guide to the types of cases that Article III empowers federal courts to consider." *Texas*, 599 U.S. at 676–77; *id.* at 677 (emphasizing that "[a] telling indication of the severe constitutional problem with the [plaintiffs'] assertion of standing to bring this lawsuit is the lack of historical precedent supporting it).  For example, in *Raines*, where members of Congress challenged the constitutionality of the Line Item Veto Act, the Supreme Court held that the legislators lacked a cognizable injury, 521 U.S. at 818, 829-30, emphasizing the absence of any "historical practice" supporting the suit.  *Id.* at 826.

Less than two months ago—citing, *inter alia*, a case in which the D.C. Circuit declined to find legislative standing—the Supreme Court observed that "the standing requirement means that the federal courts may never need to decide some contested legal questions" because "[o]ur system of government leaves many crucial decisions to the political processes, where democratic debate can occur and a wide variety of interests and views can be weighed."  *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024) (citing *Campbell v. Clinton*, 203 F.3d 19, 23 (D.C. Cir. 2000)) (quotation omitted).  Rather than being addressed through litigation, historically disputes between Congress and the Executive Branch "have been hashed out in the 'hurly-burly, the give-and-take of the political process between the legislative and the executive.'"  *Mazars*, 591 U.S. at 858–59 (quoting Hearings on S. 2170 *et al.* before the Subcomm. on Intergovt'l Rels. of the S. Comm. on Gov't Ops., 94th Cong., 1st Sess., 87 (1975) (A. Scalia, Ass't Att'y Gen., Off. of

Legal Couns.)).  History and tradition therefore do not support the Committee's asserted standing in this case.

The Department acknowledges that the decision in *Committee on Judiciary v. McGahn* addressed a House committee's standing.  *See* 968 F.3d 755, 763 (D.C. Cir. 2020) (en banc).  The government respectfully disagrees with the decision in *McGahn* in multiple respects.  But, the situation now before this Court is different in two key respects.  First, in *McGahn*, the court's determination did not involve "taking sides in an interbranch dispute," *id.* at 773, to the extent it would require here.  There, in determining that the separation of powers was not implicated by adjudicating whether a former White House Counsel would appear pursuant to a congressional subpoena, the D.C. Circuit emphasized that he could appear and assert executive privilege, which remained a "powerful protection of the President's interest in Executive Branch confidentiality, and it remain[ed] unaffected by an order compelling McGahn to appear and testify before the Committee."  *Id.*  Even if such a step could be required, there is no such interim step available here that would allow the Executive Branch to protect its interests; the Committee seeks a final ruling overriding the President's assertion of privilege over specific law enforcement files.

Second, the full House had authorized the request for judicial intervention in *McGahn*, *see* 968 F.3d at 767-68, and the D.C. Circuit emphasized that the committee was "duly authorized" to maintain the suit as one of the key factors that led that court to conclude that the committee had standing, *id.* at 770.[5]  The House has given no such authorization here; the Committee is before the Court based on a vote of the BLAG.  *See* Compl. ¶ 56.  But approval by the BLAG alone is insufficient.  While the House Rules provide that the BLAG "speaks for, and articulates the

---

[5] This Court, too, in finding that a committee of the House had standing to seek judicial enforcement of its subpoena, relied on the fact that the lawsuit had been authorized by the full House.  *See Holder*, 979 F. Supp. 2d at 21.

institutional position of, the House in all litigation matters," Rules of the H.R. 118th Cong., Rule II, cl. 8(b), and Resolution 430 likewise authorizes the BLAG to speak for the House as to civil enforcement of subpoenas, H. Res. 430, 116th Cong. (2019), this generalized delegation of authority—while adequate to address the ordinary litigation needs of the House—cannot constitutionally substitute for a decision by the full House to seek Article III court adjudication affecting the balance of powers between the political branches.

At a minimum, the Branch of government on whose behalf the Committee purports to seek intervention must have authorized that weighty step. For example, among the other reasons why the *Raines* plaintiffs lacked standing, the Supreme Court "attach[ed] some importance to the fact that [plaintiffs had] not been authorized to represent their respective Houses of Congress in [that] action," even though Congress had by statute expressly authorized individual Members of Congress to bring the action. 521 U.S. at 815-16, 829. In *McGahn*, likewise, the court found standing relying, in part, on the passage of a House Resolution that authorized that action. *See McGahn*, 968 F.3d at 767–68 (distinguishing *Virginia House of Delegates v. Bethune-Hill*, 587 U.S. 658 (2019), where only one house in a bicameral body had authorized the suit); *cf. Walker v. Cheney*, 230 F. Supp. 2d 51, 69-70 (D.D.C. 2002) (concluding that the general, statutory delegation of authority did not give the court "confidence that the current Congress has authorized this Comptroller General to pursue a judicial resolution of the specific issues affecting the balance of power between the Article I and Article II Branches that have crystalized during the course of this dispute and lawsuit"). Indeed, in each of the handful of cases in which courts have permitted committees to judicially enforce subpoenas against the Executive Branch, the full House or Senate had voted to authorize the specific lawsuit. *See McGahn*, 968 F.3d at 767-68; *Holder*, 979 F. Supp. 2d at 21; *Comm. on the Judiciary v. Miers*, 558 F. Supp. 2d 53, 71 (D.D.C. 2008); *Senate Select*,

498 F.2d at 727.   This approach is consistent with the House's other subpoena enforcement mechanisms, authorization of which, as a matter of historical practice, requires a vote of the full House.   *See* Cong. Rsch. Serv., Congressional Subpoenas: Enforcing Executive Branch Compliance (R45653) at 2, 13 (2019).   The House has given no such authorization here.

The Committee asserts that House Resolution 917 "specifically authorizes the Committee to seek enforcement of subpoenas issued in furtherance of the impeachment inquiry."   Compl. ¶ 56; H. Res. 917, 118th Cong. § 4 (2023).[6]   But a grant of authority to issue and enforce subpoenas in furtherance of that inquiry *in general* is far from an explicit authorization to seek judicial intervention in this "constitutional confrontation between the political branches," *Walker*, 230 F. Supp. 2d at 69, concerning the subpoena at issue in this case.   Indeed, although the Resolution names specific subpoenas, it does not reference this subpoena issued to the Attorney General, *see* H. Res. 917, 118th Cong. § 4 (enumerating only subpoenas issued to two named Department of Justice line attorneys in connection with an inquiry with no nexus to Special Counsel Hur's investigation).   Thus, Resolution 917 serves only to underscore that the House, as a body, did not authorize enforcement of the specific subpoena that the Committee seeks to litigate here.   And because interbranch litigation—unlike the issuance of a subpoena—requires courts to take sides between the political branches, authorization for specific litigation from the whole House is required.   *See* pp. 12-13, *supra*.   Without such authorization, these circumstances are insufficient under the "especially rigorous" standing inquiry required "when a court is faced with an action that presents separation of powers concerns."   *Holder*, 979 F. Supp. 2d at 20-21 (quoting *Raines*, 521 U.S. at 819).

---

[6] H. Res. 917 was adopted through the House's vote on H. Res. 918.   *See* H. Res. 918 § 6.

### B.  Statutory subject-matter jurisdiction is lacking.

Even if this suit were susceptible to judicial adjudication as a constitutional matter, no statute authorizes subject-matter jurisdiction for suits to enforce a House subpoena.  "For a case or controversy to fall within the authority of an inferior court created under Article III of the Constitution, the Constitution must have supplied to the courts the capacity to take the subject matter *and an Act of Congress must have supplied jurisdiction over it*."  *Al-Zahrani v. Rodriguez*, 669 F.3d 315, 318 (D.C. Cir. 2012) (emphasis added).

#### 1.  Congress expressly withheld subject-matter jurisdiction for suits brought by House committees to enforce subpoenas against Executive Branch officials asserting executive privilege.

As the D.C. Circuit has recognized, "[p]rior to 1978 Congress had only two means of enforcing compliance with its subpoenas: a statutory criminal contempt mechanism and the inherent congressional contempt power."  *In re Application of the U.S. Senate Permanent Subcomm. on Investigations*, 655 F.2d 1232, 1238 (D.C. Cir. 1981); *see* S. Rep. No. 95-170, at 16 (1977).[7]  In 1978, Congress enacted a provision purporting to create subject-matter jurisdiction over *some* subpoena-enforcement actions brought by Congress.  *See* Pub. L. No. 95-521, 92 Stat. 1824 (1978).  That statute, now codified (as amended) at 28 U.S.C. § 1365 and 2 U.S.C. §§ 288b and 288d, authorizes jurisdiction only over the *Senate's* subpoena-enforcement actions, and it specifically *excludes* cases concerning "any subpena or order issued to an officer or employee of the executive branch of the Federal Government acting within his or her official capacity, . . . if the refusal to comply is based on . . . a governmental privilege or objection."  28 U.S.C. § 1365(a).

---

[7] The existence of these enforcement mechanisms does not, of course, mean that they may constitutionally be exercised in all circumstances.  Neither of the contempt powers permits Congress to punish an executive official who, as here, asserts a Presidential claim of executive privilege.  *See Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C. 101, 140 & n.42 (1984).

The statute also lays out procedural rules for such actions.  *Id.* § 1365(b); *see* 2 U.S.C. §§ 288b(b), 288d.  But no act of Congress supplies jurisdiction for suits brought by House committees to enforce subpoenas against Executive Branch officials asserting executive privilege.

That congressional choice was deliberate.  The Senate had proposed a bill that would have conferred district-court jurisdiction to enforce subpoenas issued by both chambers of Congress, but the House did not support the proposal and it did not pass.  H.R. Rep. No. 95-1756, at 80 (1978) (Conf. Rep.).  As the House Report explained, "[t]he appropriate committees in the House . . . have not considered the Senate's proposal to confer jurisdiction on the courts to enforce subpenas of House and Senate committees."  *Id.*  Nonetheless, "[t]he Senate . . . twice voted to confer such jurisdiction on the courts and desire[d] . . . to confer jurisdiction on the courts to enforce Senate subpenas."  *Id.*  Congress therefore passed, and the President signed, a version of the bill that conferred jurisdiction over only those suits brought by the Senate (or any of the Senate's authorized committees) to enforce its subpoenas.  And "[w]here Congress includes [an authorization] in an earlier version of a bill but deletes it prior to enactment, it may be presumed that the [authorization] was not intended."  *Russello v. United States*, 464 U.S. 16, 23-24 (1983).

