**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| COMMITTEE ON THE JUDICIARY, UNITED STATES HOUSE OF REPRESENTATIVES, <br><br> *Plaintiff*, <br><br> v. <br><br> MERRICK GARLAND, in his official capacity as Attorney General of the United States, <br><br> *Defendant*. | Case No. 1:24-cv-1911-ABJ |

**DEFENDANT'S REPLY IN SUPPORT OF DEFENDANT'S
CROSS-MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................ 1

ARGUMENT ............................................................................................................... 1

I.      There is neither jurisdiction nor a cause of action for the Committee's claim. ................. 1

     A.      The Committee lacks standing. ........................................................................ 1

     B.      There is no statutory subject-matter jurisdiction over this case. .......................... 3

     C.      The Committee does not have a cause of action. ................................................ 5

     D.      The Court should exercise discretion to abstain from hearing this case. ............... 9

II.     The Committee cannot overcome the President's assertion of executive privilege. .......... 9

     A.      The law enforcement component of executive privilege covers the audio
           recordings. ...................................................................................................... 9

     B.      There was no waiver of privilege. ..................................................................... 16

     C.      The privilege assertion has not been overcome. ................................................. 19

CONCLUSION ............................................................................................................ 25

# TABLE OF AUTHORITIES

## CASES

*Ali v. Rumsfeld*,
   649 F.3d 762 (D.C Cir. 2011) ........................................................................... 8

*Anderson v. Dunn*,
   19 U.S. (6 Wheat.) 204 (1821) ......................................................................... 6

*Armstrong v. Exceptional Child Ctr., Inc.*,
   575 U.S. 320 (2015) .......................................................................................... 8

*Aspin v. Dep't of Def.*,
   491 F.2d 24 (D.C. Cir. 1973) ......................................................................... 13

*Black v. Sheraton*,
   564 F.2d 531 (D.C. Cir. 1977) ....................................................................... 14

*Buckley v. Valeo*,
   424 U.S. 1 (1976) .............................................................................................. 7

*C & E Servs., Inc. of Wash. v. D.C. Water & Sewer Auth.*,
   310 F.3d 197 (D.C. Cir. 2002) ......................................................................... 8

*Campbell v. Clinton*,
   203 F.3d 19 (D.C. Cir. 2000) ......................................................................... 15

*Cheney v. U.S. Dist. Ct. for D.C.*,
   542 U.S. 367 (2004) ................................................................................... 14, 19

*Comm. on Judiciary v. McGahn*,
   968 F.3d 755 (D.C. Cir. 2020) (en banc) ...................................................... 1, 2

*Comm. on Judiciary v. McGahn* ("*McGahn III*"),
   973 F.3d 121 (D.C. Cir. 2020) ......................................................................... 9

*Comm. on Oversight & Gov't Reform v. Holder*,
   979 F. Supp. 2d 1 (D.D.C. 2013) ..................................................................... 3

*Cummings v. Murphy*,
   321 F. Supp. 3d 92 (D.D.C. 2018) ................................................................... 3

*FDA v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000) .......................................................................................... 4

*FDA v. All. for Hippocratic Med.*,
   602 U.S. 367 (2024) ........................................................................ 15

*Fund for Animals, Inc. v. Kempthorne*,
   472 F.3d 872 (D.C. Cir. 2006) ........................................................ 3

*Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*,
   527 U.S. 308 (1999) ........................................................................ 7

*In re Application of Comm. on Judiciary*,
   414 F. Supp. 3d 129 (D.D.C. 2019) ................................................ 23

*In re Application of the U.S. Senate Permanent Subcomm. on Investigations*,
   655 F.2d 1232 (D.C. Cir. 1981) ...................................................... 4

*In re Sealed Case* ("*Espy*"),
   121 F.3d 729 (D.C. Cir. 1997) ................................................. *passim*

*In re Sealed Case*,
   856 F. 2d 268 (D.C. Cir. 1988) ...................................................... 17

*Jesner v. Arab Bank, PLC*,
   584 U.S. 241 (2018) ................................................................ 6, 7, 8

*John Doe v. U.S. Parole Comm'n*,
   602 F. App'x 530 (D.C. Cir. 2015) ................................................ 8

*Jud. Watch, Inc. v. DOJ*,
   365 F.3d 1108 (D.C. Cir. 2004) ..................................................... 20

*Jud. Watch, Inc. v. NARA*,
   876 F.3d 346 (D.C. Cir. 2017) ....................................................... 24

*Landry v. FDIC*,
   204 F.3d 1125 (D.C. Cir. 2000) ..................................................... 12

*Nixon v. GSA*,
   433 U.S. 425 (1977) ...................................................... 11, 13, 15, 22

*NY Times Co. v. NASA*,
   920 F.2d 1002 (D.C. Cir. 1990) (en banc) .................................. 17, 18

*Reed v. Cnty. Comm'rs of Del. Cnty.*,
   277 U.S. 376 (1928) ........................................................................ 5

*Senate Select Comm. on Presidential Campaign Activities v. Nixon*,
498 F.2d 725 (D.C. Cir. 1974) (en banc) .................................................................. 15, 16, 19, 20

*Trump v. Mazars USA, LLP*,
591 U.S. 848 (2020) ................................................................................................ *passim*

*Trump v. United States*,
144 S. Ct. 2312 (2024) ............................................................................................ 10

*Tuite v. Henry*,
181 F.R.D. 175 (D.D.C. 1998), *aff'd*, 203 F.3d 53 (D.C. Cir. 1999) ...................................... 13

*U.S. v. AT&T*,
551 F.2d 384 (D.C. Cir. 1976) .................................................................................. 4, 5

*U.S. v. AT&T*,
567 F.2d 121 (D.C. Cir. 1977) .................................................................................. 18

*U.S. v. Bryan*,
339 U.S. 323 (1950) .............................................................................................. 18

*U.S. v. Fausto*,
484 U.S. 439 (1988) .............................................................................................. 4

*U.S. v. Mitchell*,
377 F. Supp. 1326 (D.D.C. 1974) .............................................................................. 17

*U.S. v. Nixon*,
418 U.S. 683 (1974) .............................................................................................. 10, 11, 21, 23

*U.S. v. Rumely*,
345 U.S. 41 (1953) ............................................................................................... 23

*Ziglar v. Abbasi*,
582 U.S. 120 (2017) .............................................................................................. 6, 7

## CONSTITUTION

U.S. Const. art. I ....................................................................................................... 9

U.S. Const. art. II ...................................................................................................... 10

## STATUTES

2 U.S.C. § 194 ......................................................................................................... 2

28 U.S.C. § 2201 ...................................................................................................... 8

## LEGISLATIVE HISTORY

142 Cong. Rec. 19,412 (1996) ........................................................................................ 4

S. Rep. No. 95-170 (1977) .......................................................................................... 4, 5

## OTHER AUTHORITIES

*Assertion of Executive Privilege Concerning the Dismissal and Replacement of U.S. Attorneys*,
    31 Op. O.L.C. 1, 8 (2007). ..................................................................................... 17

*Assertion of Exec. Priv. Concerning the Spec. Counsel's Interviews of the V.P.*
    *and Senior W.H. Staff*,
    32 Op. O.L.C. 7 (2008) .................................................................................... 13, 25

ASSOCIATED PRESS, "GOP Advances Garland Contempt Charges After White House Exerts
    Executive Privilege Over Audio," (May 17, 2024),
    https://perma.cc/72TQ-FF9L ................................................................................ 24