Likewise, Congress deliberately withheld jurisdiction over actions to enforce subpoenas against a federal Executive Branch official acting in her official capacity and refusing to comply based on a governmental privilege or objection.  Prior to 1978, Congress had considered legislation that lacked such a carve-out.  *See, e.g.*, S. 495, 94th Cong. § 1364(a) (1976); S. 2170, 94th Cong. § 343(b)(1) (1976); S. 2731, 94th Cong. § 6 (1976).  In hearings on these bills, the Executive Branch presented its view that those grants of jurisdiction would raise constitutional concerns because "the Supreme Court should not and would not undertake to a[d]judicate the validity of the assertion of Executive privilege against the Congress."  *Executive Privilege: Secrecy in*

*Government: Hearings Before the Subcomm. on Intergovernmental Relations of the Comm. on Gov't Operations of the U.S. Senate*, 94th Cong. 116 (1975) (statement of Ass't Att'y Gen. Scalia); *id.* at 84 ("[T]he courts are precisely not the forum in which this issue should be resolved."). Congress included the clear carve-out for suits against Executive Branch officials in response to those concerns. *See, e.g.*, 123 Cong. Rec. 2970 (1977) (statement of Sen. Abourezk) ("[T]he Department argued vigorously that bringing such suits [against Executive Branch officials for assertions of Executive privilege] would be unconstitutional . . . . Due to this opposition to [a section that would have authorized such suits], it was deleted by the Senate Government Operations Committee when the bill was reported.").

The Senate bill that would eventually become Section 1365 thus excluded cases concerning "any subpoena or order issued to [1] an officer or employee of the executive branch of the Federal Government acting within his or her official capacity, . . . if [2] the refusal to comply is based on . . . a governmental privilege or objection." § 1365(a); *see also* S. 555, 95th Cong. § 1364 (1978) (as introduced Feb. 1, 1977); S. Rep. No. 95-170, at 103 ("Under no circumstances is it intended that this subsection be utilized to authorize the Counsel to bring any action against the executive branch . . . to challenge a claim of executive privilege."). And subsequent Congresses understood that the "purpose" of Section 1365's carve-out of controversies over executive privileges "is to keep disputes between the executive and legislative branches out of the courtroom." 142 Cong. Rec. 19,412 (1996) (statement of Sen. Specter); *see also id.* at 19,413 (statement of Sen. Levin) (purpose is "to keep interbranch disputes out of the courtroom"). "[S]uch views are entitled to significant weight." *Seatrain Shipbuilding Corp. v. Shell Oil Co.*, 444 U.S. 572, 596 (1980).

Because "Congress has the constitutional authority to define the jurisdiction of the lower federal courts" as a statutory matter, once "the lines are drawn, limits upon federal jurisdiction . . .

17

must be neither disregarded nor evaded." *Keene Corp. v. United States*, 508 U.S. 200, 207 (1993). Congress granted jurisdiction over civil actions to enforce congressional subpoenas only when brought by the Senate, and only when not brought against an Executive Branch official acting in his official capacity and invoking a governmental privilege.  This suit is outside that jurisdictional grant twice over:  it is brought by the House, not the Senate, and is against just such an official.

### 2. General federal-question jurisdiction does not reach this matter.

The Committee asserts (Pl. Mem. 18-19) that this Court has subject-matter jurisdiction under 28 U.S.C. § 1331, which is a general grant to district courts of "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."  But where "a general authorization and a more limited, specific authorization exist side-by-side," "[t]he terms of the specific authorization must be complied with."  *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012).  Thus, "general grants of subject matter jurisdiction such as [Section] 1331" do not "control over the specific limitation of subject matter jurisdiction contained" in other provisions.  *Gila River Indian Cmty. v. U.S. Dep't of Veterans Affs.*, 899 F.3d 1076, 1081 (9th Cir. 2018).  Congress's decision to specifically withhold jurisdiction over House suits against Executive Branch officials under Section 1365 therefore forecloses a general exercise of jurisdiction under Section 1331.  A different outcome would render Section 1365 "superfluous."  *Bilski v. Kappos*, 561 U.S. 593, 607-08 (2010).

This Court previously determined that, because Section 1331 had an amount-in-controversy requirement for suits against non-federal parties at the time Section 1365 was enacted, Section 1365 would not have been superfluous because it would have had the effect of permitting enforcement of Senate subpoenas against private parties irrespective of any amount-in-controversy requirement.  *Holder*, 979 F. Supp. 2d at 18-19.  Defendant respectfully disagrees.  At the time

Section 1365 was enacted, it was well understood that Congress otherwise lacked the authority to sue to enforce its subpoenas against anyone, including federal parties (with respect to whom Section 1331 did not contain an amount-in-controversy requirement). *Senate Permanent Subcomm.*, 655 F.2d at 1238. If such suits against federal officials were already covered by Section 1331, that carve-out in Section 1365 would be pointless, as would be its various procedural requirements for suits against private parties. It would be an odd outcome if congressional committees could simply invoke Section 1331 to initiate the precise sort of litigation Congress sought to keep "out of the courtroom," 142 Cong. Rec. 19,412, without complying with the procedures Congress adopted for those suits it was willing to allow into court. And there is no basis to conclude Congress intended such an outcome, *see Pub. Citizen v. U.S. Dep't of Just.*, 491 U.S. 440, 454 (1989) (where statutory construction "would 'compel an odd result' … we must search for further evidence of congressional intent'"), as the legislative history reflects serious concerns about disputes between the political branches over governmental privileges being resolved outside the historical practice of accommodation. In short, if Congress truly intended Section 1331 to place courts in the middle of separation-of-power disputes between its committees and the Executive, "it would simply have said so" rather than attempting to do so "through so subtle, indirect, and opaque a mechanism" as dropping the amount-in-controversy requirement. *See Becerra v. Empire Health Found., for Valley Hosp. Med. Ctr.*, 597 U.S. 424, 440 (2022).

Moreover, the Department in *Holder* did not raise—and this Court therefore did not consider—the 1996 amendments to Section 1365, which confirm that Section 1365 was not intended merely to eliminate the amount-in-controversy requirement. Those amendments provided that an Executive official's refusal to comply based upon a personal (rather than governmental) privilege does not defeat jurisdiction. *See* Pub. L. No. 104-292, § 4, 110 Stat. 3459,

3460 (1996). This would have no purpose if Section 1331 already applied. Courts must "presume that Congress has used its scarce legislative time to enact statutes that have some legal consequence." *Fund for Animals, Inc. v. Kempthorne*, 472 F.3d 872, 877 (D.C. Cir. 2006) (Kavanaugh, J., for the Court).[8]

At a minimum, Section 1331 does not unambiguously confer jurisdiction over the Committee's suit. Constitutional avoidance therefore requires construing Section 1331 not to confer jurisdiction, because that statutory resolution will avoid the "significant separation of powers issues" the Committee's suit presents. *Mazars*, 591 U.S. at 866. *Cf. United States v. Rumely*, 345 U.S. 41, 48 (1953) ("Grave constitutional questions are matters properly to be decided by this Court but only when they inescapably come before us for adjudication.").

## II.   Congress denied House committees a cause of action to enforce their subpoenas.

Even if this Court were to conclude that subject-matter jurisdiction exists, the Committee still lacks a cause of action to enforce its subpoena. Congress has provided an express cause of action to the Senate to enforce its subpoenas against persons who do not present objections based on their service as federal Executive officials. *See* 28 U.S.C. § 1365; 2 U.S.C. § 288d(a); *see also* pp. 15-18, *supra*. And Congress has granted the Executive Branch authority to bring contempt prosecutions to enforce congressional subpoenas. *See* 2 U.S.C. §§ 192, 194. But Congress has not authorized House committees to enforce any subpoenas, much less one seeking information

---

[8] *Mims v. Arrow Fin. Servs., LLC* (*see* Pl. Mem 19) construed 47 U.S.C. § 227(b)(3)—which generally authorized a person "if otherwise permitted by laws or rules of court of a State, [to] bring [an action] in an appropriate court of that State"—to grant jurisdiction to both State and federal courts. 565 U.S. 368, 380 (2012). Section 1365, however, is a specific grant of jurisdiction to *federal* courts with carve-outs intended to *withhold* jurisdiction over specific types of actions. Similarly, *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.* (*see* Pl. Mem. 19) concerned 47 U.S.C. § 252(e)(6), which the Supreme Court read to "not even mention subject-matter jurisdiction," but instead to "confer[] a private right of action," 535 U.S. 635, 643 (2002). Section 1365 is different: it is indisputably a circumscribed grant of subject-matter jurisdiction.

from an Executive Branch official following the President's invocation of executive privilege over that information.

Despite this lack of authorization, the Committee posits several theories for why it has a cause of action to enforce its subpoena. Pl. Mem. 19-27 (Dkt. 11). Precedent forecloses those theories, as a D.C. Circuit panel concluded. *See Comm. on Judiciary v. McGahn ("McGahn III")*, 973 F.3d 121 (D.C. Cir. 2020), *vacated pending reh'g en banc*, No. 19-5331 (Oct. 15, 2020), *and dismissed by joint motion* (July 13, 2021).[9]

### A. The Committee does not have an implied cause of action under Article I to bring suit to enforce its subpoenas.

The Committee errs in arguing that it "has a cause of action under the Constitution to enforce a subpoena." Pl. Mem. 20; *see* Compl. ¶ 7. To the contrary, although Congress has the authority to "issue" subpoenas, *Mazars*, 591 U.S. at 862, the "[a]uthority to exert the powers of [Congress] to compel production of evidence differs widely from authority to invoke judicial power for that purpose." *Reed v. County Comm'rs of Del. Cty.*, 277 U.S. 376, 389 (1928). In *Reed*, the Senate had authorized a special committee to issue subpoenas for an investigation related to the nomination of Senate candidates, "and to do such other acts as may be necessary in the matter of said investigation." *Id.* at 386-87. The special committee contended that the

---

[9] The Committee labels (Pl. Mem. 23) the panel opinion in *McGahn III* as "vacated" and incorrectly infers from that vacatur that the *en banc* Court determined the panel opinion was "incorrect." The *en banc* Court never had occasion to rule on the merits of the panel opinion. The vacatur of the panel opinion resulted from the Court's granting of the parties' "consent motion to vacate." In that motion, the Executive Branch agreed to the vacatur request by the Committee *not* because the opinion was incorrect, but because the vacatur served "the interest of accommodation between the branches." *Compare* Order in No. 19-5331 (D.C. Cir. July 13, 2021) (Dkt. 1906135), *with* Joint Mot. to Dismiss Appeal & Consent Mot. to Vacate Panel Opinion at 1, No. 19-5331 (D.C. Cir. filed June 10, 2021) (Dkt. 1902017). Here, the panel opinion's reasoning remains persuasive for a District Court to "consult." *Cf. Nat'l Black Police Ass'n v. Dist. of Columbia*, 108 F.3d 346, 354 (D.C. Cir. 1997) (opinion "remain[s] 'on the books' even if vacated, albeit without any preclusive effect," and "future courts [are] able to consult its reasoning").

authorization to issue subpoenas had "authorized by law" the special committee "to sue" to enforce the subpoenas, thus satisfying the grant of subject-matter jurisdiction that it invoked.  But the Supreme Court disagreed.  *See id.* at 386, 388-89.