L. Fisher, *Cong. Rsch. Serv.,*
    *Congressional Investigations: Subpoenas and Contempt Power* (2003) ............................... 16

Majority Staff Rep., *Rep. of the Impeachment Inquiry of Joseph R. Biden Jr., President of the*
    *United States* (Aug. 19, 2024) .................................................................................. 23

NewsNight With Abby Phillip, (March 12, 2024), *transcript available at*:
    https://perma.cc/HSH4-UCM4 ............................................................................... 25

*Position of the Exec. Dep't Regarding Investigative Reps.*,
    40 U.S. Op. Atty. Gen. 45 (1941) ............................................................................ 13

Rep. James Comer (@RepJamesComer), X,
    https://perma.cc/ZR6E-GEJ .................................................................................. 24

*Response to Cong. Requests for Info. Regarding Decisions Made Under the Indep. Couns. Act*,
    10 Op. O.L.C. 68 (1986) ................................................................................... 5, 13

**INTRODUCTION**

The Committee has not demonstrated that this Court can adjudicate this case or that it should exercise its discretion to do so.  To the contrary, the Committee's brief provides no persuasive response to the arguments that the Committee lacks standing, statutory jurisdiction, or a cause of action. Moreover, the Committee signals that it may believe the accommodation process has not run its course. Under the circumstances, the Court should exercise its discretion not to hear this case.

On the merits, the Committee's brief fails to acknowledge the extraordinary level of disclosure the Executive Branch has already made, the lack of significant Congressional need for further information, and the strong law enforcement interest in protecting the integrity of future investigations. The President and Department of Justice have exercised reasoned judgment in determining that release of the audio recordings would cause significant harm to law enforcement interests.  The Committee's vanishingly small informational needs come nowhere close to overcoming the assertion of privilege. For these reasons, the Court should rule in favor of the Department.

**ARGUMENT**

**I.      There is neither jurisdiction nor a cause of action for the Committee's claim.**

**A. The Committee lacks standing.**

The D.C. Circuit's decision in *Committee on Judiciary v. McGahn*, 968 F.3d 755 (D.C. Cir. 2020) (en banc), does not require the Court to find standing here.  Def.'s Mem. 10-14, ECF No. 19. This case differs from *McGahn* for two reasons.  First, the dispute in *McGahn* addressed an assertion of immunity from compelled testimony, and its adjudication would have left the Executive Branch the opportunity to assert executive privilege as needed to protect privileged information.  Def.'s Mem. 12. That is not the case here.  The Committee objects (Pl.'s Opp. 5, ECF No. 21) that this analysis conflates the merits with standing, but the D.C. Circuit's consideration of this issue in *McGahn* makes clear that whether adjudication would require the Court to "take[] sides in an interbranch dispute," 968 F.3d at

772, is part of the standing inquiry.  The Committee further asserts that adjudication of the merits here would *not* involve taking sides in an interbranch dispute, citing the D.C. Circuit's comment that "[a] court is not normally understood to be taking sides when it enforces a subpoena in civil litigation."  Pl.'s Opp. 6 (quoting *McGahn*, 968 F.3d at 773).  But the D.C. Circuit so remarked while highlighting that executive privilege would remain available as "a powerful protection of the President's interest in Executive Branch confidentiality."  *McGahn*, 968 F.3d at 773.  That would not be true here.

Second, in *McGahn*, the committee's suit was specifically authorized by the full House.  Not so here.  The Committee contends here that authorization is furnished by House Resolutions 917 (for its asserted impeachment purpose) and 1292 (for its asserted legislative purpose), and a vote by the BLAG. *See* Pl.'s Opp. at 6–10.  None suffices.  As to the cited House Resolutions, neither actually authorizes the instant suit.  The former mentions two previously issued subpoenas on an unrelated topic, but not the one at issue here, and does not include the issues under investigation by Special Counsel Hur.  The latter authorizes the Speaker of the House to "take all appropriate action" to enforce the subpoena, which would obviously include referring the contempt vote to the Department pursuant to a statute that expressly provides for the Speaker to take such action, 2 U.S.C. § 194, but does not mention civil litigation.  Since the Speaker, individually, is not empowered to initiate litigation, a resolution that *the Speaker* should take appropriate action cannot authorize the instant suit.

Nor can the Committee here rely on BLAG authorization.  Delegating its authority to a majority of just five Members implies that the House could delegate all its institutional authority—including its authority to legislate—to any component of Congress, thereby shielding its members from political accountability.  This position has no basis in law or historical practice.  The Committee contends (Pl.'s Opp. 7) that "[t]he House's choice, under its [Article I] rulemaking authority, to rely on BLAG in this way is no different from the House's choice to create a particular committee structure or to assign certain

tasks to a given standing or select committee," but that is wrong.  The Committee's example of committee assignments authorized by Article I is not relevant to the Article III requirement that the House actually authorize a lawsuit against the Executive Branch purporting to assert the House's interests.  *See* Def.'s Mem. 13–14.  That the House has discretion to organize itself internally does not mean that it may ignore the requirement of authorizing litigation against the Executive before filing it.

The Committee does not dispute that, in the past cases where the House has sought to enforce subpoenas against the Executive Branch, it specifically voted to authorize each lawsuit.  And *this* House plainly knows how to do so, as the full House voted on the very resolutions cited by the Committee.  The authorization requirement ensures that "only fully considered inter-branch conflicts enter the judicial realm."  *Cummings v. Murphy*, 321 F. Supp. 3d 92, 115 (D.D.C. 2018).  This case—unlike *McGahn*, and, notably, *Comm. on Oversight & Gov't Reform v. Holder*, 979 F. Supp. 2d 1 (D.D.C. 2013)—was not "fully considered" by the House.  It therefore should not be before this Court.

### B.  There is no statutory subject-matter jurisdiction over this case.

The Committee contends that Section 1365 cannot displace the general grant of jurisdiction contained in Section 1331 because the former is a "now-redundant statute[]" that "no one thought to repeal."  Pl.'s Opp. 13 (citations omitted).  According to the Committee, Section 1365 was necessary only at the time it passed because Section 1331 then contained "an amount-in-controversy requirement that prevented many subpoena enforcement suits from proceeding."  *Id.*  But this theory cannot be squared with Congress's decision to amend Section 1365 in 1996—nearly two decades after Congress removed Section 1331's amount-in-controversy requirement—to make clear that an Executive official's refusal to comply based on a personal privilege does not defeat jurisdiction.  Def.'s Mem. 19-20.  And the Committee does not (and cannot) dispute the principle that Courts must "presume that Congress has used its scarce legislative time to enact statutes that have some legal consequence."  *Fund for Animals,*

*Inc. v. Kempthorne*, 472 F.3d 872, 877 (D.C. Cir. 2006) (Kavanaugh, J., for the Court).

The Committee is also wrong to argue (Pl.'s Opp. 13) that, prior to Section 1365's enactment, Section 1331 clearly applied to suits by congressional committees to enforce legislative subpoenas. The D.C. Circuit has said otherwise. *See In re Application of the U.S. Senate Permanent Subcomm. on Investigations*, 655 F.2d 1232, 1238 (D.C. Cir. 1981). So, too, did Congress at the time it passed Section 1365, *see* S. Rep. No. 95-170, at 16 (1977), and in subsequent Congresses, *see* Def.'s Mem. 17 (citing 142 Cong. Rec. 19,412 (1996)). Thus, this case does not involve an "implied repeal" of Section 1331, but rather is a "classic" circumstance in which the proper reading of a prior statute is informed "by the implications of a later statute," "particularly . . . where the scope of the earlier statute is broad but the subsequent statute[] more specifically address[es] the topic at hand." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143 (2000) (quoting *U.S. v. Fausto*, 484 U.S. 439, 453 (1988)).