The Court explained that the Senate's authorization must "be construed having regard to the power possessed and customarily exerted by the Senate."  *Reed*, 277 U.S. at 388.  The Court explained that the authority to issue subpoenas implicit in Article I "differs widely from authority to invoke judicial power for that purpose," and it would be a departure from "established practice" for the Senate "to invoke the power of the Judicial Department" to enforce a subpoena, rather than "rely on its own powers."  *Id.* at 389.  The Court thus held that the Senate's authorization for the special committee to issue subpoenas and perform "such other acts as may be necessary" in the course of its investigation, *id.* at 386-87, was "not intend[ed] to authorize the committee" to sue, *id.* at 389.  *Reed*'s holding that the Senate was not "authorized by law to sue" despite being authorized to take any "necessary" action in connection with the subpoena, *Reed*, 277 U.S. at 388, necessarily means that the Constitution itself does not impliedly authorize a cause of action to enforce an authorized legislative subpoena.

Neither *McGrain v. Daugherty*, 273 U.S. 135 (1927), nor *Quinn v. United States*, 349 U.S. 155 (1955), states otherwise.  *See McGahn III*, 973 F.3d at 125.  The Committee relies (Pl. Mem. 19-20) on *McGrain*'s statement that the "power of inquiry—with process to enforce it—is an essential and appropriate auxiliary to the legislative function." 273 U.S. at 174.  *McGrain* involved a habeas petition from a private citizen following his arrest by the Senate's sergeant-at-arms, not a congressional effort to litigate a subpoena against an Executive Branch official after a presidential assertion of privilege.  Its "process to enforce" discussion merely referred to historical examples in which Congress went beyond voluntary requests and issued compulsory process

enforceable through contempt.  *Id.* at 167-68.  All of the historical precedent *McGrain* cited to support Congress's implied "auxiliary" enforcement power involved, like *McGrain* itself, the enforcement of subpoenas exclusively through contempt.  *See id.* at 154, 168-74; *see also Reed*, 277 U.S. at 388-89.  *Quinn* is likewise unavailing.  It involved a criminal contempt prosecution brought by the Executive Branch, and in referring to Congress's ability to "compel testimony . . . through judicial trial," *Quinn* cited another case involving a prosecution for criminal contempt.  349 U.S. at 161 & n.20 (citing *In re Chapman*, 166 U.S. 661 (1897)).  As the *McGahn III* panel explained, those cases "do not demonstrate that Article I creates a cause of action," but rather "show that Congress has long relied on its own devices."  973 F.3d at 125.

*Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 325, 327 (2015), concluded that the Supremacy Clause, which "is silent regarding who may enforce federal laws in court, and in what circumstances they may do so," "certainly does not create a cause of action."  Instead, the question is whether statutory jurisdictional grants carry an implied cause of action, either in equity, *id.* at 327, or, in extremely rare cases, for damages, *see Ziglar v. Abbasi*, 582 U.S. 120, 133-35 (2017).  Article I does not expressly confer a right on congressional committees to sue to enforce subpoenas, and thus it does not itself provide such a right of action.  *Armstrong*, 575 U.S. at 320, 325, 327.

## B. The Committee cannot infer a cause of action from Congress's grant of equity jurisdiction.

The Committee also cannot infer a cause of action from Congress's grant of equity jurisdiction.  *See McGahn III*, 973 F.3d at 123-24; *see also Armstrong*, 575 U.S. at 327-328.

When "a party seeks to assert an implied cause of action under the Constitution itself," "separation-of-powers principles are . . . central to the analysis," and "most often," Congress—not "the courts"—"should decide" whether to permit a suit.  *Abbasi*, 582 U.S. at 135.  Contrary to the

Committee's contention (Pl. Mem. 23-24), those principles are not limited only to actions that seek to imply a damages remedy under the Constitution.  The separation of powers is equally "central to the analysis" when the Judiciary creates an implied cause of action for equitable relief that extends beyond "traditional" equity practice.  *Abbasi*, 582 U.S. at 135-36.  In "determining whether traditional equitable powers suffice to give necessary constitutional protection," or whether something additional is needed—either "a damages remedy," *id.* at 133-34, or relief that extends beyond that "traditionally accorded by courts of equity," *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999)—there are "a host of considerations that must be weighed and appraised," *Abbasi*, 582 U.S. at 135-36.  That task generally "should be committed to those who write the laws rather than those who interpret them."  *Id.*; *see Grupo Mexicano*, 527 U.S. at 322 ("When there are indeed new conditions that might call for a wrenching departure from past practice, Congress is in a much better position than [the courts] both to perceive them and to design the appropriate remedy.").  Congress's grant of equity jurisdiction to the federal courts is thus limited to the relief that "was traditionally accorded by courts of equity."  *Grupo Mexicano*, 527 U.S. at 318-19, 329.  A "substantial expansion of past practice" is "incompatible with" courts' "traditionally cautious approach to equitable powers, which leaves . . . to Congress" such policy judgments.  *Id.*

Here, the "relative recency" of lawsuits to enforce congressional subpoenas, *McGahn*, 968 F.3d at 777, all but forecloses their being within the scope of federal courts' implied equitable authority.  *See Grupo Mexicano*, 527 U.S. at 319, 322.  Unlike traditional equitable suits, in which private parties seek to enforce personal interests based on violations of federal laws, *see, e.g.*, *Armstrong*, 575 U.S. at 326-27, the Committee here seeks to enforce an institutional prerogative based on non-compliance with a legislative subpoena, *see McGahn III*, 973 F.3d at 124 ("[T]here

24

is . . . nothing 'traditional' about the Committee's claim."). Given that *Grupo Mexicano* characterized the relatively subtle shift from suits by post-judgment creditors to creditor suits before judgment as "a wrenching departure from past practice" that "Congress [was] in a much better position" to address through legislation, 527 U.S. at 322, it follows *a fortiori* that, assuming such suits are judicially cognizable at all, Congress must decide the much weightier issue of whether to provide a House Committee with a novel cause of action here.

The Committee asserts (Pl. Mem. 22) that "when the Constitution grants a power, it also grants auxiliary powers that are necessary to exercising it," but that principle does not help the Committee here. The congressional power of inquiry, backed by the power to issue subpoenas, is itself the unwritten auxiliary power that is necessary and proper to effectuate the enumerated powers of legislation or impeachment. *See, e.g.*, *McGrain*, 273 U.S. at 174. The power to conscript the judiciary into enforcing such subpoenas would be auxiliary to that auxiliary power, and the Committee cites no authority for that kind of constitutional bootstrapping. And it would be particularly inappropriate to infer such a power given that it is the Executive Branch, not the Legislative Branch, that is constitutionally charged with enforcing the laws—including to prosecute noncompliance with congressional subpoenas, *see* 2 U.S.C. § 192.

Contrary to the Committee's contention (Pl. Mem. 20-21), *Armstrong* does not teach otherwise. To be sure, *Armstrong* recognized "that federal courts may in some circumstances grant injunctive relief against . . . violations of federal law by federal officials." 575 U.S. at 326-27. For that principle, *Armstrong* cited *American School of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 110 (1902), which reasoned that "[t]he acts of all . . . officers must be justified by some law, and in case an official violates the law *to the injury of an individual* the courts generally have jurisdiction to grant relief," *id.* at 108 (emphasis added). But the Committee can only assert injury

as a Branch of the Government—it obviously is *not* an "*individual* aggrieved by an erroneous decision of a legal question by Department officers" for whose benefit courts "have power to grant relief." *Id.* The Committee's reliance (e.g., Pl. Mem. 21) on cases brought by private parties to enforce their own constitutional rights are thus inapposite.

In any event, and just as fundamentally, a court's equitable powers remain "subject to express and implied statutory limitations." *Armstrong*, 575 U.S. at 327. Where, as here, Congress has had "specific occasion to consider" the means for enforcing congressional subpoenas, *Abbasi*, 582 U.S. at 148, its decision to authorize suits by the Senate—but not the House—and its decision to exclude suits that involve Executive Branch assertions of "governmental privilege," 28 U.S.C. § 1365(a), "suggest[] that Congress intended to preclude" the suit the Committee seeks to bring here, *Armstrong*, 575 U.S. at 328; *see* pp. 15-18, *supra*. It would turn that statutory scheme on its head to conclude that, when Congress addressed the means of enforcing congressional subpoenas with particularity—expressly granting the Senate a *limited* cause of action and granting the House *no* cause of action—Congress thereby allowed the House to invoke a broader cause of action in equity. *See Hernandez v. Mesa*, 589 U.S. 93, 109 (2020) ("It would be 'anomalous to impute . . . a judicially implied cause of action beyond the bounds [Congress has] delineated for [a] comparable express caus[e] of action.'" (citation omitted)). That is especially so given that the Senate's statutory cause of action is subject to numerous limitations, as discussed. *See* pp. 15-20, *supra*; *see also Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 15 (1981) ("In the absence of strong indicia of a contrary congressional intent, we are compelled to conclude that Congress provided precisely the remedies it considered appropriate.").

**C. The Declaratory Judgment Act does not supply a cause of action.**

The Committee's alternative reliance on the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, is also mistaken. Pl. Mem. 26-27. That Act simply "enlarge[s] the range of remedies

available in the federal courts" for cases that already can be litigated there.  *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667-71 (1950).  The Supreme Court has "long considered 'the operation of the Declaratory Judgment Act' to be only 'procedural,' leaving 'substantive rights unchanged.'"  *See Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 571 U.S. 191, 199 (2014).

Hence the Declaratory Judgment Act does not alone "provide a cause of action."  *Ali v. Rumsfeld*, 649 F.3d 762, 778 (D.C. Cir. 2011); *accord Buck v. Am. Airlines, Inc.*, 476 F.3d 29, 33 n.3 (1st Cir. 2007); *Davis v. United States*, 499 F.3d 590, 594 (6th Cir. 2007); *Hanson v. Wyatt*, 552 F.3d 1148, 1154, 1156-57 (10th Cir. 2008).  Because there is otherwise no cause of action to bring this dispute into court, *see* pp. 20-26, *supra*, the Committee cannot rely on the Declaratory Judgment Act to provide it with one.  *See McGahn III*, 973 F.3d at 124-25.

## III.   The Court should exercise its equitable discretion to decline to adjudicate this suit.

Even if the Court were to find jurisdiction and a cause of action here, the Court should nonetheless dismiss this action as a matter of equitable discretion.  "The Declaratory Judgment Act provides that a federal court, '[i]n a case of actual controversy within its jurisdiction, . . . *may* declare the rights and other legal relations of any interested party seeking such declaration.'"  *Morgan Drexen, Inc. v. Consumer Fin. Prot. Bureau*, 785 F.3d 684, 696 (D.C. Cir. 2015) (quoting 28 U.S.C. § 2201(a)) (emphasis the Court's).  Indeed, "[s]ince its inception, the Declaratory Judgment Act has been understood to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants."  *Id.* (quoting *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995)); *see also MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 136 (2007); *Chenoweth v. Clinton*, 181 F.3d 112, 114-15 (D.C. Cir. 1999) (denial of relief on "equitable discretion" grounds is permissible when cases present "separation of powers problems" between the other branches).  Consistent with the constitutionally mandated accommodation process and

guidance of the Supreme Court and the D.C. Circuit to minimize the courts' involvement in inter-branch political disputes, the Court should decline to adjudicate this lawsuit.