The Committee maintains (Pl.'s Opp. 12) that Section 1365 "is not a specific provision that would control over § 1331 for House lawsuits" because "§ 1365 does not apply to House subpoena enforcement actions." But Section 1365's exclusion of House subpoena enforcement actions was a deliberate choice, as earlier versions of the bill that became Section 1365 did confer such jurisdiction. Def.'s Mem. 16. This creates a presumption that Congress did not intend to confer jurisdiction for suits brought by the House. *Id.* And that presumption is not overcome by the Committee's assertion (Pl.'s Opp. 14 n.6) that "[n]on-review of the Senate's proposal does not equate to a lack of support." If Congress had supported conferring jurisdiction for House suits, it would have passed the version of the legislation that did so, or at least said that Section 1365 did not apply to actions brought by the House.

The Committee argues (Pl.'s Opp. 11) that the D.C. Circuit has already held that Section 1331 supplied jurisdiction over the action in *U.S. v. AT&T*, 551 F.2d 384, 389 (D.C. Cir. 1976). But *AT&T* was not a suit by Congress; it was a case brought by the United States against a telephone company. *Id.*

4

at 385.  That distinction is critical:  Section 1365 displaces Section 1331 for suits brought by congressional plaintiffs, not suits by other parties.  Moreover, *AT&T* did not have occasion to address the clear implication of Section 1365, as that statute passed two years after *AT&T* issued.

The Committee insists (Pl.'s Opp. 13) that Section 1365 was merely intended to provide "an additional tool for the Senate to pursue subpoena enforcement against private parties."  That makes no sense given Section 1365's carve-out for suits against the Executive Branch—a carve-out that would be pointless if courts already had jurisdiction to review all congressional-subpoena cases, including those against the Executive Branch.  Indeed, the legislative history demonstrates that Congress accommodated the Executive Branch's objections to permitting Congress to sue the Executive Branch, underscoring that Congress did not believe that Section 1331 already authorized such suits.  Def.'s Mem. 15-17.[1]

Finally, the Committee points to a passage in the Senate Report that states that the enactment of Section 1365 is "not intended to be a Congressional finding that the Federal courts do not now have the authority to hear a civil action to enforce a subpena against an officer or employee of the Federal Government."  Pl.'s Opp. 13-14 (quoting S. Rep. No. 95-170 at 91-92).  But the very next sentence of that report states that, "if the Federal courts do not now have this authority, this statute does not confer it."  S. Rep. No. 95-170, at 92.  And in all events, the import of the statutory text is clear:  if district courts already had jurisdiction over a Senate suit against federal officers under Section 1331, there would be no reason to expressly carve out such jurisdiction from Section 1365.

**C. The Committee does not have a cause of action.**

**1**.  The Committee lacks an implied cause of action under Article I—the only claim asserted in the complaint.  Compl. ¶¶ 122-29; *see Reed v. Cnty. Comm'rs of Del. Cty.*, 277 U.S. 376 (1928).  The

---

[1] The Committee errs in relying (Pl.'s Opp. 11-12) on *Response to Cong. Requests for Info. Regarding Decisions Made Under the Indep. Couns. Act*, 10 Op. O.L.C. 68, 88 (1986); that opinion predicts "courts may be willing to entertain a civil suit brought by the House," *id.*, but does not endorse those arguments.

Committee argues (Pl.'s Opp. 18) that *Reed* was only about whether the committee satisfied a prerequisite of the jurisdictional statute invoked in that case. But Article I was just as available there as it is here, and the Court's enforcement of the statutory requirement—that the plaintiff be "authorized by law" to bring suit—makes clear that the Constitution does not itself authorize the committee to enforce subpoenas in court. And *Reed* held that the committee could not bring suit even though it was authorized "to do such other acts as may be necessary in the matter of [its] investigation." *Id.* at 386-87.

The Committee further errs in comparing (Pl.'s Opp. 17) the cause of action it urges the Court to infer here to the inherent contempt authority addressed in *Anderson v. Dunn*, 19 U.S. (6 Wheat.) 204 (1821). *Anderson* and later cases make clear that the extraordinary authority of inherent contempt must be circumscribed as "auxiliary and subordinate" to Congress's legislative functions, limited to cases "of necessity," and informed by "the history of the practice of our legislative bodies." *Id.* at 225-26, 228, 231. But neither "necessity" nor "history" supports implying a right of action here because—of all parties—only Congress can create a cause of action through the legislative process.

Indeed, the Supreme Court has rejected the notion that "it [is] a proper judicial function to 'provide such remedies as are necessary to make effective'" a substantive right and instead "adopted a far more cautious course before finding implied causes of action." *Ziglar v. Abbasi*, 582 U.S. 120, 132 (2017); *see also Jesner v. Arab Bank, PLC*, 584 U.S. 241, 264 (2018) ("recent precedents" teach that "a decision to create a private right of action is one better left to legislative judgment in the great majority of cases."). *Ziglar*, which the Committee overlooks, instructs that when "'a host of considerations . . . must be weighed and appraised'" before determining whether "the public interest would be served" by a judicial remedy, those considerations "should be committed to 'those who write the laws' rather than 'those who interpret them.'" 582 U.S. at 135-36. That principle is not limited to damages: whenever "litigation implicates serious separation-of-powers" concerns, such litigation must be "subject to

vigilant doorkeeping." *Jesner*, 584 U.S. at 256.  The key "question is 'who should decide'" whether to grant a cause of action—here, as elsewhere, the answer is Congress.  *Ziglar*, 582 U.S. at 135.  And judicial creation of a cause of action would be especially inappropriate here given Congress's affirmative exclusion of the House and the enforcement of subpoenas against the Executive when it enacted a statutory basis for suit by the Senate.

**2**.  Contrary to the Committee's contention (Pl.'s Opp. 18-20), an equitable cause of action is not properly inferred because the Committee's claim does not arise in a context where the "relief . . . requested . . . was traditionally accorded by courts of equity."  *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999); *accord id.* at 332 (equitable powers of the federal courts do "not include the power to create remedies previously unknown to equity jurisprudence").  There is no historical tradition of the courts adjudicating suits by the House to enforce subpoenas.

The Committee nevertheless contends (Pl.'s Opp. 19) that courts "have traditionally accorded equitable relief . . . to prevent the Executive from breaking the law."  But asserting executive privilege as authorized by the Constitution is not breaking the law.   Moreover, there is no tradition of *interbranch* suits seeking to vindicate *institutional* interests of different federal-government components.   This novelty stands in stark contrast to suits like *AT&T* that are brought by the Executive Branch asserting the sovereign interests of the United States, which have a well-established pedigree.  *See, e.g.*, *Buckley v. Valeo*, 424 U.S. 1, 138-41 (1976) (primary responsibility for vindicating public rights through litigation is vested in the Executive Branch).  Because the Committee's suit "was unknown to traditional equity practice," allowing it to proceed is "incompatible with [the Supreme Court's] traditionally cautious approach to equitable powers."  *Grupo Mexicano*, 527 U.S. at 327, 329.   Equating the unique claims the Committee asserts here with run-of-the-mill actions for injunctive relief disregards the separation-of-powers principles underlying the cause-of-action requirement and abdicates the "vigilant

doorkeeping" they demand.  *Jesner*, 584 U.S. at 256.