The historical absence of Congressional lawsuits seeking Executive Branch information is no coincidence. Such suits threaten the separation of powers and its system of checks and balances that has served the Nation well for 230 years. The Supreme Court made clear in *Raines* that our constitutional system contemplates a "restricted role for Article III courts," which is most fundamentally to protect "'the constitutional rights and liberties of individual citizens and minority groups against oppressive or discriminatory government action.'" 521 U.S. at 828-29 (citation omitted). "'It is this role, not some amorphous general supervision of the operations of government, that has maintained public esteem for the federal courts and has permitted the peaceful coexistence of the countermajoritarian implications of judicial review and the democratic principles upon which our Federal Government in the final analysis rests.'" *Id.* at 829. Otherwise, the federal courts would be "not the last but the first resort," *Barnes v. Kline*, 759 F.2d 21, 53 (D.C. Cir. 1984) (Bork, J., dissenting), *vacated sub nom.*, *Burke v. Barnes*, 479 U.S. 361 (1987), such that "the system of checks and balances [would be] replaced by a system of judicial refereeship," *Moore v. U.S. House of Representatives*, 733 F.2d 946, 959 (D.C. Cir. 1984) (Scalia, J., concurring in result), *abrogated by Raines*, 521 U.S. 811.

The impact of opening an Article III forum for political-branch disputes is real. While no such suits arose in the first two hundred years of the nation's history, *three* have been filed by the current House Judiciary Committee in less than six months. *See Committee on the Judiciary, U.S. House of Reps. v. Chan*, Case No. 1:24-cv-344 (D.D.C. filed Feb. 6, 2024); *and Committee on the Judiciary, U.S. House of Reps. v. Daly*, Case No. 1:24-cv-815 (D.D.C. filed Mar. 21, 2024).

Judicial resolution of political disputes might sometimes be more expedient than "political struggle and compromise," *Barnes*, 759 F.2d at 55 (Bork, J., dissenting), but the separation-of-powers may not be sacrificed in the name of expediency.  Indeed, political struggle and compromise are its defining feature, not some defect to be removed or avoided.  *See Mazars*, 591 U.S. at 854 ("Congress and the President—the two political branches established by the Constitution—have an ongoing relationship that the Framers intended to feature both rivalry and reciprocity.") (citations omitted).  The process of negotiation and accommodation, even if contentious or difficult, protects the political branches from excessive judicial interference and the Judiciary from the undue politicization that would result from "repeated use of [its] power to negate the actions of the representative branches." *Walker*, 230 F. Supp. 2d at 65.  Indeed, recognizing "that a better balance would result in the constitutional sense, however imperfect it might be, if it were struck by political struggle and compromise than by a judicial ruling," the D.C. Circuit in *AT&T*, remanded an informational dispute without decision rather than reaching "nerve-center constitutional questions."  551 F.2d at 394.  The D.C. Circuit urged the branches to consider settlement, observing:  "A court decision selects a victor, and tends thereafter to tilt the scales.  A compromise worked out between the branches is most likely to meet their essential needs and the country's constitutional balance."  *Id.* at 394; *see also Mazars*, 591 U.S. at 862 (noting a court's "duty of care to ensure that [the court does not] needlessly disturb 'the compromises and working arrangements that [the political] branches . . . themselves have reached'") *(*quoting *NLRB v. Noel Canning*, 573 U.S. 513, 524-26 (2014)).

Here, the Department of Justice has gone to great lengths to follow the constitutionally-mandated accommodation process to provide the Committee information related to Special Counsel Hur's investigation.  *See* pp. 5-10, *supra*.  Moreover, the President's judgment in asserting

executive privilege was exercised following extensive efforts to accommodate the Committee with a high volume of responsive information—including even law enforcement sensitive information—and after following a careful and deliberate assessment of the legality and necessity of the assertion.   *See* pp. 9-10, *supra*.   The assertion was narrowly tailored and specific.   And it was made with rigorous adherence to long-established Executive Branch procedures developed to mitigate congressional concerns about potential overuse of the privilege, and to ensure that "executive privilege will be asserted only in the most compelling circumstances, and only after careful review demonstrates that assertion of the privilege is necessary."   Memorandum from President Reagan to the Heads of Executive Departments and Agencies Regarding Procedures Governing Responses to Congressional Requests for Information at 1 (Nov. 4, 1982).

Against this backdrop, the Committee asks this Court to intervene.   But, as discussed above, the Committee neither secured—nor even sought—the authorization of the full House to ensure that the Legislative Branch indeed seeks the intervention of this Court in this inter-branch dispute.   Instead, it asks the Court to adjudicate weighty constitutional questions on the strength of three Members' votes, and a resolution specifically authorizing litigation to enforce subpoenas other than the one at issue here.   For all these reasons, even if the Committee had Article III standing to pursue the claims it has alleged—which it does not—this Court should nonetheless exercise its discretionary power under the Declaratory Judgment Act to dismiss the Complaint.

## IV.    **Executive privilege bars enforcement of the subpoenas.**

If this Court reaches the merits, Defendant is entitled to judgment as a matter of law because the requested recordings are protected from disclosure by the President's formal invocation of executive privilege.   Whatever need the Committee may have for the audio recordings cannot overcome this rare, narrow, and carefully considered assertion of executive privilege by the President, at the Attorney General's request, to protect an important tool the

Department requires to carry out its law-enforcement mission, particularly in high-profile and sensitive investigations and prosecutions implicating the White House.  The President's constitutional authority to protect confidential law enforcement information is grounded in both historical practice and constitutional text.

### A. The audio recordings are law enforcement files that fall within the scope of executive privilege.

The Executive's duty to "take Care that the Laws be faithfully executed," c, encompasses a presidential responsibility to assess when certain Executive Branch information should remain confidential to protect the public interest, particularly when disclosure risks harm to Article II functions.  *See Nixon*, 418 U.S. at 708 (executive privilege is "fundamental to the operation of Government and inextricably rooted in the separation of powers" and "derive[s] from the supremacy of each branch within its own assigned area of constitutional duties").  *See also Nixon v. GSA*, 433 U.S. 425, 449 (1977) ("[T]he privilege is not for the benefit of the President as an individual, but for the benefit of the Republic.").

The availability and use of executive privilege to protect the public interest in effective law enforcement and the separation of powers is deeply rooted in the Constitution and historical practice. "[I]t is the Executive who is charged by the Constitution to 'take Care that the Laws be faithfully executed.'"  *Heckler v. Chaney*, 470 U.S. 821, 832 (1985) (quoting U.S. Const., art. II, § 3).  Congress, by contrast, is constitutionally excluded from law-enforcement functions, *Mazars*, 591 U.S. at 863, and other branches may neither usurp nor unduly interfere with that Article II authority, *Morrison v. Olson*, 487 U.S. 654, 693-94 (1988).  Deference to the law enforcement judgment of the Executive Branch is therefore particularly important when the President has determined that the release of law enforcement files would harm the public interest and has asserted executive privilege over those files against a congressional committee. *Cheney v. U.S.*

*Dist. Ct. for D.C.*, 542 U.S. 367, 385 (2004) (When the Executive Branch "at its highest level" asserts its interests in confidentiality, the "high respect that is owed to the office of the Chief Executive" calls for "judicial deference and restraint.").

### 1. Throughout this nation's history, Presidents have consistently asserted executive privilege over law enforcement materials sought by Congress.

Consistent with the text of the Take Care Clause, "[s]ince the beginnings of our nation," Presidents have asserted executive privilege "to resist disclosure of information the confidentiality of which they felt was crucial to fulfillment of the unique role and responsibilities of the executive branch of our government." *In re Sealed Case*, 121 F.3d 729, 736 (D.C. Cir. 1997); *see also Dellums v. Powell*, 561 F.2d 242, 247 (D.C. Cir. 1977) ("It is the [] President who has the information and attendant duty of executing the laws . . . and who has the primary, if not the exclusive, responsibility of deciding when presidential privilege must be claimed[.]") (cleaned up). Since the very first presidential administration, the Executive Branch has consistently maintained that the President may assert executive privilege, including in response to Congressional requests for information, when necessary to effectively carry out his Article II duties and when disclosure would harm the public interest. *See Cong. Requests for Conf. Exec. Branch Info.*, 13 Op. O.L.C. 153, 154 (1989).

Law enforcement materials and investigative files have long been considered to fall within the scope of executive privilege. *See Assertion of Exec. Priv. Concerning the Spec. Counsel's Interviews of the V.P. and Senior W.H. Staff*, 32 Op. O.L.C. 7, 10-11 (2008); *see also* Exec. Order No. 12,667, 54 Fed. Reg. 3403 (Jan. 18, 1989) (executive order defining a "substantial question of Executive privilege" to include instances when disclosure "might impair . . . law enforcement"). And that protection extends to confidential information in both open and closed cases where disclosure would compromise law enforcement functions. 32 Op. O.L.C. at 10; *Response to Cong.*

*Requests for Info. Regarding Decisions Made Under the Indep. Couns. Act*, 10 Op. O.L.C. 68, 76 (1986).

Accordingly, executive privilege has protected the confidentiality of investigative files for almost two centuries based on many of the same concerns that motivated the President to act here. *See generally History of Refusals by Exec. Branch Officials to Provide Info. Demanded by Cong.*, 6 Op. O.L.C. 751, 760-61, 765 (1982) (identifying instances dating back to the early 19th century in which investigative materials were withheld from Congress based on President's assertion of executive privilege); 8 Op. O.L.C. at 117 ("Since the early part of the 19th century, Presidents have steadfastly protected the confidentiality and integrity of investigative files from untimely, inappropriate, or uncontrollable access by the other branches, particularly the legislature.").

In 1941, for example, Attorney General Jackson wrote the House Committee on Naval Affairs refusing to provide FBI investigative records.  *Position of the Exec. Dep't Regarding Investigative Reps.*, 40 U.S. Op. Atty. Gen. 45 (1941).  He stated that, "[i]t is the position of this Department, restated now with the approval of and at the direction of the President, that all investigative reports are confidential documents of the executive department of the Government, to aid in the duty laid upon the President by the Constitution to 'take care that the laws be faithfully executed,' and that congressional or public access to them would not be in the public interest." *Id.* at 46.  Attorney General Jackson explained multiple ways in which disclosure of investigative files "would not be in the public interest" and would "seriously prejudice law enforcement." *Id.* Attorney General Jackson further noted that in reaching this position, he was "following the conclusions reached by a long line of distinguished predecessors . . . who have uniformly taken the same view," dating back to at least 1904. *Id.* at 47.