The Committee asserts (Pl.'s Opp. 19) that "[w]hat matters is the relief sought, not the identity of the plaintiff."  But the Committee has no answer to Defendant's explanation (Def.'s Mem. 26) that "[t]he power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations," such that a plaintiff cannot "invoke[e] [a court's] equitable powers [to] circumvent Congress's exclusion" of particular remedies.  *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327-28 (2015).  Congress has provided a cause of action to permit the Senate to enforce its subpoenas under certain circumstances, *see* pp. 3-5, *supra*; it would render this statutory scheme superfluous if *any* congressional committee could simply invoke this Court's equity powers.

**3**.  The Committee is also wrong to assert (Pl.'s Opp. 16-17) that the Declaratory Judgment Act, 28 U.S.C. § 2201, supplies a cause of action.  The Committee's argument boils down to the contention that it may invoke the Declaratory Judgment Act because it has "rights . . . established elsewhere."  But putting to one side whether the House has a legally cognizable "right" as against the Executive that is capable of enforcement in court, the question is whether the Committee has a cause of action to seek a judicial remedy, because a party seeking a declaratory judgment must show that the suit could be litigated in federal court even absent the Declaratory Judgment Act.  *See Ali v. Rumsfeld*, 649 F.3d 762, 778 (D.C Cir. 2011) (the right must already be "judicially remediable"); *C & E Servs., Inc. of Wash. v. D.C. Water & Sewer Auth.*, 310 F.3d 197, 201 (D.C. Cir. 2002).  Whether the Committee has a cause of action allowing it to "'enforce in court the . . . rights and obligations' identified in [its] complaint" is "'analytically distinct and prior to the question of what relief, if any, [it] may be entitled to receive." *John Doe v. U.S. Parole Comm'n*, 602 F. App'x 530, 532 (D.C. Cir. 2015) (citations omitted).  Here, the Committee is not seeking to use the Declaratory Judgment Act to preempt a potential coercive action from the Executive Branch, or as a lesser form of relief, but instead as a universal cause of action that

could be invoked by any party that asserts a substantive right but otherwise lacks a cause of action.  *See Comm. on Judiciary v. McGahn* ("*McGahn III*"), 973 F.3d 121, 124-25 (D.C. Cir. 2020).[2]

### D. The Court should exercise discretion to abstain from hearing this case.

The Committee asserts that staying the Court's hand in this case "would be tantamount to declaring DOJ the victor."  Pl.'s Opp. at 21.  To the contrary, if the Court were to dismiss this case, the parties would return to the constitutionally mandated "give-and-take of the political process," *Trump v. Mazars USA, LLP*, 591 U.S. 848, 858-59 (2020) (citation omitted).  In that context, both branches have incentives to compromise and political tools at their disposal.  *See, e.g.*, U.S. Const. art. I, § 9.  Already, that process has resulted in the Committee's receipt of nearly all of the information it sought.  Def.'s Mem. 29-30.  Moreover, the Committee itself highlights that the accommodation process may not have run its course.  Pl.'s Opp. 44; p. 25, *infra*.  Particularly in light of the Committee's recent expression of potential interest in accommodation, judicial restraint is warranted.

### II.    The Committee cannot overcome the President's assertion of executive privilege.

### A.  The law enforcement component of executive privilege covers the audio recordings.

The recordings at issue are protected by the law enforcement component of executive privilege, which is constitutionally based and was properly asserted here.  Beginning with President Washington and continuing in almost every Presidency since, Presidents have exercised discretion to withhold confidential information from Congress—including law enforcement information—when disclosure would, in the President's judgment, harm the public interest.  Def.'s Mem. 43-46.  For centuries, Congress respected the exercise of this privilege, with disputes being "hashed out" in "the give-and-

---

[2] The Committee cites (Pl.'s Opp. 15) district court decisions that are not binding and may have come out differently today.  In *Holder*, for example, this Court did not address *Ali*, and the earlier district court decisions it cited lacked the benefit of more recent precedents such as *Ziglar*, which clarified the "far more cautious course" courts now follow "before finding implied causes of action."  Pp. 5-7, *supra*.

take of the political process,'" not in court.  *Mazars*, 591 U.S. 859.  Thus, far from the Executive Branch taking an "ever-expanding view of executive privilege" (Pl.'s Opp. 26), it is the Committee that is advancing the novel and implausible theory that this longstanding practice between the branches is not based in the separation of powers at all, and that Presidents cannot shield confidential law enforcement files from Congress despite the long history of them doing so.  The Committee's novel and cramped view of executive privilege has no basis in the Constitution, judicial precedent, or historical practice.

    **1**.  The Committee fails to refute the Department's showing that the law enforcement component of executive privilege is constitutionally based.  The Committee's concession (Pl.'s Opp. 23) that executive privilege is constitutionally based when asserted to protect military and diplomatic secrets means the privilege is also constitutionally based when asserted to protect confidential law enforcement information.  Each of those areas implicates core constitutional functions assigned to the Executive Branch.  The Constitution allocates authority to the President as "Commander in Chief of the Army and Navy," U.S. Const. art. II, § 2, and it also allocates law enforcement authority to the President, *id*. § 3 (the President "shall take Care that the Laws be faithfully executed"); *see U.S. v. Nixon*, 418 U.S. 683, 693 (1974) ("[T]he Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case."); *Trump v. U.S.*, 144 S. Ct. 2312, 2334 (2024) ("[I]nvestigation and prosecution of crimes is a quintessentially executive function.").  The Committee offers no logical explanation—and there is none—as to why the President would have a constitutionally grounded ability to protect information with respect to some of his core constitutional powers but not others.

    Nor does judicial precedent support the Committee's attempt to constrain the justifications available for asserting a constitutionally based executive privilege.  When assessing executive privilege, the Supreme Court has explained that "it must be presumed that the incumbent President is vitally concerned with and in the best position to assess the present and future needs of the Executive Branch,

and to support invocation of the privilege accordingly," *Nixon v. GSA*, 433 U.S. 425, 449 (1977), such that, once such privilege is formally asserted, the materials subject to that assertion are "presumptively privileged," *Nixon*, 418 U.S. at 713.  There is no dispute that such a formal assertion occurred here, and the requested records are thus "presumptively privileged."  Seeking to overcome that presumption, the Committee collects cases (Pl.'s Opp. 23) in which courts recognized a constitutionally based executive privilege over presidential communications.  But, as this Court and others have acknowledged, recognition of executive privilege over presidential communications does not preclude the assertion of executive privilege over other forms of confidential information.  None of the authorities the Committee cites purported to limit the availability of constitutionally based executive privilege in that manner.