Formal assertions of executive privilege over law enforcement materials have generally been rare because Congress has often respected these interests.  But when it has not, Presidents have continued to assert privilege over these materials, even over documents from previous administrations of the opposite party.  *See, e.g.*, *Assertion of Executive Privilege with Respect to Prosecutorial Documents*, 25 Op. O.L.C. Atty. Gen. 1 (2001) (requesting that President Bush assert executive privilege over prosecutorial decision-making memoranda to Attorney General Reno).

In a 1986 opinion, the Department made clear that the law-enforcement component of executive privilege encompasses "closed criminal enforcement file[s]."  10 Op. O.L.C. at 76-78. The Department explained that, although certain risks from disclosure are not present once a case is closed, "much of the information in a closed criminal enforcement file such as unpublished details of allegations against particular individuals and details that would reveal confidential sources, and investigative techniques and methods would continue to need protection."  *Id.* at 77. Further, in releasing information about the prosecutorial decision-making process, the Department must "weigh the potential 'chilling effect' of a disclosure of details of the deliberative process against the immediate needs of Congress and of the Department."  *Id.* at 77-78; *see also id.* at 76 (quoting Attorney General Jackson's statement that "[i]t is the position of this Department, restated now with the approval of and at the direction of the President, that all investigative reports are confidential documents of the executive department of the Government").

Indeed, in 2008 in a letter advising the President on the assertion of executive privilege with respect to FBI reports of a Special Counsel's interviews with high-level White House officials, Attorney General Mukasey reiterated the "long-recognized" principle that the law-enforcement component of executive privilege "protects documents related to a closed criminal

investigation where disclosure might . . . undermine the Executive Branch's 'long-term institutional interest in maintaining the integrity of the prosecutorial decision-making process." 32 Op. O.L.C. at 10; *see id.* ("[T]he separation of powers necessity of protecting the integrity and effectiveness of the prosecutorial process continues after an investigation closes.").  And the Attorney General specifically invoked the same concerns that animate President Biden's assertion of executive privilege here:  the need to protect the effectiveness of future law enforcement investigations, which could be undermined by a release that would "impact . . . White House cooperation with future Justice Department criminal investigations."  *Id.* at 10-11; *see also id.* at 13 ("I am greatly concerned about the chilling effect . . . on . . . White House cooperation with future Justice Department investigations.").

This history—in which the Executive Branch declines to release information that, in its assessment as the branch of government responsible for enforcing the law, could harm law-enforcement interests—matters.  In separation-of-powers disputes, the longstanding practice of the Executive Branch and acquiescence of Congress "'is a consideration of great weight.'"  *Mazars*, 591 U.S. at 862 (quoting *Noel Canning*, 573 U.S.at 524-26).  And courts generally should not disturb "the compromises and working arrangements" reached by "the allocation of power between [the] two elected branches of Government."  *Id.*

### 2.  The audio recordings are law enforcement records subject to executive privilege.

The President properly asserted executive privilege over the materials sought here because release of the audio recordings could harm future law enforcement efforts by discouraging potential sources of information from submitting to voluntary recorded interviews in future "high-profile criminal investigations—in particular, in investigations where the voluntary cooperation of White House officials is exceedingly important."  *See* Ex. W at 5-15.  As the Attorney General

explained, if potential witnesses in such investigations were aware that the audio recordings of interviews could be released to Congress and potentially to the public, those witnesses would be less likely to submit to voluntary recorded interviews or may otherwise diminish the degree and extent of their cooperation, thereby significantly impairing the Department's ability to conduct such investigations.  *Id.* at 4-5.  Accordingly, President Biden's assertion of executive privilege on this basis is consistent with the historical practice of resisting disclosure of law enforcement information where disclosure would impair future law enforcement investigations.

Given that courts have historically not resolved disagreements between the branches in these circumstances, it is unsurprising that there is no judicial precedent (*see* Pl. Mem. 30) specific to the law enforcement component of executive privilege.  But this component of executive privilege has long been part of the structure of negotiations when Congress seeks sensitive law enforcement information from the Department of Justice.  Further, the President's assertion here is consistent with the distinct (but related) law enforcement privilege that has developed at common law.  Although the President's assertion of executive privilege at issue here derives from the Constitution and his Article II authority, courts have also recognized a law enforcement privilege derived from common law.  *See, e.g.*, *Black v. Sheraton Corp. of Am.*, 564 F.2d 531, 541-42 (D.C. Cir. 1977).  The common-law variation of the privilege serves a similar function as "the constitutional privileges."  *Id.* at 541-42 (explaining the purpose of the common-law-enforcement privilege is "to minimize disclosure of documents whose revelation might impair the necessary functioning of a department of the executive branch"); *see also In re Dep't of Investigation*, 856 F.2d 481, 484 (2d Cir. 1988) (law enforcement privilege is designed "to prevent disclosure of law enforcement techniques and procedures, to preserve the confidentiality of sources, to protect witness and law enforcement personnel, to safeguard the privacy of individuals involved in an

investigation, and otherwise to prevent interference with an investigation").  Accordingly, the D.C. Circuit in *Black* found it "justified in drawing broadly on various executive privilege decisions" when assessing the law enforcement privilege outside of the executive privilege context.  564 F.2d at 542.

This body of law further supports the President's assertion of executive privilege.  Courts, when applying the law enforcement privilege in its common law form, consistently credit and defer to the Department's concerns about whether "disclosure will thwart governmental processes by discouraging citizens from giving the government information."  *See In re Sealed Case*, 856 F.2d 268, 272 (D.C. Cir. 1988) (quotation omitted).  Indeed, in *In re Micron Tech., Inc. Sec. Litig.*, 264 F.R.D. 7 (D.D.C. 2010), the court found the privilege applicable because it was "readily apparent that a refusal to recognize law enforcement privilege for information obtained through [that the Department Antitrust Division's lenience] program would chill future informants from coming forward" and "the Antitrust Division's investigative capacity would surely suffer."  *Id.* at 10-11. The same is true here, because the President and the Attorney General reasonably determined that release would threaten the privacy interests of witnesses in potential future White House investigations, deterring those potential witnesses from cooperating.

Specifically, audio recordings implicate at least two significant privacy interests that must be protected to ensure the effectiveness of future law enforcement investigations in similar high-profile cases.  First, audio recordings contain unique and particularly personal information that is different from the information that may be present in transcriptions.  *See, e.g.*, *New York Times Co. v. NASA*, 920 F.2d 1002, 1005-07 (D.C. Cir. 1990) (*en banc*) (explaining that "voice inflections can contain personal information" and recognizing a privacy interest in an audio recording of astronauts' voices even when a transcript had already been publicly released), *remanded* 782 F.

Supp. 628, 631-33 (D.D.C. 1991) (emphasizing that the "very sound of [a person's] words . . . constitute[s] a privacy interest" and exempting the audio recording from disclosure).  The release of audio recordings effects a particularly significant intrusion on an individual's privacy where the recording is of a law enforcement interview, especially in a case where the interviewees have not been charged with a crime.  *See Jud. Watch, Inc. v. Nat'l Archives & Recs. Admin.*, 876 F.3d 346, 349 (D.C. Cir. 2017) ("Where individuals have been investigated but not charged with a crime," disclosure of certain private law enforcement information "represents a severe intrusion on the privacy interests of the individual in question.") (alteration and quotations omitted).

Second, audio recordings are more easily and convincingly manipulated than transcripts. That concern is growing in significance due to modern technology, *see* Weinsheimer Decl. ¶ 44, but courts have recognized the principle for decades.  In 1996, for example, a trial court played a video recording of a deposition of President Clinton.  *United States v. McDougal*, 940 F. Supp. 224, 226 (E.D. Ark. 1996).  But the Eighth Circuit refused to allow the video recording to be duplicated, in part because of the "potential for misuse" of the recording, such as through "cutting, erasing, and splicing." *United States v. McDougal*, 103 F.3d 651, 658 (8th Cir. 1996); *see also Nixon v. Warner Communc'ns, Inc.*, 435 U.S. 589, 601, 608 (1978) (denying a press request for access to White House audiotapes that had been played for a jury, and for which transcripts had been furnished to the press, and recognizing that if audio recordings were released, there would not "be any safeguard, other than the taste of the marketing medium, against distortion through cutting, erasing, and splicing of tapes").  And more broadly, courts have recognized that audio or video coverage of high-profile proceedings raise different and weightier concerns than releasing transcripts.  *Cf.*, *e.g.*, *Hollingsworth v. Perry*, 558 U.S. 183, 193-194 (2010).  This concern is not speculative: at least one false "deepfake" of the audio of the President's interview with Special

Counsel Hur was circulated on the internet.  Cercone, "Joe Biden-Robert Hur interview audio wasn't leaked; it's a deepfake, DOJ and experts say," Politifact (June 7, 2024), *available at*: https://www.politifact.com/factchecks/2024/jun/07/tiktok-posts/joe-biden-robert-hur-interview-audio-wasnt-leaked/.  It was readily confirmed as a fake in part because the true audio had not been released.  *Id.*

The Committee claims (Pl. Mem. 39-40) that where transcripts already have been released, the marginal difference in witnesses' future incentives to cooperate as a result of releasing audio recordings might be only slight.  But it is the President who holds the relevant privilege and who, with the advice of the Attorney General, is responsible for protecting the integrity and effectiveness of future investigations and prosecutions.  His judgment about the relative costs and benefits of asserting (or declining to assert) privilege in any particular instance is entitled to respect—not to review by members of the Legislative Branch who lack any constitutional authority in this context. *Nixon v. GSA*, 433 U.S. at 449 ("[I]t must be presumed that the incumbent President is vitally concerned with and in the best position to assess the present and future needs of the Executive Branch, and to support invocation of the privilege accordingly."); *cf. Citizens for Responsibility & Ethics in Washington v. U.S. Dep't of Just.*, 746 F.3d 1082, 1098 (D.C. Cir. 2014) (explaining that, in the FOIA context, courts "give deference to an agency's predictive judgment of the harm that will result from disclosure of information"); *Elec. Priv. Info. Ctr. v. Dep't of Just. Crim. Div.*, 82 F. Supp. 3d 307, 321 (D.D.C. 2015) (explaining that the court "must defer to the agencies' expertise" on assertion of harm to criminal investigations). Here, the President and Attorney General reasonably concluded that the likely invasion of the privacy interests set forth above could deter witnesses from submitting to voluntary interviews in future high-profile investigations, and that such harm was not outweighed by the countervailing interests in release.  That is especially

true here, where the Department had undertaken significant efforts to satisfy the Committee's needs by releasing the interview transcripts and authorizing Hur to testify.