The Committee portrays *GSA* and *Nixon* (Pl.'s Opp. 23) as limiting executive privilege to "military and diplomatic secrets and certain presidential communications."  But *GSA* reaffirmed the scope of the privileged recognized in *Nixon*, which includes communications not just with the President, but "between high Government officials and those who advise and assist them in the performance of their manifold duties," as well as military, diplomatic and national security information.  418 U.S. at 705, 708.  *GSA*'s statement that the privilege is "limited to" communications in performance of a President's official responsibilities was a reference to the precise communications at issue in *Nixon* and concerned a disputed assertion over presidential communications.  433 U.S. at 449.  The Court had no occasion to consider or limit privilege outside the context of that dispute.  Moreover, *GSA* elsewhere describes the privilege as broader than the Committee credits: "the privilege of confidentiality of Presidential communications derives from the supremacy of the Executive Branch within its assigned area of constitutional responsibilities."  433 U.S. at 447.  And there is no dispute that law enforcement is one of the Executive Branch's assigned areas of constitutional responsibilities.  P. 10, *supra*.  It follows that assertions of privilege pursuant to the Executive's law enforcement functions are

constitutionally based.  In any event, *Mazars* forecloses the Committee's crabbed view of the privilege, explaining that the "privilege safeguards the public interest in candid, confidential deliberations *within the Executive Branch*," thereby making clear that the privilege is not limited only to presidential communications.  *Id*. at 864 (emphasis added); *see also In re Sealed Case* ("*Espy*"), 121 F.3d 729, 735 n.2 (D.C. Cir. 1997) ("'[E]xecutive privilege' is generally used to refer to a wide variety of evidentiary and substantive privileges that courts accord the executive branch.").

The Committee cites (Pl.'s Opp. 23-24) *Espy* as distinguishing between the presidential communications component of executive privilege, which the Committee concedes is constitutionally based, and "other forms of privilege," such as the deliberative process and law enforcement components of executive privilege, which the Committee contends are derived from common law.  But *Espy* did not concern the law enforcement component of executive privilege at all; the court instead sought to distinguish between executive privilege claims involving presidential communications and those involving deliberative processes.  In any event, *Espy* merely recognized that the deliberative process component of executive privilege has roots in the common law——it did not purport to hold that the privilege has no constitutional basis.  *See Espy*, 121 F.3d at 745 ("the deliberative process privilege is *primarily* a common law privilege") (emphasis added).  Indeed, the D.C. Circuit confirmed elsewhere in that opinion that "aspects of the [deliberative process] privilege . . . have roots in the constitutional separation of powers."  *Id.* at 737 n.4.  The same is true of executive privilege over law enforcement materials.  Def.'s Mem. 31-35.  The presidential communications privilege is but "one form of the executive privilege," *Espy*, 121 F.3d at 738, not the entirety of the constitutionally based privilege.

The Committee's reliance (Pl.'s Opp. 24) on *Landry v. FDIC*, 204 F.3d 1125, 1135 (D.C. Cir. 2000), is similarly misplaced.  That case involved common law governmental privileges asserted by an agency head in litigation.  But when the President asserts executive privilege against another branch to

protect the proper functioning of the Executive Branch, that assertion is based in the separation of powers. *Cf. GSA*, 433 U.S. at 449; *Espy*, 121 F.3d at 739-40 ("the existence of the presidential privilege was definitively established as a necessary derivation from the President's constitutional status in a separation of powers regime"). That President Biden formally asserted executive privilege over the materials sought by Congress here also distinguishes this case from the Committee's authorities.

Historical practice further supports the assertion here. Presidents have refused to provide Congress with law enforcement investigatory materials where significant confidentiality interests were at stake for centuries and have long maintained that executive privilege may be asserted over materials in closed investigatory files. Def.'s Mem. 31-35. The basis for the Executive's refusal to provide law enforcement materials here—that disclosure of the audio recordings would compromise the effectiveness of future investigations, *id.* at 35-37—echoes throughout that history.[3]

Courts have explained the need to prevent harm to future investigations when addressing law enforcement privilege as a common law matter, including with respect to closed files. *See, e.g.*, *Aspin v. Dep't of Def.*, 491 F.2d 24, 30 (D.C. Cir. 1973) ("[I]f investigatory files were made public subsequent to the termination of enforcement proceedings, the ability of any investigatory body to conduct future investigations would be seriously impaired."); *Tuite v. Henry*, 181 F.R.D. 175, 181 (D.D.C. 1998) ("[T]he interest in nondisclosure remains strong despite the conclusion of the investigation[.]"), *aff'd*, 203 F.3d 53 (D.C. Cir. 1999). Where, as here, the President has asserted executive privilege over such materials in furtherance of his constitutional duties, those principles apply with even greater force. *See*

---

[3] *See, e.g.*, *Position of the Exec. Dep't Regarding Investigative Reps.*, 40 U.S. Op. Atty. Gen. 45, 46-47 (1941) ("[D]isclosure of the reports would be of serious prejudice to the future usefulness of the Federal Bureau of Investigation."); *Response to Cong. Requests for Info. Regarding Decisions Made Under the Indep. Couns. Act*, 10 Op. O.L.C. 68, 77-78 (1986) (weighing the "chilling effect" of disclosure on future investigations); *Assertion of Exec. Priv. Concerning the Spec. Counsel's Interviews of the V.P. and Senior W.H. Staff*, 32 Op. O.L.C. 7, 10-11 (2008) (privilege asserted where release would "impact . . . White House cooperation with future . . . criminal investigations").

*Black v. Sheraton*, 564 F.2d 531, 542 (D.C. Cir. 1977) ("drawing broadly on various executive privilege decisions" to assess the law enforcement privilege at common law).[4]

The Committee also incorrectly states (Pl.'s Opp. 27) that executive privilege over law enforcement materials will eliminate the "Executive's incentive to respond to congressional requests for information." Presidents have long withheld materials from Congress when disclosure would be against the public interest, *see Mazars*, 591 U.S. at 850, and have long understood law enforcement materials to fall within the scope of executive privilege, *see* Def.'s Mem 31-35. This well-established understanding of executive privilege has not led to the distortionary effects the Committee fears, as presidential assertions of executive privilege against Congress have been exceedingly rare. Keeping with that tradition, President Biden has asserted executive privilege only once despite significant oversight from Congress. *See Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 390 (2004) (privilege should be a last resort, asserted only after all other avenues have failed). If it is the Committee's view that it is entitled to any and all confidential law enforcement files—and that even one assertion of executive privilege is too many—that would upend centuries of legal tradition between the branches. And it would allow "Congress [to] walk away from the bargaining table and compel compliance in court," *Mazars*, 591 U.S. at 867, rather than rely on the Framers' tools and stay in an accommodation process that puts the assertions of the branches to a test of true need and that facilitates political accountability. The history of the accommodation process in this action illustrates the point. The formal assertion here became necessary only after the Department provided Special Counsel Hur's Report,

---

[4] The Committee thus errs in characterizing (Pl.'s Opp. 22) the privilege assertion here as dependent on "self-serving statements" prepared by the Department's Office of Legal Counsel (OLC) rather than on "judicial precedent." The relative shortage of "judicial precedent" on the law enforcement component of executive privilege simply reflects the historical tradition of Congress respecting the law enforcement functions of the Executive Branch and the longstanding practice of the political branches of reaching accommodations when they disagree over production of information in response to legislative subpoenas. *See* Def.'s Mem. 31-35.

testimony from Special Counsel Hur, the interview transcripts, and other records requested by the Committee.  *See* Def.'s Mem. 5-8.

Moreover, the preclusion of judicial review of an assertion of a constitutionally based executive privilege if an accommodation is not needed does not end the matter.  "[T]here are obvious political checks against an incumbent's abuse of [executive] privilege." *GSA*, 433 U.S. at 448.  And Congress possesses other constitutional powers, such as the power to appropriate, that can be brought to bear in the "'hurly-burly, the give-and-take of the political process,'" *Mazars*, 591 U.S. at 859.  That those checks can be employed by the political branches is a feature, not a bug, of the constitutional system. *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024) (citing *Campbell v. Clinton*, 203 F.3d 19, 23 (D.C. Cir. 2000)).