The Committee also argues (Pl. Mem. 40-41) that the President cannot assert the law-enforcement component of executive privilege because Special Counsel Hur's investigation has concluded. But the Department has for decades recognized that the law-enforcement component of executive privilege may protect the confidentiality of investigative materials after the closure of a particular investigation to preserve the long-term viability of law-enforcement practices. The reason there are so few cases in this area is not because the principle is novel, or that congressional access to files from specific law enforcement investigations is the norm; it is because Congress has never challenged the Executive Branch's authority to assert executive privilege over its core law enforcement interests in court. *See* pp. 31-35, *supra*. This longstanding arrangement should not lightly be disturbed. *See Noel Canning*, 573 U.S. at 524-26. Moreover, even when evaluating common law assertions of law enforcement privilege, whether a matter is closed is only one factor to consider, along with considerations of whether disclosure would impair future investigations. *Cf.*, *In re Sealed Case*, 856 F.2d at 272 (noting as one of ten factors "whether the … investigation has been completed").

The Committee nonetheless analogizes (Pl. Mem. 40-41) the law-enforcement privilege to FOIA Exemption 7(A), under which an agency can withhold records only if such records "could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A). But executive privilege is rooted in the Constitution, not FOIA, and thus the scope of the law-enforcement strand of that privilege is not bound to follow the contours of Exemption 7(A), nor are they coterminous.[10]

---

[10] The Committee cites (Pl. Mem. 40-41) dicta from *Citizens for Responsibility and Ethics in Washington v. Department of Justice*, 658 F. Supp. 2d 217 (D.D.C. 2009) (*CREW*), for the

### 3. Executive privilege can be asserted against Congress to protect law enforcement interests.

The Committee contends (Pl. Mem. 34-37) that the existence of a common law law-enforcement privilege means that the President cannot assert executive privilege against Congress if law enforcement information is at issue.  That is incorrect twice over.  As an initial matter, a President's assertion of executive privilege is derived from the Constitution, including when that assertion involves law enforcement materials.  *See* pp. 31-35, *supra*.  And such a privilege can be asserted against Congress.  Indeed, this Court's decision in *Committee on Oversight & Government Reform, U.S. House of Representatives v. Holder*, No. 12-cv-1332 (ABJ), 2014 WL 12662665, at *3 (D.D.C. Aug. 20, 2014), *modified*, 2014 WL 12662666 (D.D.C. Sept. 9, 2014), has already rejected the Committee's argument.  In that case, the plaintiff committee similarly argued that a privilege it characterized as "a common law privilege"—there, the deliberative-process privilege—cannot apply "in the context of congressional subpoenas."  Mem. of Points and Authorities in Supp. of Pl.'s Mot. for Summ. J. at 25-32 (ECF No. 61) (D.D.C. Dec. 16, 2013). This Court rejected that argument, holding that D.C. Circuit precedent is to the contrary:  "The language cited in *Espy* [*In re Sealed Case*, 121 F.3d 729] above does not support the Committee's contention that the deliberative process privilege cannot be asserted at all if it is Congress that is making the request. Indeed, the Court in *Espy* specifically mentions balancing a claim of the privilege against Congressional demands."  *Comm. on Oversight*, 2014 WL 12662665, at *3.  This Court was correct, and its logic also applies to the law enforcement component of executive privilege.  It would make no sense for the D.C. Circuit to specify that its opinion in *In re Sealed*

---

proposition that the Department has previously maintained that the law enforcement privilege and Exemption 7(A) are "co-extensive," *id.* at 232.  But the Department argued that the two would be "co-extensive" "only if [the Court] agree[d] with [the Department's] . . . interpretation of 7(A)." Hrg. Tr. at 28, ECF No. 25, *CREW v. U.S. Dep't of Justice* (D.D.C. Jan. 29, 2010).  If not, the Department argued the exemption encompassing the law enforcement privilege in that case "is broader."  *Id.*

*Case* did not "affect[] the scope of the privilege in the congressional-executive context," 121 F.3d at 753, if the privilege did not exist in that context.

In any event, the Supreme Court has since confirmed that "recipients of legislative subpoenas . . . have long been understood to retain common law and constitutional privileges with respect to certain materials, such as attorney-client communications and governmental communications protected by executive privilege." *Mazars*, 591 U.S. at 861 (citing L. Fisher, *Congressional Research Service, Congressional Investigations: Subpoenas and Contempt Power* 16-18 (2003) and *Senate Select*, 498 F.2d at 727, 730-731). The Committee reads (Pl. Mem. 36-37) this language to state only that "parties do not automatically waive common-law privileges" such that it "remains up to Congress to decide whether to accept a common-law privilege." But this interpretation defies the very definition of "retain" on which the Committee relies. A recipient of a legislative subpoena does not "retain"—or "keep and not lose, part with, or dismiss," *id.* at 36 n.16 (quoting *Retain*, BLACK'S LAW DICTIONARY (12th ed. 2024))—a privilege if Congress can dispense with that privilege at any point in time. That *Mazars* cited a D.C. Circuit decision upholding the President's assertion of executive privilege in response to a Congressional subpoena in a lawsuit brought by a congressional committee in *Senate Select*, 498 F.2d at 727, 730-731, also refutes the Committee's reading.

The Supreme Court, D.C. Circuit, and this Court have therefore all made clear that executive privilege, including when based on law-enforcement interests, may be asserted to withhold materials from Congress.

### 4. Executive privilege has not been waived.

The Committee argues (Pl. Mem. 30-32) that the President waived his ability to assert executive privilege over the audio recordings by releasing transcripts of the underlying interviews and by declining to formally claim executive privilege prior to the return date on the Committee's

subpoena.  But because "executive privilege exists to aid the governmental decision process" and is grounded in the constitutional principles, "a waiver should not be lightly inferred."  *In re Sealed Case*, 121 F.3d at 741; *see also Mazars*, 591 U.S. at 864 ("[I]nformation subject to executive privilege deserves 'the greatest protection consistent with the fair administration of justice.'") (quoting *Nixon*, 418 U.S. at 715).  Indeed, "given the constitutional foundation of executive privilege," "executive privilege claims" should receive as much protection as "privilege claims raised by Members of Congress under the Speech or Debate Clause."  *In re Search of Info. Stored at Premises Controlled by Twitter, Inc.*, No. 23-5044, 2024 WL 158766, at *4 (D.C. Cir. Jan. 16, 2024).  And waiver in that context can "be found only after explicit and unequivocal renunciation of the protection."  *United States v. Helstoski*, 442 U.S. 477, 490-91 (1979).  Neither of the Committee's waiver theories clears this high bar.

*First*, the President did not waive executive privilege over the audio recordings by releasing the transcripts of those interviews because the audio recordings contain additional information not reflected in the transcripts implicating executive privilege.  Indeed, the premise of the Committee's action is that the audio recordings contain "unique information."  Pl. Mem. 7.  Because that "unique information" falls within the scope of the law-enforcement component of executive privilege and has not been disclosed, the President has not waived executive privilege over the audio recordings.

For this same reason, the D.C. Circuit has held in the context of FOIA that the government may properly withhold an audio recording even after a transcript is released because the "lexical and non-lexical aspects of a file may convey different information."  *N.Y. Times Co.*, 920 F.2d at 1005.  Citing that authority in a FOIA case involving a law enforcement recording, a court in this district recognized that, "[u]nder binding precedent, written transcripts of recordings do not

contain information that is identical to the audio recorded version." *Pike v. Dep't of Justice*, 306 F. Supp. 3d 400, 412 (D.D.C. 2016).

That principle applies here too:  in both the FOIA and congressional-executive contexts, courts disfavor loose conceptions of waiver because to do otherwise would disincentivize the release of information.  *See In re Sealed Case*, 121 F.3d at 741 (explaining that, in the congressional-executive context, a "limited approach to waiver . . . is designed to ensure that agencies do not forego voluntarily disclosing some privileged material out of fear that by doing so they are exposing other, more sensitive documents"); *see also Pub. Citizen v. Dep't of State*, 11 F.3d 198, 203 (D.C. Cir. 1993) (explaining that, in the FOIA context, "we would be unwilling to fashion a rule that would require an agency to release all related materials any time it elected to give the public information . . . . To do so would give the Government a strong disincentive ever to provide its citizenry with briefings of any kind.").  Indeed, interpreting the production of the transcripts as a waiver of privilege over the audio recordings here would incentivize less Executive Branch cooperation and broader privilege assertions, undermining each branch's "constitutional mandate to seek optimal accommodation" of each other's legitimate interests.  *United States v. AT&T*, 567 F.2d 121, 127 (D.C. Cir. 1977).  If providing Congress with anything were to necessitate giving it everything, the Executive Branch would rightly conclude that producing nothing is the wiser course.  The upshot of disincentivizing accommodation likely would be less information provided to Congress and more cases brought to the courts to resolve.

*United States v. Mitchell*, 377 F. Supp. 1326 (D.D.C. 1974), and *Nixon v. Sirica*, 487 F.2d 700 (D.C. Cir. 1973), cited in Pl. Mem. 31, do not compel a different result.  The Special Prosecutor in those cases sought audio recordings of conversations involving the President and his aides— that is, confidential conversations protected by the presidential communications privilege—and

disclosure was resisted solely to protect "the interest in maintaining the confidentiality of conversations pertinent to Watergate," *Sirica*, 487 F.2d at 718.  In that circumstance, publication of the transcripts meant that "the conversations [we]re no longer confidential," thus defeating the sole ground for claiming privilege.  *Id.*; *see Mitchell*, 377 F. Supp. at 1330.  Those courts had no occasion to consider the unique privacy and risk-of-misuse concerns attendant to release of the audio recordings here; those concerns are not mooted by public disclosure of the transcripts.[11]

Similarly, Mr. Hur's testimony before the Committee (*see* Pl. Mem. 31) cannot constitute a waiver of executive privilege because the audio recordings contain unique information that necessarily cannot be conveyed through testimony by the interviewer.  And release of merely related information, such as the interviewer's impression of the way an interviewee presented, is not enough to effect waiver.  *In re Sealed Case*, 121 F.3d at 741 ("[R]elease of a document only waives these privileges for the document or information specifically released, and not for related materials.").  Accordingly, the President has not waived his assertion of executive privilege over the audio recordings by releasing transcripts or by authorizing Special Counsel Hur to testify.