2.  The Committee maintains (Pl.'s Opp. 32) that a common law privilege cannot "be asserted in response to a Congressional subpoena."  But the President's formal assertion of executive privilege here is grounded in the Constitution.  Pp. 10-14, *supra*.  In any event, the Committee is wrong on its own terms.  The Committee has no response to this Court's previous conclusion that the deliberative process privilege can be asserted against Congress.  Def.'s Mem. 41-42.  And *Mazars* explained, 591 U.S. at 863, that recipients of legislative subpoenas "retain" both common law privileges *and* executive privileges.  The Committee argues (Pl.'s Opp. 32) that *Mazars* merely referenced the ability to assert a privilege outside the legislative domain.  But *Mazars* addressed responses to *congressional* subpoenas. Indeed, the Committee ignores the Court's reliance in *Mazars* on *Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 730-31 (D.C. Cir. 1974) (en banc), a case in which the Executive Branch asserted a privilege against Congress.  The Committee notes (Pl.'s Opp. 32) *Mazars*'s citation to a CRS Report, but the pages cited in that report further confirm that common law privileges can be asserted against Congress by summarizing an agreement under which release of documents to a

15

*Senate* committee did not result in waiver of attorney-client privilege against a *House* committee.[5]

Bereft of supporting authority, the Committee argues (Pl.'s Opp. 33) that "judicial recognition of common law privileges" would "distort the balance of power" between the political branches and "downgrade Congress's ability to obtain Executive Branch information to that of civil litigants." But the executive privilege asserted here is a qualified one, and the D.C. Circuit has carefully tailored the showing Congress must make to overcome the privilege in a manner that maintains the balance of power. *See Senate Select*, 498 F.2d at 730-31. A FOIA requester cannot overcome the qualified privilege on that basis. Moreover, unlike with civil litigants and FOIA requesters, there is a constitutionally based accommodation process to address Congress's legitimate needs for information and the Executive's needs for confidentiality, and the Department participated in that process here.

### B. There was no waiver of privilege.

The Committee contests (Pl.'s Opp. 28) the standard for waiver of executive privilege, faulting the Department for its citation to a statement by Circuit Judge Rao. But the standard for waiver of executive privilege in the D.C. Circuit is derived from the D.C. Circuit's decision in *Espy*, which teaches that, as the privilege has "constitutional origins," a waiver "should not be lightly inferred." 121 F.3d at 741, 743. The Committee attempts (Pl.'s Opp. 29-30) to distinguish *Espy* because that case involved an intra-branch dispute, but the same principles that counseled against casual inferences of waiver in that case carry even greater weight here. The narrow conception of waiver that the D.C. Circuit prescribed in *Espy* serves to "ensure that agencies do not forego voluntarily disclosing some privileged material out of fear that by doing so they are exposing other, more sensitive documents," 121 F.3d at 741, which is all the more critical in the congressional-executive context. Def.'s Mem 43-44.

---

[5] *See* L. Fisher, *Cong. Rsch. Serv., Congressional Investigations: Subpoenas and Contempt Power* 18 (2003) (noting that, "[a]s part of the agreement" between the White House and a Senate committee, House Committee "Chairman Jim Leach announced that the House would not try to later assert that President Clinton had waived his attorney-client privilege.").

Indeed, "[i]f the Department's provision of documents and information to Congress, as part of the accommodation process, eliminated the President's ability to assert privilege over White House documents and information concerning those same communications, then the Executive Branch would be hampered, if not prevented, from engaging in future accommodations." *Assertion of Executive Privilege Concerning the Dismissal and Replacement of U.S. Attorneys*, 31 Op. O.L.C. 1, 8 (2007).  The Committee's waiver theory could discourage accommodation and incentivize earlier and broader assertions of privilege, which is not in the long-term interests of either Branch or the public.  Regardless, the Committee's two theories of waiver fail under all available standards:

**1**.   The Committee's theory that the President waived executive privilege over the audio recordings by releasing the transcript cannot be reconciled with the premise of the Committee's lawsuit that the audio recordings contain unique information.  Def.'s Mem. 43.  The Committee cites *U.S. v. Mitchell*, 377 F. Supp. 1326, 1330 (D.D.C. 1974), in which the court held that release of transcripts waived privilege over audio recordings in the context of a criminal trial.  But the Committee acknowledges (Pl.'s Opp. 29) that *Mitchell* involved a different privilege—the presidential communications privilege—intended to protect different Executive Branch interests than those at issue here.  There, the unique voice information did not implicate Executive Branch interests, which covered only the substance of the communication.  Not so here, as release of the audio recordings would discourage cooperation from future witnesses in high profile White House investigations.[6]

The Committee also ignores *NY Times Co. v. NASA*, 920 F.2d 1002 (D.C. Cir. 1990) (en banc), which held that "[t]he lexical and non-lexical aspects of a file may convey different information," such

---

[6] The Committee claims (Pl.'s Opp. 29) that the privilege asserted here should be subject to a more expansive conception of waiver than in *Mitchell* because that case involved a constitutional privilege and this case involves a common law privilege.  But even if that were true (and it is not), waiver would still not be appropriate because the D.C. Circuit has held that failing to assert a well-taken claim of the common law executive privilege does not result in "the waiver of the privilege," *In re Sealed Case*, 856 F. 2d 268, 272 n.3 (D.C. Cir. 1988).

that "[t]he information recorded through the capture of a person's voice is distinct and in addition to the information contained in the words themselves." *Id.* at 1005-06. Here, it is precisely that additional information that is subject to executive privilege. Indeed, *NY Times* refutes the Committee's position (Pl.'s Opp. 29) that release of transcripts does not waive privilege over audio recordings only when the audio recordings are necessary to identify the "individual source who created the recording." The plaintiff in *NY Times* sought a tape of communications from the Space Shuttle *Challenger*, 920 F.2d at 1003, and the names of the astronauts aboard the shuttle were public.

2.   The Committee is also incorrect that the President's assertion of executive privilege was untimely. The timing of the assertion was consistent with historical practice. Def.'s Mem. 45-46. Moreover, the D.C. Circuit has held that privilege need be asserted only *after* a motion to compel is filed. *Espy*, 121 F.3d at 741. The Committee notes (Pl.'s Opp. 30-32) that *Espy* recognized that "the White House Counsel informed the OIC that it believes some of the material was privileged" before the formal assertion of privilege, *id.* at 741, but the court gave no indication that this was relevant to its holding. In any event, the Committee here also had advance notice of the Executive Branch's position because the Department stated on the subpoena's return date that the Department has "substantial confidentiality interests regarding sensitive law enforcement . . . information" that "the Department must protect." Compl., Ex. N at 2; *see also id.* (requested "materials . . . may include information potentially subject to other privileges"). This far exceeds what the D.C. Circuit required in *Espy*. The Committee cites (Pl.'s Opp. 30-31) *U.S. v. Bryan*, 339 U.S. 323, 332 (1950), for the proposition that objections to legislative subpoenas must be lodged promptly, but *Bryan* did not involve an executive privilege subject to the "greatest protection" available, *Mazars*, 591 U.S. at 864. *U.S. v. AT&T*, 567 F.2d 121 (D.C. Cir. 1977), is even further afield, as it did not address waiver at all. Finally, the Committee argues (Pl.'s Opp. 32) that the Department's "delay" in asserting privilege "made effective

negotiation and accommodation virtually impossible."  The opposite is true: the record shows extensive engagement and accommodation over the course of this dispute.  And assertions of executive privilege should be a last resort. "Once executive privilege is asserted, coequal branches of the Government are set on a collision course," which "should be avoided whenever possible."  *Cheney*, 542 U.S. at 389.