*Second*, the President asserted executive privilege over the audio recordings in a timely manner consistent with Executive Branch practice.  The assertion was made prior to either the Committee's or the House's vote on contempt when the "constitutional[ly] mandate[d]," *AT&T*, 567 F.2d at 127, accommodation process was still ongoing, and more than a month in advance of this action to compel production of the recordings. *See* Ex. W.  The timing of the assertion was also entirely consistent with historical practice, as assertions of privilege have been made on the

---

[11] None of the Committee's remaining authorities (Pl. Mem. 31-32) held that unique information was waived by the release of similar information.  *See Di Lapi v. City of New York*, No. 06-CV-2864 RJD JMA, 2012 WL 37576, at *6 (E.D.N.Y. Jan. 6, 2012) ("unqualified willingness" to discuss issue in question "constitutes an unequivocal waiver"); *Clark v. Twp. of Falls*, 124 F.R.D. 91, 94 (E.D. Pa. 1988) (executive privilege over specific report waived where official "confirmed at deposition that he let" a third party "read the [same] report").

same day as, and immediately prior to, a committee contempt vote across presidential administrations going back decades.[12]

Further, in *In re Sealed Case*, 121 F.3d 729, the Office of Independent Counsel (OIC) argued that the White House had waived any assertion of executive privilege because, among other reasons, "the White House . . . did not formally invoke privilege until after the OIC filed a motion to compel." *Id.* at 740. The D.C. Circuit disagreed, holding that the President did not "have an obligation to formally invoke its privileges in advance of the motion to compel." *Id.* at 740-41. D.C. Circuit precedent therefore forecloses this theory of waiver, and for good reason. Requiring earlier assertions of executive privilege in executive-congressional disputes would also incentivize broad, protective assertions of privilege before the accommodations process has fully run its course. The result would be the release of less information through the accommodations process. *See Cheney*, 542 U.S. at 390 (reversing lower court's ruling that executive privilege must be asserted at the outset of a discovery dispute and making clear that the privilege should be a last resort, asserted only after all other avenues have failed).

Indeed, it is telling that the Committee does not cite a single case in which a court held that the Executive Branch failed to assert an executive privilege in a timely manner by failing to do so prior to the return date of a congressional subpoena. In *United States v. Bryan*, 339 U.S. 323 (1950), cited in Pl. Mem. 32-33, the subpoena recipient was not a member of the Executive Branch and did not invoke executive privilege, *Bryan*, 339 U.S. at 332-33. In *Sikorsky Aircraft Corp. v. United States*, 106 Fed. Cl. 571 (2012), the United States produced the privileged records and then waited months after the privileged records were used in a deposition to assert a privilege claim in

---

[12] *See, e.g.*, N.Y. Times, *Census Fight Grows as House Panel Backs Contempt and Trump Asserts Privilege* (June 12, 2019) (reporting that "President Trump invoked executive privilege to block disclosure of crucial documents on the decision to add a citizenship question to the 2020 census" only "hours" before the committee contempt vote).

a request to claw-back the records.  *Id.* at 585-86.  Here, the Department refused to release the audio recordings from the start.  And *Fonville v. District of Columbia*, 230 F.R.D. 38, 42 (D.D.C. 2005), concerned a failure to respond at all to written discovery within the 30-day deadline provided by the Federal Rules of Civil Procedure, which have no relevance in the context of the accommodation process.

### B. The Committee has not demonstrated sufficient need for the withheld audio recordings to overcome the President's assertion of executive privilege.

Executive privilege is generally qualified, *Nixon*, 418 U.S. at 705-07, and "can be overcome by a sufficient showing of need," *In re Sealed Case*, 121 F.3d at 737; *see id.* at 745.  The "type of showing of need the [Committee] must make . . . in order to overcome" the President's assertion of executive privilege over these law enforcement materials, *id.* at 753, arguably depends on which of the two constitutional sources of power the Committee is proceeding under— legislative or impeachment.  Regardless of which source of authority the Committee invokes, however, the Committee has failed to establish a need for the subpoenaed audio recordings sufficient to overcome the President's assertion of executive privilege.

### 1. The Committee has not shown that the subpoenaed materials are demonstrably critical to its legislative functions.

The *en banc* D.C. Circuit has addressed the showing of need required to enforce a congressional committee subpoena for recordings over which the President had asserted executive privilege:  a committee issuing a subpoena under its legislative authority may overcome an assertion of executive privilege only if the subpoenaed materials are "demonstrably critical to the responsible fulfillment of the Committee's functions."  *Senate Select*, 498 F.2d at 731.  The Court explained that, "the presumption that the public interest favors [Executive] confidentiality [could] be defeated only by a strong showing of need by another institution of government—a showing that the responsibilities of that institution cannot responsibly be fulfilled without access" to the

information demanded.  *Id.* at 730.

That holding defeats the Committee's claims here.  In *Senate Select*, the Senate Select Committee on Presidential Campaign Activities sought to enforce a subpoena against President Nixon directing him to produce "'original electronic tapes' of five conversations between the President and his former Counsel."  *Id.* at 726.  Critically, the court "took judicial notice of the President's public release of transcripts, with partial deletions, of each of the tapes at issue."  *Id.* at 732.  The Senate committee advanced the same arguments as those advanced by the Committee in the instant action about why it had a unique need for tapes:  "to verify the accuracy of the public transcripts," because "portions that the transcripts designate as 'inaudible' might be understood," and because "inflection and tone of voice that the tapes would supply are indispensable to a correct construction of the conversations."  *Id.* at 732-33.  The D.C. Circuit rejected each of these arguments, concluding that the Senate committee had "shown no more than that the materials deleted from the transcripts may possibly have some arguable relevance to the subjects it has investigated and to the areas in which it proposes legislation."  *Id.* at 733.  That is all the more so here:  if a congressional committee cannot establish that audio recordings are demonstrably critical to a legislative function where incomplete transcripts have been provided, it follows *a fortiori* that the Committee here cannot satisfy that same standard here, where the committee was given accurate transcriptions.  Weinsheimer Decl. ¶ 14.

The Committee asserts that because Hur "relied on the way that President Biden presented, not merely the words he spoke," in arriving at his no-prosecution recommendation, the Committee needs the audio recording "to fully assess the Special Counsel's conclusion."  Pl. Mem. 9; *see id.* at 8-9.  The Committee likewise asserts that it needs the audio recording of Mr. Zwonitzer's interview "to better assess the Special Counsel's view of Zwonitzer's credibility, which may shed

light on President Biden's credibility." *Id.* at 9 (citation omitted).  But there cannot be a demonstrably critical legislative need to fully reconstruct every jot and tittle of a past criminal investigation, given that "legislative judgments," such as whether reforms aimed at DOJ's use of special counsels are needed, "normally depend more on the predicted consequences of proposed legislative actions and their political acceptability, than on precise reconstruction of past events." *Senate Select*, 498 F.2d at 732; *see also* 40 U.S. Op. Att'y Gen. at 50 ("The information here involved, was collected, and is chiefly valuable, for use by the executive branch of the Government in the execution of the laws. It can be of little, if any, value in connection with the framing of legislation or the performance of any other constitutional duty of the congress."); 10 Op. O.L.C. at 92 ("[I]t is difficult for us to speculate as to what legitimate interests Congress would have in gaining access to the details of a prosecutorial decision . . . a decision that Congress constitutionally could not alter.").  And, although it is well established that Congress may "inquire into and publicize corruption, maladministration or inefficiency in agencies of the Government," *Watkins v. United States*, 354 U.S. 178, 200 n.33 (1957), Congress is excluded from conducting investigations for "the purpose of 'law enforcement,'" *id.* at 682-83 (quoting *Quinn*, 349 U.S. at 161); *see also Heckler*, 470 U.S. at 832.

     *Mazars* is also instructive on this point.  Although the Supreme Court in that case did not apply the stringent *Senate Select* standard for weighing congressional need against an assertion of executive privilege, it nonetheless emphasized that even under a more permissive test for assessing whether Congress's legislative purpose justifies its efforts to seek a President's personal information, Congress cannot obtain from the President "every scrap of potentially relevant evidence" where "other sources could provide Congress the information it needs." *Id.* at 870.  And if Congress cannot establish a legislative need sufficient to compel the production of these

recordings in the *Mazars* context, it necessarily follows that the Committee has failed to establish that "the subpoenaed evidence [was] demonstrably critical to the responsible fulfillment of the Committee's functions" under the more demanding standard in *Senate Select*, 498 F.2d at 731.

Applying the teachings of *Senate Select* and *Mazars* here, it is clear that the Committee cannot establish a demonstrably critical need for the audio recordings to overcome the President's assertion of executive privilege:

*First*, because "other sources could reasonably provide Congress the information it needs in light of its particular legislative objective," there is no demonstrably critical need for the audio recordings. *Mazars*, 591 U.S. at 869-70; *see also Senate Select*, 498 F.2d at 733 (holding access to transcripts met the Committee's needs). The Department has already provided the Special Counsel's report, transcripts of the President's and Mr. Zwonitzer's interviews with the Special Counsel, hours of testimony from Mr. Hur, access to the two classified documents that the Committees requested, and correspondence regarding the Special Counsel's report. *See* pp. 5-9, *supra*. That is, the Committee "know[s] what the Special Counsel concluded, know[s] why he made those determinations, and ha[s] had an opportunity to ask him about his investigation." Ex. U at 3. No more information could be necessary to "help [the Committee] decide whether legislative reforms aimed at DOJ's use of special counsels are needed." Compl. ¶ 56.

*Second*, and for similar reasons, the information sought is not demonstrably critical to the Committee's legislative functions because the subpoena is "broader than reasonably necessary to support Congress's legislative objective," *Mazars*, 591 U.S. at 869-70; *Senate Select*, 498 F.2d at 731. The subpoena is overbroad because there is simply no legislative reason to completely reconstruct Special Counsel Hur's investigations. And as in *Senate Select*, the Committee "points to no specific legislative decisions that cannot responsibly be made without access to materials

uniquely contained in the tapes or without resolution of the ambiguities that the transcripts may contain."  *Id.* at 733.

*Third*, "the evidence offered by Congress" to establish that a subpoena seeks evidence critical to legislation, *Mazars*, 591 U.S. at 870, is insufficient.  The Committee argues that it has a demonstrably critical need for the recordings to supplement the transcript "because speakers convey unique information with . . . verbal and nonverbal nuances" and certain "filler words" may have been omitted from the transcript. Pl. Mem. 7.  But the Committee fails to identify any specific instance in the transcripts where there are gaps to fill in or where the Committee cannot discern the meaning of the answers provided, especially when considering that it argues it needs to do so to further legislative needs.  To the contrary, the record establishes that there is no reasonable dispute that the "transcripts accurately capture the words spoken during the interview on the audio recording with no material differences between the audio recording and transcripts."  Weinsheimer Decl. ¶ 14.  Far from establishing a "demonstrably critical" need for the audio recordings to accomplish its legislative objectives, the Committee has shown at most that the content of the audio recordings "may possibly have some arguable relevance to the subjects it has investigated and to the areas in which it may propose legislation"—a showing that is plainly insufficient to overcome a presidential assertion of executive privilege.  *Senate Select*, 498 F.2d at 733.