### C. The privilege assertion has not been overcome.

**1**. The Committee cannot overcome the President's assertion of executive privilege based on its asserted oversight or legislative need because the audio recordings are not "demonstrably critical to the responsible fulfillment of the Committee's functions," *Senate Select*, 498 F.2d at 731; Def.'s Mem. 47-52.  Seeking to evade this demanding standard, the Committee argues that it "is entitled to the audio recordings . . . so long as it shows that they 'likely contain[] important evidence' 'that . . . is not available with due diligence elsewhere.'"  Pl.'s Opp. 33 (quoting *Espy*, 121 F.3d at 745).  But the D.C. Circuit disclaimed the applicability of that standard to the congressional-executive context in *Espy* itself, "underscor[ing]" that its opinion did not "affect[] the scope of the privilege in the congressional-executive context" because "the President's ability to withhold information from Congress implicates different constitutional considerations."  121 F.3d at 753.  Accordingly, *Espy* took "no position on how the institutional needs of Congress and the President should be balanced," *id.*, which is the very purpose for which the Committee employs *Espy* here.

The Committee argues (Pl.'s Opp. 34) that the *Espy* standard is nonetheless more relevant than the *Senate Select* standard because *Senate Select* involved the presidential communications privilege. But *Senate Select* addressed why a congressional committee is limited in obtaining information in furtherance of its legislative function, which is distinct from the Executive Branch's basis for withholding that information.  And the Committee identifies no basis in *Senate Select* to conclude that the D.C. Circuit intended to limit its holding to one particular component of executive privilege. Moreover, *Mazars*, while declining to apply the *Senate Select* standard to information over which the

19

President had not asserted executive privilege, indicated that that standard applies throughout "the context of privileged information," because "information subject to executive privilege deserves 'the greatest protection consistent with the fair administration of justice.'" 591 U.S. at 864. The D.C. Circuit's holding that a congressional committee in *Senate Select* could not establish that audio recordings were "demonstrably critical" to any congressional function when Congress already had access to transcripts of the underlying conversations thus controls here. Def.'s Mem. 47-48.[7]

Regardless of what standard applies, the Committee has an insufficient need for the audio recordings. The Committee cannot satisfy even *Espy*—and certainly not the more demanding standard from *Senate Select*—because there is only a tenuous connection between the privileged audio recordings and the Committee's stated purpose of potentially legislating on the Department's use of Special Counsels. Most fundamentally, the Committee does not need "the best available evidence of the Special Counsel's interviews" (Pl.'s Opp. 35), pertaining to one particular aspect of one Special Counsel investigation, to determine whether to pursue general legislative reform of the Special Counsel process. *See Senate Select*, 498 F.2d at 732 (legislative judgments do not typically depend on "precise reconstruction of past events"). And that is particularly true because the Committee has access to transcripts that contain the substantive content of the interview. Although the Committee claims (Pl.'s Opp. 36) that it requires the recordings to "evaluate the Special Counsel's subjective view of the President's mental state," the Special Counsel testified before the Committee on this very question, and that hearing provided ample opportunity to probe the Special Counsel's "subjective view." The

---

[7] *Jud. Watch, Inc. v. DOJ*, 365 F.3d 1108 (D.C. Cir. 2004), is not to the contrary. That case did not involve a President's formal assertion of executive privilege, *id.* at 1114, and recognized only that the presidential communications component of executive privilege is a broader privilege than the common law deliberative process privilege, *id.* Accordingly, the D.C. Circuit did not have occasion to address— and did not purport to hold—that the presidential communications component of executive privilege is broader or more protective than the law enforcement component of executive privilege, which is the comparison relevant here.

20

Committee cannot redo the Special Counsel's investigation to make its own credibility determinations in support of a specific charging decision.  As the Court made clear in *Mazars*, "Congress may not use subpoenas to 'try' someone 'before [a] committee for any crime or wrongdoing,'" 591 U.S. 863.

The Committee argues (Pl.'s Opp. 36) that its subpoena is "narrowly focused" on the audio files, but its subpoena in fact sought much more information resulting in significant disclosures.  The Committee overlooks that substantial compliance, which granted it access to Special Counsel Hur's report, hours of testimony from Special Counsel Hur, and other documents it requested.  Def.'s Mem. 7-10.  And the Committee's view (Pl.'s Opp. 37) that it has established a demonstrable need merely by claiming that the evidence is necessary to assess whether a particular charging decision was "consistent with a commitment to impartial justice" contains no limiting principle.  Under the Committee's logic, Congress could assert a demonstrable need for any and every piece of evidence in any politically sensitive investigation.  If that were accepted, Congress would become the superintendent of all charging decisions in such investigations, effectively arrogating for itself the law enforcement power that is constitutionally allocated to the Executive.  *See Nixon*, 418 U.S. at 693 ("Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case.").

**2**.  The Committee's attempt to establish that the audio recordings are critical to its impeachment inquiry fares no better.  The Committee again proceeds under the wrong standard.  It is not enough that that the audio recordings will "advance the impeachment inquiry."  Pl.'s Opp. 38.  Rather, the Committee, at a minimum, must show that the requested materials "contain[] important evidence" that "is not available with due diligence elsewhere," *Espy*, 121 F.3d at 754, or must establish a "demonstrated, specific need" for the information sought, *Nixon*, 418 U.S. at 713.

Indeed, the Committee cites no judicial authority for the relaxed standard it cuts from whole cloth, and instead rests (Pl.'s Opp. 39) on its concern that a more demanding showing would enable the

President to assert privilege to "simply shield evidence of his or her wrongdoing and frustrate the House's constitutional impeachment power." But the accommodations process preceding this action demonstrates that such a concern is exaggerated: the Committee has received almost all that it requested, and the President asserted executive privilege only over two audio recordings despite extensive and wide-ranging inquiries. That is because executive privilege is asserted only after a formal process, followed here, Def.'s Mem. 29-30, intended to guard against its abuse, and "obvious political checks" further prevent abuse. *GSA*, 433 U.S. at 448. Thus, the Committee's unfounded parade of horribles cannot justify a new, insufficiently probative standard for establishing impeachment need capable of overcoming executive privilege.

Regardless, there is no need for the audio recordings because they are at best only remotely related to the impeachment inquiry's topics of investigation. The Committee attempts (Pl.'s Opp. 39) to link the recordings to the impeachment inquiry by invoking the two classified documents that President Biden retained "related to a call that he had with the Ukrainian Prime Minister." But those two records documented a call, the substance of which "no jury could reasonably find . . . was national defense information. The two exchanged pleasantries and the Prime Minister heaped praise upon Mr. Biden for his . . . speech to Ukraine's parliament. They did not engage in substantive policy discussion." Hur Report 310-11. The Committee has seen the records, too, yet continues to peddle speculation about them to justify its continued pursuit of audio files that do not discuss them. Nor does the Committee identify any questions that Special Counsel Hur asked about those documents. Instead, straining to link the interview to the Ukraine-related documents, the Committee notes that Special Counsel Hur asked about a box in which the documents were found. That happenstance is simply too tenuous a connection for the audio recordings to even advance the impeachment inquiry, much less for those recordings to constitute important evidence unavailable elsewhere. *Espy*, 121 F.3d at 754.