The Committee attempts (Pl. Mem. 40) to diminish the weight of executive privilege by arguing that, even if future White House witnesses are reluctant to submit to voluntary interviews, the Department retains other forms of compulsory process to elicit testimony.  But, again, that is not the Committee's role.  The Executive Branch has determined that voluntary interviews serve a unique role in the law-enforcement process, in particular in the type of high-profile investigations implicating the White House that this assertion of privilege was intended to protect.  *See* Ex. S, at

4.  As Attorney General Mukasey explained in his 2008 opinion, a witness concerned about release of information could "insist, alternatively, on disclosing information only pursuant to a grand jury subpoena in order to ensure the secrecy protections of Rule 6(e),"—a process that can impose significant disadvantages on investigators.  32 Op. O.L.C. at 10; *see also* Decl. of Lanny A. Breuer ¶¶ 6-8, Ass't Atty. Gen., *Citizens for Responsibility & Ethics in Wash. v. Dep't of Justice*, No. 1:08-cv-1468 (D.D.C. July 1, 2009) (describing burdens and investigative disadvantages of grand jury testimony as compared to voluntary interviews).  Because the powers of law enforcement are "assigned under our Constitution to the Executive," *Quinn*, 349 U.S. at 161, the Department's determination on these questions is entitled to deference, *Nixon v. GSA*, 433 U.S. at 449; *cf. Citizens for Responsibility & Ethics in Washington*, 746 F.3d at 1098.

### 2.  The Committee has not made a showing of impeachment need sufficient to overcome the President's assertion of executive privilege.

Nor can the Committee overcome the President's assertion of executive privilege by invoking the Committee's powers under its impeachment inquiry.  Although no court has articulated the precise showing necessary to do so, regardless of the precise formulation of the legal standard this Court adopts, the Committee must show both that there exists a significant need for the evidence requested and that its need cannot be satisfied through other information.  For example, if the standard for overcoming privilege in the impeachment context is akin to the standard that applies in a grand jury investigation, a committee would need to show that the recordings "likely contain[] important evidence" that "is not available with due diligence elsewhere."  *In re Sealed Case*, 121 F.3d at 754.  Other potentially analogous standards might be drawn from other contexts, but also require a "demonstrated, specific need" for the information sought. *Nixon*, 418 U.S. at 713 (discussing the insufficiency of the President's assertion of privilege "based only on the generalized interest in confidentiality" in light of a "demonstrated,

specific need" for the information in a criminal case); *Cf. In re The City of New York*, 607 F.3d 923, 945 (2d Cir. 2010) (holding that, to overcome the presumption against lifting the law-enforcement privilege in the civil discovery context, "the party seeking disclosure must show (1) that its suit is 'non-frivolous and brought in good faith,' (2) that 'the information sought is [not] available through other discovery or from other sources,' and (3) that the information sought is 'importan[t]' to the party's case.") (citation omitted).[13]

The outcome here is the same under any of the standards potentially applicable to an impeachment inquiry because (1) the audio recordings have no actual relevance to that impeachment inquiry and (2) the Committee has already received the information it needs for its impeachment inquiry in other forms through the accommodation process.

*First*, because the Committee's impeachment inquiry purports to be rooted in the "Impeachment Memorandum" cited in the Complaint, *see* Ex. B, the Committee may compel the production of information only as to those matters that fall within the scope of that authorized purpose. *See Rumely*, 345 U.S. at 44-45 (A committee's "right to exact testimony and to call for the production of documents must be found in [the] language" of the "controlling charter of the committee's powers," and the "resolution must speak for itself."); *Tobin v. United States*, 306 F.2d

---

[13] In reliance on *In re Rep. & Recommendation of June 5, 1972 Grand Jury Concerning Transmission of Evidence to House of Representatives*, 370 F. Supp. 1219, 1220 (D.D.C. 1974), the Committee suggests (Pl. Mem. 39) that *any* impeachment inquiry creates a compelling need that requires release of "all the available evidence." But no court has held that impeachment renders executive privilege a nullity. The President in that case took no position on the release the Grand Jury's report and instead "suggested that the matter is entirely within the Court's discretion." 370 F. Supp at 1221. That case therefore cannot (and did not purport to) supply the standard for when, in an impeachment inquiry, Congress can obtain materials over which the President has asserted executive privilege. In any event, if executive privilege may be asserted in the context of criminal proceedings despite "'the public['s] . . . right to every man's evidence,'" *Nixon*, 418 U.S. at 709, surely it may be asserted in an impeachment proceeding as well.

270, 274-75 (D.C. Cir. 1962) (in the statutory contempt context, construing the scope of a resolution authorizing an investigation narrowly as a matter of constitutional avoidance).

The Committee's demand for audio recordings seeks records that plainly fall outside the topics outlined in that memorandum.  That memorandum identifies four areas of focus:  (1) whether President Biden took "any official action … because of money or other things of value provided to his family or him from foreign interests;" (2) whether President Biden "abuse[d] his office of public trust by providing foreign interests with access to him and his office in exchange for payments to his family or him"; (3) whether President Biden "abuse[d] his office of public trust by knowingly participating in a scheme to enrich himself or his family by giving foreign interests the impression that they would receive access to him and his office in exchange for payments to his family or him"; and, (4) whether President Biden "impede[d], obstruct[ed], or otherwise hinder[ed] investigations (including Congressional investigation) or the prosecution of Hunter Biden,"  Ex. B at 27-29.  The audio recordings that the Committee seeks are not facially relevant to any of those areas of inquiry, as Special Counsel Hur was investigating President Biden's "possible unauthorized removal and retention of classified documents," *see Appointment of Robert K. Hur as Special Counsel*, Attorney General Order No. 5588-2023 (Jan. 12, 2023).  Accordingly, because of the disconnect between the subject of the impeachment inquiry and the information sought here, the information sought is not critical to the Committee's inquiry and therefore cannot overcome the President's assertion of executive privilege.

Even on its own terms, the Committee's asserted impeachment purpose does not state a need for the audio recordings. The Committee theorizes that, because "Special Counsel [Hur] found that President Biden retained two classified documents related to Ukraine," the Committee

would use the audio recordings to "determine whether President Biden retained those documents to enrich his family" or to "execute a multimillion-dollar book deal."  Pl. Mem. 38-39.

Here, the availability of the transcripts is critical: despite access to them, the Committee identifies no questions posed by Special Counsel Hur in which those subjects were broached and identifies no answers provided by President Biden where the audio recordings could be necessary to fill any gaps.  The Committee does not explain how the interviews—much less the audio recordings—are relevant to those lines of inquiry.  Indeed, Special Counsel Hur concluded that "[t]here is no evidence that Mr. Biden shared classified information with any foreign person," Hur Report at 253. Nor does the Committee explain how those documents—or classified information generally—are relevant to a book deal.  The Committee's unfounded speculation—belied by the transcript it already has—is insufficient to overcome executive privilege because it has failed to show that the recordings "likely contain[] important evidence," *In re Sealed Case*, 121 F.3d at 754, or establish a "demonstrated, specific need," *Nixon*, 418 U.S. at 713, for the recordings.[14]

*Second*, and even assuming that a connection between the interviews and the impeachment inquiry existed—which it does not—the Committee offers no explanation as to why the audio recordings contain insight into whether President Biden committed an impeachable offense.  The Committee already has access to the transcripts, Special Counsel Hur's report, and the hours of testimony that Special Counsel Hur provided.  *See* pp. 5-9, *supra*.  Even if the audio

---

[14] Further belying any purported need based on the impeachment inquiry, public statements indicate that the House's impeachment inquiry has fully investigated the topics it sought to cover, demonstrating that the audio recordings are not critical to the inquiry.  *See, e.g.*, *House GOP leaders urge members: Stop making race comments about Harris*, POLITICO (July 23, 2024) (Chairman Comer of the House Oversight Committee stating that he was "done drafting his part" of the impeachment report); Melanie Zanona, https://x.com/MZanona/status/1816487390904553766 ("Judiciary Chair Jim Jordan tells me he hopes to release their long-awaited Biden impeachment inquiry report 'next week.' The House will be on recess by then. House Rs have been sitting on the report for weeks. Some have questioned the point of it now, given Biden dropped out.").

recordings had some value to Special Counsel Hur's charging decisions, the audio recordings would still serve a purely cumulative purpose on the topics the Committee purports to be investigating for impeachment purposes, particularly as the Committee has never asserted that it is considering impeachment based on the President's retention of classified information alone. Thus, under the standard for overcoming privilege in the grand jury context, the Committee would fail to overcome privilege because evidence is available "with due diligence elsewhere," *In re Sealed Case*, 121 F.3d at 754.  And for the same reason, the Committee cannot establish a "specific need," *Nixon*, 418 U.S. at 713, for the recordings.

## V.   **In all events, a permanent injunction is unwarranted.**

A litigant seeking a permanent injunction must prove that (1) it "has suffered an irreparable injury"; (2) "remedies available at law, such as monetary damages, are inadequate to compensate for that injury"; (3), "considering the balance of hardships between the . . . [parties], a remedy in equity is warranted"; and (4) "the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006); *see Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 546 n.12 (1987).  Even if the Committee had standing and were correct on the merits, it has not satisfied the requirements for the permanent injunctive relief, which "does not follow from success on the merits as a matter of course." *Winter v. NRDC, Inc.*, 555 U.S. 7, 32 (2008).  Even if the Court concluded that the harms to the government's institutional law-enforcement interests are outweighed by the Committee's need for the recordings for purposes of the qualified executive privilege, the weighing must be different for purposes of a permanent injunction.  Not only does the public interest "merge" with the government's interests in the balance, *Nken v. Holder*, 556 U.S. 418, 435 (2009), but traditional equitable principles, *see* pp. 27-30, *supra*, strongly caution against the judiciary's issuing a mandatory injunction against a

coordinate Branch of government in a "nerve-center" dispute with another Branch, *AT&T*, 551 F.2d at 394.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendant's cross-motion for summary judgment and deny Plaintiff's motion for summary judgment.

Dated: August 6, 2024                    Respectfully submitted,

                                         BRIAN M. BOYNTON
                                         Principal Deputy Assistant Attorney General

                                         BRIAN D. NETTER
                                         Deputy Assistant Attorney General

                                         */s/ Elizabeth J. Shapiro*
                                         ELIZABETH J. SHAPIRO (D.C. Bar No. 418925)
                                         Deputy Director, Federal Programs Branch

                                         JULIA A. HEIMAN (D.C. Bar No. 986228)
                                         INDRANEEL SUR (D.C. Bar No. 978017)
                                         Senior Counsels
                                         ALEXANDER W. RESAR (N.Y. Bar 5636337)
                                         Trial Attorney

                                         United States Department of Justice
                                         Civil Division, Federal Programs Branch
                                         P.O. Box 883
                                         Washington, DC 20530
                                         Tel:  (202) 514-5302
                                         E-mail: elizabeth.shapiro@usdoj.gov

                                         *Counsel for Defendant*