The Committee also fails to identify any questions directed to whether President Biden sought to enrich himself by retaining classified information.  Instead, it piles conjecture on conjecture, arguing that the recordings *may* reveal whether President Biden "seemed deceptive" when discussing "the classified materials that he ultimately relied upon when writing his memoir," which *may* lead the Committee to "decide that additional investigative steps are necessary," which *may* uncover "an abuse of office that *could* constitute an impeachable offense."  Pl.'s Opp. 40 (emphasis added).  This speculative chain of possibilities cannot establish that the recordings "likely contain[] important evidence," *Espy*, 121 F.3d at 754, or establish a "demonstrated, specific need," *Nixon*, 418 U.S. at 713.[8]

The Committee argues (Pl.'s Opp. 41-42) that it can demand the recordings regardless of their link to the topics of inquiry because the House Resolution "includes . . . but is not limited to" the topics outlined in the Impeachment Memorandum, which "reserved the Committee's right to take the investigation in . . . directions that the Committees do not currently foresee."  But a committee's right to evidence "must be found in th[e] language" authorizing the inquiry.  *U.S. v. Rumely*, 345 U.S. 41, 44 (1953).  That rule preserves the balance between the political branches:  without a requirement that an impeachment investigation be limited in scope to the topics outlined in the resolution, Congress would have every incentive to open impeachment inquiries on unspecified topics on the first day of every President's term and use those inquiries to conduct unbounded investigations.[9]

---

[8] Even if the audio recordings were relevant evidence, the Committees investigating impeachment have already issued their report, *see* Majority Staff Rep., *Rep. of the Impeachment Inquiry of Joseph R. Biden Jr., President of the United States* (Aug. 19, 2024), confirming that the Committee has no need for the audio recordings to conclude President Biden "willfully retained classified documents."  Pl.'s Opp. 40.

[9] *In re Application of Comm. on Judiciary* is inapposite.  There, the court expressed, in dicta, its view that a House resolution is not needed to conduct an impeachment inquiry.  414 F. Supp. 3d 129, 168-69 (D.D.C. 2019).  But where, as here, the House has voted to define its scope and purpose and to authorize committees to issue subpoenas in furtherance of the inquiry, the resolution acts as both an authorization and a limit.  *See* Def.'s Mem. 53-54.

**3**.  Even if the Committee could establish some degree of need for the audio recordings, that minimal need would not outweigh the significant Executive Branch interests that the assertion of privilege protects.  Release of recordings of interviews in criminal investigations exposes witnesses to unique risks that release of transcripts does not, as audio can be easily manipulated and the intrusion on privacy is more extreme.  Def.'s Mem. 37-40.  Witnesses in future high-profile investigations involving the White House will be unlikely to submit to voluntary interviews if they know that recordings of those interviews can be released to Congress or made public.  The Committee's attempts (Pl.'s Opp. 43-45) to minimize the import of this chilling effect are unavailing.

The Committee argues (Pl.'s Opp. 43) that no privacy interests are at stake because this case does not involve release of an unpublished criminal indictment.  But numerous courts have recognized that audio recordings of an individual's voice contain personal information to which a privacy interest attaches.  Def.'s Mem. 37-38.  And intrusions on an individual's privacy interests are particularly acute in the context of criminal investigations.  *Jud. Watch, Inc. v. NARA*, 876 F.3d 346, 349 (D.C. Cir. 2017).  Release of an individual's voice in the context of an interview conducted for a criminal investigation would thus effect a significant intrusion of privacy, and the Committee cites no contrary authority.

Indeed, the privacy interests at stake (and thus, the chilling effect) are heightened by the potential for manipulation of audio recordings, which the Committee does not dispute.  Def.'s Mem. 38-39.  Instead, the Committee argues (Pl.'s Opp. 43-44) that the audio recordings would not necessarily be made public upon disclosure to the Committee.  But House officials, including Speaker Johnson, Chairman Comer, and Chairman Jordan have stated that the purpose of seeking the recordings was to ensure that the "American people will . . . be able to hear why prosecutors felt the President of the United States was . . . an 'elderly man with a poor memory,' and thus shouldn't be charged."[10]  In any

---

[10]  *See* ASSOCIATED PRESS, "GOP Advances Garland Contempt Charges After White House Exerts Executive Privilege Over Audio," (May 17, 2024), *available at*: https://perma.cc/72TQ-FF9L; *see also*

event, release to Congress itself risks chilling effects.  *See* 32 Op. O.L.C. at 10-11 (expressing concern over "the prospect of committees of Congress obtaining confidential records from Justice Department criminal investigative files for the purpose of addressing highly politicized issues in public committee hearings").  The Committee also proposes (Pl.'s Opp. 44) potential accommodations to prevent release of the audio recordings.  But it is the Committee that rushed to file this action and then pressed for expedited briefing rather than explore the accommodations that it now offers.

The Committee attempts (Pl.'s Opp. 45-46) to diminish the weight of the law enforcement interest by asserting without evidence that "the risk of a chilling effect in the future" is minimal.  But Attorneys General appointed by Presidents of both political parties have concluded otherwise when advising the assertion of executive privilege over materials related to Special Counsel interviews of senior White House officials.  *See* Compl., Ex. S at 4; 32 Op. O.L.C. at 10-11.  Those conclusions about the most effective way to conduct that task are entitled to significant deference.  Def.'s Mem. 31-32.  And those conclusions remain sound:  White House officials will be far less likely to submit to voluntary interviews with the knowledge that recordings of those interviews could be released to a rival political branch.  *See* 32 Op. O.L.C. at 13 ("I am greatly concerned about the chilling effect . . . on . . . White House cooperation with future Justice Department investigations.").  Release of a transcript does not pose the same risks because audio recordings implicate unique privacy interests.  Def.'s Mem. 36-37.

## CONCLUSION

For the foregoing reasons and those stated in Defendant's cross-motion, the Court should grant Defendant's cross-motion for summary judgment and deny Plaintiff's motion for summary judgment.

---

Rep. James Comer (@RepJamesComer), X, https://perma.cc/ZR6E-GEJ6 ("The American people deserve to hear the actual audio of President Biden's answers to Special Counsel Hur."); CNN, "NewsNight With Abby Phillip," (March 12, 2024), *transcript available at*:  https://perma.cc/HSH4-UCM4 (Chairman Jordan stating "we've asked for the actual audio tapes . . . . so we can evaluate that, the United States Congress, and more importantly, the American people.").

Dated: August 29, 2024

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

BRIAN D. NETTER
Deputy Assistant Attorney General

ELIZABETH J. SHAPIRO
Deputy Director, Federal Programs Branch

*/s/ Alexander W. Resar*
JULIA A. HEIMAN (D.C. Bar No. 986228)
INDRANEEL SUR (D.C. Bar No. 978017)
Senior Counsels
ALEXANDER W. RESAR (N.Y. Bar 5636337)
Trial Attorney

United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, DC 20530
Tel: (202) 616-8188
E-mail: alexander.w.resar@usdoj.gov

*Counsel for Defendant*